# 13 CIV 4928

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VALUE RECOVERY FUND LLC, Individually and on Behalf of All Those Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> JPMORGAN CHASE & CO., CITIGROUP, INC., THE GOLDMAN SACHS GROUP, INC., HSBC HOLDINGS PLC, HSBC BANK USA, N.A., BANK OF AMERICA CORPORATION, and MARKIT GROUP, LTD., <br><br> Defendants. | Civil Action No. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS** <br><br><br> **JURY TRIAL DEMANDED** |

RECEIVED
JUL 15 2013
U.S.D.C. S.D.N.Y.
CASHIERS

Vincent R. Cappucci, Esq.
Andrew J. Entwistle, Esq.
Robert N. Cappucci, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200

Robert N. Kaplan, Esq.
Gregory K. Arenson, Esq.
Richard J. Kilsheimer, Esq.
Matthew P. McCahill, Esq.
**Kaplan Fox & Kilsheimer LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Bruce L. Simon. Esq.
George S. Trevor, Esq.
**Pearson, Simon & Warshaw, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 941040
Telephone: (415) 433-9000

*Attorneys for Value Recovery Fund LLC,
Individually and on Behalf of All Those Similarly
Situated*

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 2 |
| III. | PARTIES | 3 |
| | A. Plaintiff | 3 |
| | B. The Dealer Bank Defendants | 3 |
| | C. Defendant Markit Group, Ltd. | 5 |
| IV. | AGENTS AND CO-CONSPIRATORS | 5 |
| V. | FACTUAL BACKGROUND | 6 |
| | A. Credit Default Swaps | 6 |
| | B. Lack of Regulation in the CDS Market | 9 |
| | C. The Lack of Market Transparency | 9 |
| | D. The CDS Market | 15 |
| | E. The Dealer Banks' Market Power Over The CDS Trading Market | 16 |
| VI. | DEFENDANTS' WRONGFUL CONDUCT | 17 |
| | A. The Dealer Banks Conspired To Inflate CDS Spreads | 17 |
| | 1. Overview of Wrongdoing Alleged | 17 |
| | 2. The Dealer Banks Control Trading And Information In the CDS Market | 18 |
| | a. The Dealer Banks Control The Dissemination Of CDS Trading Information Through Defendant Markit | 18 |
| | b. The Dealer Banks Control The Dissemination Of CDS Trading Data Through DTCC | 20 |
| | c. The Dealer Banks Dominate ICE CC, The Primary CDS Clearinghouse | 22 |

d.  The Dealer Banks Control The Standardization Of CDS Contracts Through Their Domination Of The ISDA ..................................................................................26

F.  Inflated Spreads Would Not Have Existed In a Competitive Market........27

G.  Government Investigations Into Anticompetitive Conduct By The Dealer Banks.................................................................................28

VII.  CLASS ALLEGATIONS ....................................................................31

VIII.  TRADE AND COMMERCE.................................................................34

IX.  FRAUDULENT CONCEALMENT.........................................................34

X.  COUNT
Violation of Section 1 of the Sherman Act (Against All Defendants) .................34

PRAYER FOR RELIEF ....................................................................................35

DEMAND FOR JURY TRIAL ...........................................................................37

Plaintiff Value Recovery Fund LLC ("Plaintiff"), individually and on behalf of a Class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants identified below. Plaintiff alleges on information and belief as follows:

## I. INTRODUCTION

1.      Plaintiff brings this antitrust class action on behalf of all persons and entities who purchased or sold credit default swaps ("CDS") directly from or to the Dealer Bank Defendants named below in the United States and its territories, or for delivery in the United States or its territories, during the Class Period, defined as January 1, 2008 until such time as the Defendants' illegal conduct ceased.

2.      The Dealer Bank Defendants named herein were the dominant dealers of CDS in the United States during the Class Period.  Their share of CDS trading conducted within the United States was approximately 97% in 2008 and rose to over 99.6% by the first quarter of 2013.  The Dealer Bank Defendants held and continue to hold monopoly power over the trading of CDS in the United States.  Plaintiff alleges that the Dealer Bank Defendants agreed among themselves to restrain trade and preserve their collusive control over CDS trading in the United States for the purpose of maintaining artificially wide spreads between purchase and sale prices for CDS and insuring their continued control over the U.S. CDS trading market.

3.      As alleged more fully below, the Dealer Bank Defendants agreed among themselves to artificially inflate and maintain the spreads paid by participants in CDS trading by, among other things:  (a) establishing and controlling ICE Credit Clear LLC, the largest CDS-dedicated central clearinghouse that processes the vast majority of CDS

trades; (b) obstructing the ability of sufficiently capitalized CDS dealer competitors from becoming members of that clearinghouse; (c) limiting the availability of CDS trading data by excluding market participants, including investors and other actual or potential CDS dealers, from accessing CDS trading data; and (d) excluding potential entrants from establishing competing platforms for CDS trading.   The Dealer Bank Defendants' agreements to collusively control CDS trading is manifested in the rules, regulations and by-laws of various associations and corporations, such as Defendant Markit Group, Ltd., the Depository Trust & Clearing Corporation ("DTCC"), the International Swaps and Derivatives Association ("ISDA") and CDS clearinghouse ICE Trust (now known as ICE Clear Credit), that are dominated and/or controlled by Defendants.

4.      As a result of the unlawful conduct by the Defendants and their co-conspirators, Plaintiff and other members of the Class paid spreads that were greater than they otherwise would have paid when conducting their CDS investment activities. The Defendants' CDS-related conduct has been so egregious that regulators in the United States and Europe are currently investigating such conduct.   On July 1, 2013, the European Commission ("EC," the European Union's antitrust regulator) issued "Statements of Objections" (an official recitation of evidence of antitrust violations uncovered by the EC to date) against Defendants (among others) for their collusive behavior in the European CDS trading market.

## II. <u>JURISDICTION AND VENUE</u>

5.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

6.      This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d), because Defendants resided, transacted business, were found, or had agents in this District and/or the claims arose at least in part in this District.

## III. PARTIES

### A.   Plaintiff

Plaintiff Value Recovery Fund LLC ("VRF") is a Delaware limited liability company, with a registered address of 2711 Centerville Road, Suite 400, Wilmington, Delaware  19808 and offices in Connecticut.   VRF has standing, by virtue of a valid assignment, to assert the federal antitrust claims herein as a direct purchaser and seller of a significant volume of CDS in the United States directly from and to one or more of the defendant Dealer Banks (as described and defined below) during the Class Period (as defined in paragraph 90 below).

### B.   The Dealer Bank Defendants

8.      Defendant Citigroup, Inc. ("Citi") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Citi was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.

9.      Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, JPMorgan Chase was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.

10.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Goldman Sachs was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.

11.     Defendant HSBC Holdings plc ("HSBC Holdings") is a bank holding, United Kingdom public limited company, organized under the laws of the United Kingdom, with its principal place of business in London, United Kingdom. During the Class Period, HSBC Holdings, through its wholly owned United States subsidiary Defendant HSBC Bank USA, N.A., was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.

12.     Defendant HSBC Bank USA, N.A. ("HSBC USA") is headquartered in McLean, Virginia with principal operations, including those responsible for trading in the U.S. CDS market, located in New York, New York. During the Class Period, HSBC USA was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Defendants HSBC Holdings and HSBC USA are referred to collectively here as "HSBC."

13.     Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, BAC was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.

14.     Defendants named in paragraphs 9 through 14 are dealers of CDS in the United States. These Defendants are collectively referred to herein as the "Dealer Banks" or the "Dealer Bank Defendants."

**C.**     **Defendant Markit Group, Ltd.**

15.     Defendant Markit Group Ltd. ("Markit") is a privately-held company with its principal place of business in London, United Kingdom, with a number of offices in the United States including three offices within this District (two in New York, New York and a third in Rockland County, New York).   As detailed below, Markit is dominated by the Dealer Banks.  Markit was founded in 2001 to provide daily CDS pricing.  In 2002 the Dealer Banks and other banks agreed with each other and with Defendant Markit to take a majority share ownership of Markit.  Under this arrangement, the Dealer Banks agreed to supply Defendant Markit with exclusive information for their CDS trades, and Markit launched the world's first daily CDS end-of-day valuation service in 2003.  In September 2009, Markit and DTCC established a joint venture known as MarkitSERV LLC, a Delaware limited liability company that provides OTC derivative trade processing.  Markit and MarkitSERV collect and distribute trading information to the Dealer Banks from the sales of CDS on the OTC market.

## IV. AGENTS AND CO-CONSPIRATORS

16.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operations of Defendants' businesses or affairs.

17.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.  Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

18.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct alleged herein.  These co-conspirators include, but are not limited to, other banks that are active in the CDS market, as well as IntercontinentalExchange, Inc., a Delaware corporation with its principal place of business in Atlanta, Georgia.  ICE Trust U.S. LLC ("ICE Trust") is a New York Trust Company with its principal place of business in New York, New York.  ICE Trust is owned by ICE US Holding Co., a Cayman Islands-based holding company established in 2008.  ICE US Holding Co. is owned by IntercontinentalExchange, Inc. and, among others, Defendants Citi, Goldman Sachs, JPMorgan Chase, and BAC.  ICE Trust operates a CDS central clearinghouse to which the Dealer Banks have directed much of their CDS trading since 2009.  On or about July 16, 2011, ICE Trust reorganized and became known as ICE Clear Credit LLC.  All further references in this Complaint use the term "ICE CC" to refer to either ICE Trust or ICE Clear Credit.  As further detailed below, the Dealer Bank Defendants' common ownership of Defendant Markit, coupled with their prominent role in setting the rules and regulations of the ICE CC clearinghouse, allowed them to preclude competition in the CDS market by controlling the flow of information necessary for a free and competitive market.

## V.  **FACTUAL BACKGROUND**

### A.     **Credit Default Swaps**

19.     A credit default swap is a contractual agreement that transfers the default or credit risk of one or more reference entities (described below) from one party to the

other.  CDS were first developed in the 1990s by banks such as JPMorgan as a way for them to protect themselves against their exposure to large corporate loans they made to their clients.  Since then, CDS have been used to transfer default or credit risk associated with government bonds, mortgage-backed securities, corporate bonds and other forms of debt.

20.    A credit default swap is a type of derivative security -- a financial instrument whose characteristics and value depend upon the characteristics and values of a "reference entity," another underlying financial instrument such as a commodity, bond, stock or currency.

21.    Peter J. Wallison, the Arthur F. Burns Fellow in Financial Policy Studies at the American Enterprise Institute for Public Policy Research, has diagramed and explained how CDS operate:

FIGURE 1: HOW CREDIT DEFAULT SWAPS OPERATE



SOURCE: Peter J. Wallison.

Wallison, Peter J., "Everything You Wanted to Know about Credit Default Swaps – but Were Never Told", *December 2008 Financial Services Outlook*, p.3 (American Enterprise Institute for Public Policy Research).  He further explained:

> [....]  Bank B has bought a $10 million bond from company A, which in CDS parlance is known as "the reference entity."  B now has exposure to A.  If B does not want to keep this risk – perhaps it believes A's prospects are declining, or perhaps B wants to diversify its assets – it has two choices:  sell the bond or transfer the credit risk.  For a variety of tax and other reasons, B does not want to sell the bond, but it is able to eliminate most or all of the credit risk of A by entering a CDS.  A CDS is nothing more than a contract in which one party (the protection seller) agrees to reimburse another party (the protection buyer) against a default on a financial obligation by a third party (the reference entity).  In figure 1, the

reference entity is A, the protection buyer is B and the protection seller is C. Although figure 1 shows B purchasing protection against its entire loan to A, it is important to note that B also could have purchased protection for a portion of the principal amount of the $10 million bond. The amount of protection that B purchases is called the "notional amount."

*Id.*

22.     The CDS market is a dealer market – i.e., CDS transactions occur over-the-counter rather than on an exchange:

> The CDS market is a dealer market, so transactions take place through dealers, over the counter rather than on an exchange. Accordingly, in purchasing protection against A's default, B's swap is with C, a dealer – one of many, including the world's leading banks, that operate in this market. The structure of the CDS is simple. C agrees to pay $10 million (or whatever notional amount the parties negotiate) if A defaults, and B agrees to make an annual premium payment (usually paid quarterly) to C. The size of this payment or premium will reflect the risk that C believes it is assuming in protecting B against A's default. If A is a good credit, the premium will be small, and correspondingly the premium would be larger when the market perceives greater credit risk in A. Under the typical CDS contract, B is entitled to request collateral from C in order to assure C's performance. As a dealer, C generally aims to keep a matched book. For every risk it typically takes on, it typically acquires an offsetting hedge. So C enters a CDS with D, and D posts collateral. The transfer of B's risk to C and then to D (and occasionally from D to E and so on) is often described by many CDS critics as a "daisy chain" of obligations, but this description is misleading. Each transaction between counterparties in figure 1 is a separate transaction, so B can look only to C if A defaults, and C must look to D. B will not usually deal directly with E.

*Id.*

23.     Central clearing is the process of managing a transaction after buy and sell orders have been submitted to- and matched by- dealers, but before the transaction settles. A central clearinghouse is responsible for clearing trades, collecting and maintaining collateral from the participants, overseeing delivery and trade settlement, and reporting transaction data. A central clearinghouse manages the risk that could arise if the purchaser of a CDS cannot make the required payment when it is due or the CDS seller is unable to perform its contractual obligation (referred to as "counterparty risk"). Academics have found that "introducing a CCP [central clearinghouse] for a particular

set of derivatives reduces average counterparty exposures if and only if the number of clearing participants is sufficiently large relative to the exposure on derivatives that continue to be bilaterally netted." Duffie, D. and Zhu, H., *Does a Central Clearing Counterparty Reduce Counterparty Risk?* pp. 2-3 (March 6, 2010 Working Paper).

**B.      Lack of Regulation in the CDS Market**

24.      The trading market for CDS has been largely unregulated since its inception.  On December 21, 2000, President Clinton signed into law the Commodity Futures Modernization Act of 2000 ("CFMA"), which exempted certain qualifying "swap agreements" from the Commodity Exchange Act and defined security-based swap agreements as not constituting "securities."  The CFMA thereby ensured that swap agreements, including CDS, were not subject to regulation by the Commodity Futures Trading Commission ("CFTC") or the Securities and Exchange Commission ("SEC"). There has been no active and ongoing agency regulation of the conduct alleged herein.

**C.      The Lack of Market Transparency**

25.      During the Class Period, CDS trades were conducted on the OTC market, rather than through a central exchange.  Persons wishing to buy or sell CDS could not do so directly between themselves but only through an intermediary, the CDS dealer.  Prior to the start of the Class Period, the Dealer Banks controlled the vast majority of CDS trades made in the United States OTC market.  Regardless of whether a Class member is a buyer or seller of a CDS, virtually all CDS transactions in the United States are made through one of the Dealer Banks.

26.      During the relevant period, a relatively small number of dealers consisting of major Wall Street banks (the Dealer Banks), dominated the dealer-to-dealer trades of

CDS. The only practical way for a buyer or seller of a CDS to participate in that market was through one of the Dealer Banks.

27.     The CDS market, as designed and operated by the Dealer Banks, is "opaque," rather than "transparent."  Transparent markets allow participants to obtain timely, accurate information indicating the price and size of prospective trading interest (pre-trade transparency) as well as the prices and volumes of completed transactions (post-trade transparency).

28.     Scholars have concluded that pretrade market transparency increases liquidity and narrows interdealer spreads.  By way of example only, Flood, *et al.*, summarized the results of their study, in part as follows:

> Pretrade transparency significantly reduces search costs, thus alleviating uncertainty and facilitating trade.  As a result, market liquidity, measured by spreads and volume is greater in the transparent market:  opening spreads are smaller and interdealer trading is much higher.

Flood, Mark D., et al., "Quote Disclosure and Price Discovery in Multiple-Dealer Financial Markets" *The Review of Financial Studies* Spring 1999 Vol. 12, No. 1, pp 37-59 at 57.

29.     Even more specifically, examination of the private corporate bond, municipal bond and NASDAQ equity markets, and regulatory efforts to increase the transparency of those markets, shows that increased price transparency and information results in lower transaction costs.

30.     For example, in the corporate bond market prior to 2002, quotations for the purchase of such bonds were available only to market professionals and prices at which bond transactions were completed were not publicly available information.  In July 2002, regulators of the United States corporate bond market introduced the Transaction

Reporting and Compliance Engine ("TRACE") system which required corporate bond dealers to report all trades in publicly issued TRACE eligible securities making such information available to bond investors.  Several years after the introduction of the TRACE system, academic research found that "costs are lower for bonds with transparent trade prices and they drop when the TRACE system starts to publicly disseminate their prices. The result suggests that public traders benefit significantly from price transparency."

31.     As Securities and Exchange Commission Commissioner Annette L. Nazareth stated in a speech on February 7, 2006: "the widespread availability of timely price information, whether the security is equity or debt, promotes fair and efficient pricing.  Real-time price information aids investors and dealers in evaluating the current bid or ask for that security and furthers efficient price discovery."  Thus, the SEC along with academicians who have studied the implementation of the TRACE system concluded that increased transparency associated with TRACE transaction reporting is associated with a material decline in investors' trading costs.

32.     Similar studies of the municipal bond market and the introduction of greater transparency in that market in recent years conclude that greater price transparency in the municipal bond market results in lower transaction costs.  One such study found that the average trading costs in municipal bonds when they traded on an exchange were one-half of what they were in the OTC market, and attributed this differential to differences in market structure and greater price transparency.

33.     Studies of the NASDAQ equity trading market after market reforms were introduced in 1997 that increased reporting of bid-ask spreads also concluded that

increased transparency resulted in reduced spreads on NASDAQ trades.  The same result was observed as far back as 1973 in the equity option market.  In 1973, the Chicago Board Options Exchange ("CBOE") became the first organized and regulated market place for trading of standardized, listed options on equity securities.  What was found following the 1973 reforms was that moving such trading to an options exchange significantly enhanced the price transparency of options trading resulting in not only greater liquidity for such options but also lower transaction costs for participants in those markets.

34.     Examples of transparent markets include the major exchanges for stock trading such as the NYSE or the NASDAQ.  Through the electronic reporting of trading volume and price during the trading hours on exchange listed stocks, market participants have almost instantaneous access to share price and volume traded.  The transparency of such markets also results in full disclosure of spreads for the buying and selling of stocks.  This results in narrower spreads between the "bid" and "ask" price on stocks compared to less transparent financial trading markets such as CDS.

35.     However, the CDS trading market is opaque.  In that market, there is no central exchange similar to the NYSE or the NASDAQ where the prices of CDS are listed and widely available to investors on both a pre-trade and post-trade basis.  Instead, when an end-user wants to buy a CDS, it must place an order with one of the Dealer Banks which then matches that order with someone selling the same type of CDS.  As a result of this opaque market, a Dealer Bank tells the buyer of a CDS only what that Dealer Bank will pay for the contract and tells the seller of the same contract only the amount it will receive.  The difference between the buy and sell price is commonly

referred to as the transaction cost, or spread. The Dealer Bank profits from the spread between what it charged the buyer of a CDS and the amount the seller of that CDS received.

36.    The lack of transparency allows the Dealer Banks to keep CDS spreads artificially inflated, and enables the Dealer Banks to obtain monopoly profits on their CDS trades. The derivatives-related revenues generated by Defendants are estimated to be in the range of $30 billion annually. On information and belief, Plaintiff alleges that a significant portion of that amount is generated by the Dealer Banks' CDS trading. As a result, the Dealer Banks have every incentive to prevent the CDS market from becoming less opaque, as greater transparency would lead to greater competition, reduce spreads, and diminish the Dealer Banks' CDS trading profits.

37.    Unlike futures exchanges or the stock markets, which provide continuous information as to transaction prices and volumes, for CDS trading there is only one source of after-the-fact pricing information and even those data do not accurately reflect actual transactions. The limited CDS price and volume data provided to market participants is published at the end of each trading day by Defendant Markit, a data collection and distribution service that is dominated by the Dealer Banks, as described below. Although Markit collects and compiles the aggregate CDS transaction data that the Dealer Banks report to it at the end of each day, Markit does not report the actual trade data. Instead, Markit reports the **average** price for these transactions. Thus, neither Defendant Markit nor any other service provides actual transaction prices in CDS trading in real time as is true in the stock, options and futures markets.

38.     With no objective central price (like those provided by a stock exchange), the Dealer Banks' CDS trading desks are not required to mark their books to reflect actual transaction prices.  Instead, the Dealer Banks mark their books according to what they deem their positions to be worth.

39.     While in theory, end-users could shop around to several Dealer Banks, in practice and as a general rule the Dealer Banks will not provide a firm quote, but instead will just give an "indicative" or conditional price.  During the Class Period, the Dealer Banks were free to change the price of the transaction until the moment the trade was closed.

40.     End-users are dependent on their Dealer Banks as to the price they buy or sell a CDS.  Purchasers or sellers of CDS have no way of knowing whether the price is the best one, since there is no pre-trade transparency and limited post-trade transparency.  Purchasers and sellers have no way of knowing at what price counterparties are willing to buy or to sell, nor do they have comparable real-time price data against which to compare the price of their particular trade.  End-users do not know the equivalent of the bid and ask prices for the CDS they purchase but must rely instead on the price at which the Dealer Banks claim to be able to purchase or sell a particular CDS.

41.     Such an opaque market is an ideal one for the Dealer Banks.  The less the customer knows, the wider the spread the Dealer Banks can charge.  As a result, CDS trading has become one of the most lucrative and profitable lines of business for the Dealer Banks.  Based upon quarterly reports issued by the Office of the Controller of the Currency ("OCC"), the annual revenues generated by the Dealer Banks from CDS trading are at least $4.5 billion and likely much greater.

42.   What investors did not know when they bought or sold CDS during the Class Period is that the market was rigged and manipulated by the Dealer Banks that dominate and control trading in CDS within the United States.

**D.   The CDS Market**

43.   The market which the Dealer Banks collusively controlled throughout the Class Period consists of CDS directly purchased from, or directly sold to, the Dealer Bank Defendants in the United States.  The OCC issues a report every calendar quarter showing the trading in CDS and other derivatives by United States banks.  Pursuant to the OCC report for the quarter ended March 31, 2013, the CDS trading market in the United States was dominated by the five Dealer Banks named as Defendants herein.   Out of $13.510 trillion in total notional CDS purchases or sales in the first quarter of 2013 by all banks, $13.461 trillion of those trades, or 99.64%, were made by the five Dealer Bank Defendants.

44.   As shown by OCC reports from 2008 through the first quarter of 2013, the market share of the five Dealer Bank Defendants steadily increased during the Class Period.[1]   As of March 31, 2008, four of the five Dealer Bank Defendants controlled 97.0% of the United States trading market in CDS.  (Goldman Sachs is not included in the March 31, 2008 report since it did not become a reporting institution to the OCC until the fourth quarter of 2008.)  By March 31, 2009, the five Dealer Bank Defendants had

---

[1] Going back to the first quarter of 2003, the increasing U.S. market share of the Dealer Banks is apparent.  As of March 31, 2003, four of the Dealer Banks (Defendants except Goldman Sachs) controlled 91.43% of CDS trading in the United States.  The Dealer Banks' increasing dominance of this market has occurred while CDS trading volume has exploded.  From the first quarter of 2003 through the first quarter of 2013 the notional value of CDS trades has increased by over 2000% (from $709.928 billion to $13.510 trillion).

increased their share of CDS trading to 97.51%. Following the introduction of ICE CC central clearing in 2009, the Dealer Bank Defendants increased their U.S. market share to 99.64% by March 31, 2013.

45. The end-users of CDS purchased or sold in the United States include insurance companies, pension funds, investment partnerships (commonly called "hedge funds"), bond and fixed income mutual funds and other financial and investment firms. As described below, the CDS market uses standardized contracts as promulgated by ISDA, as well as customized contracts.

46. The Dealer Bank Defendants' monopoly power over CDS trading in the United States has existed since at least 2002. By the acts and conduct alleged below, the Dealer Banks have conspired to ensure their continued control over CDS trading in the United States including, among other things, excluding competitors from the CDS trading market through the establishment of ICE Trust.

### E. <u>The Dealer Banks' Market Power Over The CDS Trading Market</u>

47. As alleged more fully below, the Dealer Banks exert control over trading in the CDS market by, among other things, controlling the market infrastructure of CDS trading including the institutions that report trading data and those that clear and settle trades. In particular, the establishment of ICE Trust (now known as ICE Clear Credit) and the Dealer Banks' domination of that institution have increased their ability to monopolize the CDS trading market. Through such control the Dealer Banks are able to set and maintain artificially inflated spreads as well as margin rates and leverage ratios for end-users of CDS.

## VI.  DEFENDANTS' WRONGFUL CONDUCT

### A.  The Dealer Banks Conspired To Inflate CDS Spreads

#### 1.  Overview of Wrongdoing Alleged

48.  Starting on or before January 1, 2008 and continuing through such time as the effects of Defendants' illegal conduct and conspiracy ceased, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination or conspiracy in restraint of trade for the purpose of artificially increasing and maintaining the spreads for CDS traded on the OTC market within the United States.

49.  In participating in this illegal conspiracy, Defendants and their co-conspirators engaged in anticompetitive conduct, the purpose and effect of which was to artificially fix, raise, maintain or stabilize the spreads for CDS traded in the United States.  Such activities included the following:

a.  Defendants communicated among themselves concerning transaction costs, bid-ask spreads and otherwise shared information about the prices end-users of CDS paid for sold such contracts;

b.  Defendants agreed through meetings and conversations among themselves to fix, raise, maintain or stabilize prices, including the spreads for CDS;

c.  Defendants, through their ownership of Defendant Markit and other arrangements, effectively locked out other providers of information about the market for and trading of CDS, reducing the transparency that otherwise would have allowed prices for CDS to be set on a competitive basis; and

d.      Defendants established in concert and used ICE CC to create membership rules and other practices that prevented other CDS dealers from transacting business on the largest CDS clearinghouse, thereby reducing competition in the CDS trading market.

50.     Evidence of Defendants' agreement to restrain competition in the CDS trading market is shown by by-laws and standards promulgated by ICE CC, DTCC and Defendant Markit.  As alleged more fully below, such by-laws and standards constitute an agreement within the meaning of § 1 of the Sherman Act.

51.     Defendants' anticompetitive conduct and restraint of trade resulted in severe adverse consequences for competition in the prices end-users bought or sold CDS. Plaintiff and the other Class members who purchased or sold CDS during the Class Period were deprived of a competitive trading market and were subject to artificially inflated spreads as a result of Defendants' illegal conduct.  As a direct result of such conduct, Plaintiff and the other Class members suffered financial losses and were injured in their business or property.

2.      The Dealer Banks Control Trading And Information
        In the CDS Market

        a.      **The Dealer Banks Control The Dissemination Of
                CDS Trading Information Through Defendant
                Markit**

52.     The Dealer Banks control the distribution of CDS price and trading information through their domination of Defendant Markit, the primary source of published CDS trading data.

53.     In 2001, Lance Uggla, a former credit trader for TD Securities, founded Defendant Markit to provide reliable, independent valuation data for CDS. Defendant Markit's goal of independence was short-lived, however.

54.     In 2002, Markit agreed to sell a majority stake in the company to the Dealer Banks and other banks. Under this arrangement, the Dealer Banks agreed to supply Defendant Markit with exclusive information for their CDS trades. In 2002, when the Dealer Bank Defendants and other banks agreed to take a majority ownership stake of Defendant Markit, Markit agreed to: limit the dissemination of that CDS trading information; report only daily average (not actual real time) prices for CDS transactions; and afford the Dealer Banks with unfair access to Defendant Markit's pricing information. The agreement enabled Defendant Markit to become effectively the only source of published CDS trading data. As a result of this agreement, the Dealer Banks were able to control the dissemination of that data including the critical information regarding the spreads on CDS trades.

55.     The Dealer Banks have dominated and controlled Defendant Markit throughout the Class Period. As Uggla explained to the *Financial Times*: "We conceded majority [control] to the banks, but the banks are our best partners." Defendant Markit touts its own "privileged relationships with its shareholder banks," saying that they give the company "unparalleled access to a valuable dataset spanning credit, equities, and the broader OTC derivative universe."

56.     In November 2007, Defendant Markit acquired the ownership of the CDX and iTraxx indices, giving Markit control of the major benchmark indices for the entire

CDS market. Defendant Markit's indices account for approximately half of all CDS trading globally.

57.     Defendant Markit only allowed companies seeking to establish CDS clearinghouses if every CDS transaction that the clearinghouses guaranteed included one of Markit's bank partners. By forcing the clearinghouses to clear only CDS transactions in which the Dealer Banks were participants, Defendant Markit stifled competition from other dealers that could have provided better prices and precluded end-users from buying and selling directly with each other without the Dealer Banks acting as an intermediary. The conditions imposed by Defendant Markit delayed the creation of other CDS clearinghouses besides ICE CC, including CME Group, Inc. ("CME") and Eurex AG ("Eurex"), and continued to ensure the Dealer Banks' ability to artificially inflate and maintain spreads for end-users of CDS. The Dealer Banks have been successful in limiting the CDS transactions that have cleared through CME. As of February 2012, ICE Trust or its successor ICE CC had cleared $16.264 trillion of notional value of CDS, while CME had cleared only $189.5 million of notional value. As of February 24, 2012, ICE CC had $864 billion in open interest CDS contracts.

**b.    The Dealer Banks Control The Dissemination Of
CDS Trading Data Through DTCC**

58.     The Dealer Banks limit access to actual CDS trading data by their dominance of the entity that handles CDS trading settlements, DTCC.

59.     Once a Dealer Bank consummates a CDS trade, the terms, payments and parties to that transaction must be formally processed and confirmed. These tasks are accomplished by DTCC which, through its subsidiaries, provides clearing, settlement and information services for equities, corporate and municipal bonds, government and

mortgage-backed securities, money market instruments and OTC derivatives.   DTCC handles all aspects of settling CDS trades for the Dealer Banks through its wholly owned subsidiaries the Warehouse Trust Company, LLC and DTCC Derv/SERV, LLC.

60.     The Dealer Banks dominated DTCC and its subsidiaries.   At present, six members of DTCC's board of directors are affiliated with the Dealer Banks.   DTCC's board of directors includes: Lori Hricik and Paul H. Compton of Defendant JPMorgan Chase, Suni Harford of Defendant Citi, Robin A. Vince of Defendant Goldman Sachs and Mark D. Linsz of Defendant BAC.   In addition, Robert Druskin, DTCC's Executive Chairman of its Board, was a top executive with Citi for sixteen years and one of the other DTCC directors is the Chairman of MarkitSERV LLC ("MarkitSERV"), a joint venture established in September 2009 by DTCC and Defendant Markit, which, as alleged above, the Dealer Banks dominate.   Thus, a substantial part of the DTCC board has a direct or indirect connection with the Dealer Banks. The members of DTCC's board of directors met with each other on a regular basis throughout the Class Period, where they discussed and agreed to limit the dissemination of CDS trading data maintained by DTCC.

61.     MarkitSERV, the joint venture between DTCC and Defendant Markit, is the exclusive portal for the reporting of CDS OTC trading.  MarkitSERV provides trade confirmation, position reconciliation, and transaction processing for CDS trades worldwide.  MarkitSERV is governed by a Board of Directors, a substantial number of whom are representatives of the Dealer Banks.   Four additional directors, two from Defendant Markit and two from DTCC, constitute a board of eleven members.  With this

joint venture, the Dealer Banks, through their influence over both DTCC and Defendant Markit, maintain control over CDS trade data.

62.      DTCC with its affiliates is the central repository for CDS settlement data. Thus, DTCC is able to derive transaction prices from the data it has and receives.  DTCC could disseminate this information widely on a real-time basis to data vendors or other services providers, which would provide substantial post-trade transparency to the CDS market.  Pursuant to rules and regulations adopted by its board, DTCC has agreed not to disseminate real-time CDS trade data to market participants in order to preserve the Dealer Banks and their joint-venture partner Defendant Markit's control and domination of the CDS trading market.

63.      The timely widespread publication of actual CDS trading data by DTCC would undermine Defendant Markit's virtual monopoly on pricing information and provide the transparency that would result in reduced spreads, substantially reducing the Dealer Banks' profits on these transactions.  Instead, DTCC publishes CDS post-trade pricing data on a weekly basis only.  This delayed publication serves to maintain opacity and artificially-inflated and/or maintained the spreads paid in CDS trading.

c.      **The Dealer Banks Dominate ICE CC, The Primary CDS Clearinghouse**

64.      The Dealer Banks recognized that their dominance of CDS trading was threatened in late 2008 by rising calls from regulators and members of Congress for regulation of the CDS trading market.  In response, they attempted to blunt the impact of any reform by creating a central clearinghouse for CDS trades.  Central clearing is the process of managing a transaction after buy and sell orders have been submitted and matched, but before the transaction settles.  A central clearinghouse is responsible for

clearing trades, collecting and maintaining collateral from the participants, overseeing delivery and trade settlement, and reporting transaction data. A central clearinghouse manages the risk that could arise if the purchaser of a CDS cannot make the required payment when it is due or the CDS seller defaults on its obligation. The central clearinghouse that the Dealer Banks created was ICE CC.

65.    ICE CC was formed to serve as a central clearinghouse to clear North American CDS transactions. Intercontinental Exchange, Inc. created ICE CC with several of the Dealer Banks (including Citi, Goldman Sachs, JPMorgan Chase and BAC) by paying $39 million for Clearing Corp., a Chicago-based clearinghouse owned by Defendants Goldman Sachs, JPMorgan Chase and others. Under the terms of the purchase agreement, the Dealer Banks that co-own ICE CC evenly share in ICE CC's revenue with Intercontinental Exchange. On July 16, 2011, ICE Trust was reorganized and renamed ICE Clear Credit.

66.    The Dealer Banks are not merely co-owners of ICE CC. They are also prominent on the ICE CC Risk Committee ("Risk Committee"). Plaintiff is informed and believes that current members of the Risk Committee include Thomas J. Benison of Defendant JPMorgan Chase, Oliver Frankel of Defendant Goldman Sachs, Ali Balali of Defendant BAC and Biswarup Chatterjee of Defendant Citi. The Risk Committee meets monthly in New York, New York where it sets the terms of CDS trading on ICE CC including which financial institutions may participate as dealers in ICE CC cleared trades.    At the monthly meetings of the Risk Committee, the Dealer Banks' representatives make agreements and establish rules for participants in ICE CC for the express purpose of maintaining their monopoly power over the CDS trading market.

Among other things, the Dealer Banks have agreed to establish unreasonably high net capital requirements upon any bank that wishes to participant in ICE CC.

67.     The Dealer Banks have agreed to use their control over ICE CC, in particular their control over the ICE CC Risk Committee, to exclude competition from other firms that seek to clear CDS trades through ICE CC, undermine competing clearinghouses that would allow clearing of end-user to end-user transactions, and keep the spreads paid by end-users artificially inflated.

68.     First, through their control over ICE CC, the Dealer Banks have established substantial barriers to entry by requiring any dealer that clears CDS trades through ICE CC to have an enormous net worth.  During virtually all of the Class Period, under rules set by the Risk Committee, a financial institution was not allowed to participate in ICE CC as a designated clearing member unless it had a net worth of at least $5 billion.  This threshold has, for nearly the entire Class Period, effectively locked out competition from other end-users and other firms, such as Bank of New York Mellon and State Street Corporation from clearing trades on ICE CC.  The ICE CC capital requirements are far greater than those for other clearinghouses.

69.     Other rules and practices of ICE CC effectively lock out other competition.  First, ICE CC does not permit real-time transactions by firms that are not designated clearing members.  The lag time between when a CDS trade is submitted and when it is accepted for clearing increases the risk that the trade could be rejected. Because end-users could avoid this risk by conducting CDS trades through one of the Dealer Banks, this rule dissuades end-users from trading with smaller firms.

70.     Second, ICE CC does not protect the anonymity of end-users that execute CDS trades through non-member firms.  As end-users tend not to want their trading and hedging strategies exposed, this practice deters them from conducting CDS trades with smaller firms that cannot meet the ICE CC's designated clearing membership requirements.

71.     Third, ICE CC imposes relatively high fees and allows low levels of leverage as compared to the prevailing terms in the bilateral market.  Such fees and leverage caps do not deter the Dealer Banks from clearing trades on ICE CC, because they share in the revenue generated by ICE CC and are willing to accept each other's credit.  Nonetheless, these terms discourage end-users and smaller dealers from clearing CDS trades through ICE CC.

72.     As a result of these exclusionary rules, nearly all the of the CDS trades cleared through ICE CC are between the Dealers Banks, to the exclusion of any other potential market participants.  Although the Dealer Banks claim to compete in the CDS trading market against each other, the rules set by Dealer Banks acting through the ICE CC Risk Committee have limited and excluded competition in the CDS trading market. Because any single Dealer Bank is unlikely to have sufficient inventory to meet all of its clients' demand for particular CDS products, the Dealer Banks trade with each other to satisfy their clients' needs, and clear those trades through ICE CC.  End-users of CDS, however, have limited ability to access ICE CC on their own and are primarily relegated to buying and selling with one of the Dealer Banks bilaterally in an opaque market.

73.     Although ICE CC purports to provide greater transparency to the CDS trading market, in reality it maintains the Dealer Banks' dominance on these markets and

enables them to keep CDS pricing artificially high thereby inflating the spreads paid by end-users.

### d.   The Dealer Banks Control The Standardization Of CDS Contracts Through Their Domination Of The ISDA

74.   The financial and derivatives industry is served by several major service organizations that put on industry-wide meetings several times during each calendar year. These meetings have facilitated collusion, and the service associations have themselves functioned as a means for Defendants to cooperate and discuss CDS prices and terms and conditions of CDS trading.

75.   ISDA is a key derivatives service association.  The Dealer Banks are all members of the ISDA.  The ISDA describes itself on its website as "represent[ing] participants in the privately negotiated derivatives industry, [and] is the largest global financial trade association."

76.   Throughout the Class Period, the Dealer Banks have dominated the ISDA. Presently, ISDA's officers include a managing director of JPMorgan Chase.  Executives of Defendants Citi, Goldman Sachs, HSBC and BAC are members of ISDA's board of directors.

77.   One of the ISDA's critical functions is to define the terms of standardized derivative contracts.  Since the early 2000s and at all times during the Class Period, ISDA complied with the Dealer Banks' demands for particular terms and conditions in standardized CDS contracts.

### F.   Inflated Spreads Would Not Have Existed In a Competitive Market

78.   Objective measures commonly used by regulators and economists to judge the degree of market concentration confirm that the CDS trading market in the United States is highly concentrated. The Herfindahl-Hirschman Index (HHI) is a well-known and accepted measure of market concentration. HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. In a market consisting of a large number of firms of relatively equal size HHI will be near zero. In a monopoly market with a single firm HHI would be 10,000 (100 x 100 = 10,000). Markets with an HHI of between 1,000 and 1,800 are considered to be moderately concentrated. Those above 1,800 are considered concentrated. In the CDS trading market, the HHI over the past several years has been above 3,000. For the most recent quarter ended March 31, 2013, HHI in the CDS trading market was 3,311.41. Moreover, the CDS market's HHI has been steadily increasing since the beginning of 2009 and is now at its highest point since 2008. A leading economist who has written extensively about concentration in the CDS trading market described its current HHI as strong evidence that this market is **highly concentrated**.

79.   Numerous recent studies found that transaction costs in a financial trading market are dependent on that market's transparency. Among other things, the availability of order flow information tends to reduce information asymmetry by equalizing information across market participants. It has also been found that pre-trade price transparency in financial markets narrows spreads and thus transaction costs. Economists and academics who have examined opaque markets such as the CDS market found that dealers in such oligopolistic markets can extract anti-competitive profits from market

participants. Thus, an opaque market dominated by a small number of liquidity suppliers behaving strategically to exploit market conditions and controlling trade information among themselves, the CDS market during the Class Period in a nutshell, results in anti-competitive and artificially inflated spreads paid by the end users, i.e., the buyers and sellers of CDS. Increased transparency has historically reduced spreads in trading markets. For example, the introduction of the TRACE system in 2002 resulted in reduction of trading spreads of up to 50% in the bond trading market. The reduction in spreads following reforms being implemented in the NASDAQ equity markets further supports the conclusion that spreads in the CDS trading market were inflated by Defendants' anti-competitive conspiracy.

G. **Government Investigations Into Anticompetitive Conduct By The Dealer Banks**

80. Authorities in the United States and Europe are investigating anticompetitive practices with respect to CDS trading by the Dealer Banks.

81. On July 15, 2009, U.S. Department of Justice ("DOJ") spokesperson Laura Sweeney confirmed that, "The Antitrust Division is investigating possible anti-competitive practices in the credit derivatives clearing, trading and information services industries." On or about March 20, 2012, a DOJ spokeswoman confirmed that the DOJ's antitrust investigation of the CDS trading market was ongoing.

82. On April 29, 2011, the European Commission announced that it had opened two antitrust investigations concerning the CDS market. According to the EC's press release, "In the first case, the EC will examine whether 16 investment banks and Markit, the leading provider of financial information in the CDS market, have colluded and/or may hold and abuse a dominant position in order to control the financial

information on CDS." The EC stated that it "has indications that the 16 banks that act as dealers in the CDS market give most of the pricing, indices and other essential data only to Markit, the leading financial information company in the market concerned. This could be the consequence of collusion between them or an abuse of a possible collective dominance and may have the effect of foreclosing the access to the valuable raw data by other information providers."

83.     The banks identified by the EC that are targets of the first investigation include: JPMorgan Chase, BAC, Citi, Goldman Sachs and HSBC. Defendant Markit was also implicated, with the EC further stating that: "The probe will also examine the behavior of Markit, a UK-based company created originally to enhance transparency in the CDS market. The EC is now concerned certain clauses in Markit's license and distribution agreements could be abusive and impede the development of competition in the market for the provision of CDS information."

84.     The EC is also investigating whether certain banks received preferential treatment from CDS clearinghouse ICE CC that "have the effect of locking them in the ICE system to the detriment of competitors." The EC's press release stated that the investigation concerned a number of agreements between the CDS dealers at the time they formed ICE CC through the sale of Clearing Corp. to Intercontinental Exchange. The agreements "contain a number of clauses (preferential fees and profit sharing arrangements) which might create an incentive for the banks to use only ICE as a clearing house. The effect of these agreements could be that other clearing houses have difficulties successfully entering the market and that other CDS players have no real choice where to clear their transactions."

85.     The EC identified banks that are targets of the second investigation as: BAC, Citi, Goldman Sachs and JPMorgan Chase, among others.  The EC further stated that it "will also investigate whether the fee structures used by ICE give an unfair advantage to the nine banks, by discriminating against other CDS dealers.  This could potentially constitute an abuse of a dominant position by ICE…."

86.     In a statement referring to the EC's investigations, European Union antitrust commissioner Joaquin Almunia said, "Lack of transparency in markets can lead to abusive behavior and facilitate violations of competition rules. … I hope our investigation will contribute to better functioning of financial markets and, therefore, to more sustainable recovery."

87.     On March 26, 2013, the EC announced that it was likely to file an action against the largest banks, including Defendants named herein, for collusion in the European CDS trading market.  The EC also announced on that date that Defendant Markit and ICE Clear Europe (the European clearinghouse also owned by ICE Trust) were also part of the EC's investigation.  ISDA was also identified as a possible target of the probe into anti-competitive behavior in CDS trading.

88.     On July 1, 2013, the EC charged 13 investment banks, ISDA, and Defendant Markit with engaging in anticompetitive behavior.  Specifically, the EC concluded that the banks, including the Dealer Bank Defendants here, blocked two exchanges from establishing CDS exchanges by denying them the necessary licenses to operate the trading platforms. Instead, the banks, which control ISDA and Defendant Markit, told the two financial information providers to only license Deutsche Boerse AG and CME for over-the-counter derivative trading, which resulted in higher spreads for

clients. By only allowing Deutsche Boerse and CME to engage in over-the-counter

trading, the banks, Defendants included, were able to maintain their continued control

over the CDS trading market in Europe. European Union antitrust commissioner Joaquin

Almunia said in a statement:

> It would be unacceptable if banks collectively blocked
> exchanges to protect their revenues from over-the-counter
> trading of credit derivatives. Over-the-counter trading is not
> only more expensive for investors than exchange trading, it
> is also prone to systemic risks.

89.     According to the EC, the banks used other tactics to shut out competition

from exchanges, including coordinating their choices of preferred clearinghouses for

CDS transactions. The EC determined that such behavior was prohibited by Article 101

of the Treaty on the Functioning of the European Union (TFEU).

## VII.   CLASS ALLEGATIONS

90.     Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2)

and 23(b)(3) of the Federal Rules of Civil procedure, on behalf of itself and all others

similarly situated.  The proposed "Class" is initially defined as:

> All persons or entities who, between January 1, 2008 and
> such time as the effects of Defendants' illegal conduct
> ceases ("Class Period"), purchased or sold CDS directly
> from or to the Dealer Bank Defendants, in the United States
> and its territories, or for delivery in the United States or its
> territories.  Excluded from the Class are Defendants and
> their employees, affiliates, parents, subsidiaries and co-
> conspirators.

91.     The Class is so numerous that joinder of all members is impracticable.

While the exact number of the Class members is unknown to Plaintiff at this time and can

only be discerned through discovery, Plaintiff is informed and believes that at least

thousands of geographically dispersed Class members traded CDS during the Class Period.

92.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and other Class members sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

94.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     Whether Defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CDS including bid-ask spreads;

b.     Whether Defendants' conduct caused the spreads in CDS to be greater than they otherwise would be in a competitive market;

c.     Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

d.      Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

95.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

97.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## VIII.  TRADE AND COMMERCE

98.     During the Class Period, the Dealer Bank Defendants sold CDS on the OTC market in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including though and into this judicial district.

99.     During the Class Period, Defendants collectively controlled the vast majority of the market for the trading of CDS in the United States.

100.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## IX.  FRAUDULENT CONCEALMENT

101.    Defendants' unlawful conduct as alleged above was self-concealing. Defendants, along with other market participants, conspired and engaged in secret activities for the purpose of fixing, raising, maintaining, or stabilizing spreads for CDS. Defendants fraudulently concealed their participation in the conspiracy by, among other things, engaging in communications and periodic meetings with representatives of other Defendants in furtherance of the conspiracy.  Moreover, as detailed above, the nature of the CDS market is opaque and lacks the transparency that would have aided Plaintiff and other members of the Class in discovering the illegal conduct alleged herein.

## X.  COUNT
### Violation of Section 1 of the Sherman Act
### (Against All Defendants)

102.    Plaintiff incorporates by reference and realleges the allegations set forth above as though fully set forth herein.

103.   During the Class Period, Defendants entered into and engaged in a contract, combination or conspiracy the purpose of which was to unreasonably restrain trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

104.   At all times during the Class Period, Defendants had market power to control the market for the purchase or sale of CDS within the United States.

105.   The conspiracy consisted of a continuing agreement, understanding or concerted action among Defendants and their co-conspirators in furtherance of which Defendants fixed, raised, maintained or stabilized the spreads of CDS traded on the OTC market. Defendants' conspiracy is a violation of the federal antitrust laws.

106.   Defendants' conspiracy, and resulting impact on the market for CDS, occurred in or affected interstate and international commerce.

107.   As a proximate result of Defendants' illegal conduct, Plaintiff and the other Class members have suffered injury to their business or property.

108.   Plaintiff and the other Class members are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Act as alleged here.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands that judgment be rendered in favor of Plaintiff against Defendants as follows:

1.   Certifying this action as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

2.   Decreeing that Defendants engaged in a contract, combination and conspiracy in violation of Section 1 of the Sherman Act, and that Plaintiff and the other

Class members were injured in their business and property as a result of Defendants' violations;

3.     Permanently enjoining Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf from continuing and maintaining the combination, conspiracy or agreement alleged herein, specifically including the promulgation and enforcement of the anticompetitive rules and regulations described above in Paragraphs 65 – 78, which have acted to foreclose competition the CDS market in the United States, including those rules and regulations that serve to: prevent all qualified market participants from dealing in the CDS market; and foreclose new entrants in the electronic trading of CDS.

4.     Awarding Plaintiff and the other Class members damages against Defendants for their violations of the federal antitrust laws in an amount to be trebled in accordance with such laws;

5.     Finding Defendants jointly and severally liable for the damages incurred by Plaintiff and the other Class members;

6.     Awarding to Plaintiff and the other Class members pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial complaint in this action;

7.     Awarding to Plaintiff and the other Class members their costs of suit, including reasonable attorneys' fees and expert fees; and

8.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: July 16, 2013

Respectfully Submitted,

_____

Vincent R. Cappucci, Esq.
Andrew J. Entwistle, Esq.
Robert N. Cappucci, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272


Robert N. Kaplan, Esq.
Gregory K. Arenson, Esq.
Richard J. Kilsheimer, Esq.
Matthew P. McCahill, Esq.
**Kaplan Fox & Kilsheimer LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714


Bruce L. Simon. Esq.
George S. Trevor, Esq.
**Pearson, Simon & Warshaw, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 941040
Telephone: (415) 433-9000
Facsimile: (415) 433-9008


*Attorneys for Value Recovery Fund LLC,
Individually and on Behalf of All Those
Similarly Situated*