**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: CREDIT DEFAULT SWAPS
ANTITRUST LITIGATION

Master Docket No.: 13 MD 2476 (DLC)

**PLAINTIFFS' CONSOLIDATED OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ...................................................................................7

    A.    Defendants Kept the CDS Market Opaque to Reap Supracompetitive Bid/Ask Spreads................................................................................7

    B.    Exchange Trading of CDS Emerges as a Threat ........................................9

    C.    Defendants Conspire to Block Exchange Trading of CDS................................11

    D.    Regulatory Investigations and Statement of Objections................................13

    E.    Defendants' Conduct Harmed Investors Through Inflated Bid/Ask Spreads........14

ARGUMENT ...................................................................................14

I.    Defendants Disregard Governing Legal Standards................................................14

II.    Plaintiffs Have Standing to Pursue Their Antitrust Claims ................................17

    A.    As the Consumers and Direct Purchasers of CDS, Plaintiffs are *the* Preferred Enforcers of the Antitrust Laws................................................18

    B.    Plaintiffs Have Alleged Injuries Proximately Caused by Defendants' Conspiracy and are "Efficient Enforcers" of the Antitrust Laws ........................20

        1.    Plaintiffs' Injuries are Direct ................................................21

        2.    Plaintiffs are Not Too Remote to Assert Claims ................................24

        3.    "Other Factors" Do Not Favor Dismissal ................................26

            (a)    Plaintiffs' Injuries are Not Speculative................................26

            (b)    No Damages Apportionment Issues Exist ................................31

III.    The Complaint Pleads a Plausible Conspiracy Claim Against Each Defendant ..............31

    A.    The Complaint Directly Alleges Defendants Met and Conspired ........................33

    B.    The Complaint Alleges a Course of Conduct That is Highly Associated With an Agreement ................................................37

C.     The Complaint Alleges Numerous "Plus Factors" ...............................................39

D.     Defendants' Alternative Explanations are Unavailing ...........................................41

E.     The Complaint Adequately Pleads a Claim Against BNP.....................................43

IV.    ISDA's Claim That Its Participation in the Conspiracy is Implausible Lacks Merit........47

V.     Markit's Arguments Misconstrue the Complaint and Lack Merit.....................................54

A.     Markit Can and Did Conspire With its Shareholders, and No Rule Immunizes it From That Conspiracy ...................................................56

B.     Markit is Not an "Integrative Collaboration" or a Joint Venture With the Dealer Defendants.................................................61

C.     The Complaint Alleges an Unreasonable Restraint of Trade ...............................64

D.     Markit's Additional Standing Arguments are Unavailing ....................................66

VI.    Defendants' Statute of Limitations Arguments Lack Merit ..........................................69

A.     Plaintiffs' Claims May Rely on Conduct Occurring Before May 3, 2009 ...........69

B.     The Complaint Adequately Alleges Equitable Tolling Due to Defendants' Fraudulent Concealment ................................................71

VII.   Dodd-Frank Explicitly Permits Plaintiffs' Claims After Its Enactment and, in Any Event, Does Not Impliedly Preclude Application of the Antitrust Laws ..........................78

A.     Dodd-Frank Explicitly Preserves Existing Antitrust Law ....................................79

B.     The Legislative History Conclusively Confirms the Plain Language of the Antitrust Savings Clause.................................................83

C.     Even Absent the Savings Clause, Implied Preclusion is Unwarranted.................85

VIII.  The Complaint Adequately Alleges Injury-in-Fact .......................................................88

IX.    The Complaint States a Claim for Conspiracy to Monopolize.........................................89

X.     The Complaint States a Claim for Unjust Enrichment .....................................................92

CONCLUSION...................................................................................................................94

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*131 Main St. Assocs. v. Manko*,
  179 F. Supp. 2d 339 (S.D.N.Y. 2002) ..................................................................75, 77, 78

*AD/SAT v. Associated Press*,
  181 F.3d 216 (2d Cir. 1999) ........................................................................................36, 62

*American Express Travel Related Servs. Co., Inc. v. Visa USA, Inc.*,
  Nos. 04 Civ. 8967 (BSJ), 04 Civ. 7844 (BSJ) (S.D.N.Y. Aug. 29, 2005) ...........................91

*Abraham v. Intermountain Health Care Inc.*,
  461 F.3d 1249 (10th Cir. 2006) ...........................................................................................50

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06 MD 1775 (JG) (VVP), (E.D.N.Y. Sept. 22, 2010) ..............................72, 74, 75, 78

*Alvord-Pork, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994) ...........................................................................................51, 52

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) ...............................................................................................................50

*Am. Vision Ctrs., Inc. v. Cohen*,
  711 F. Supp. 721 (E.D.N.Y. 1989) ......................................................................................59

*American Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................. 55-60, 62, 63

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946) ...............................................................................................................90

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) .................................................................................. *passim*

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ...........................................................................................39, 46

*Arista Records LLC v. Lime Grp. LLC*,
  532 F. Supp. 2d 556 (S.D.N.Y. 2007) ................................................................................91

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ........................................................................................... 17-20

*Associated Press v. United States*,
  326 U.S. 1 (1945) ...................................................................................................................65

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ...............................................................................................................67

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,*
  155 F.3d 59 (2d Cir. 1988) ...................................................................................17

*Barry v. St. Paul Fire & Marine Ins. Co.,*
  555 F.2d 3 (1st Cir. 1977) ...................................................................................73

*Bates v. United States,*
  522 U.S. 23 (1997) ...............................................................................................82

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................... *passim*

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
  620 F.2d 1360 (9th Cir. 1980) .............................................................................46

*Berkey Photo v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979) .............................................................................7, 70

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,*
  448 F.3d 573 (2d Cir. 2006) ................................................................................92

*Beverage Corp. v. Honickman,*
  55 F.3d 762 (2d Cir. 1995) ..................................................................................24

*Bigelow v. RKO Radio Pictures,*
  327 U.S. 251 (1946) .............................................................................................30

*Blue Shield of Va. v. McCready,*
  457 U.S. 465 (1982) .......................................................................... 4, 18-20, 22, 25

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
  369 F.3d 212 (2d Cir. 2004) ................................................................................88

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,*
  No. 13 Civ. 1111 (JSR), 2013 WL 6311202 (S.D.N.Y. Dec. 5, 2013) ................50

*Boyd v. AWB Ltd.,*
  544 F. Supp. 2d 236 (S.D.N.Y. 2008) .................................................................24

*Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.,*
  646 F. Supp. 1110 (S.D.N.Y. 1986) ....................................................................23

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ........................................................................................69, 92

*In re Buspirone Antitrust Litig.,*
  185 F. Supp. 2d 363 (S.D.N.Y. 2002) .............................................................70, 72

*In re Cardizem CD Antitrust Litig.,*
  105 F. Supp. 2d 618 (E.D. Mich. 2000) ..............................................................93

*Churchill Downs Inc. v. Thoroughbred Horesemen's Grp., LLC,*
  605 F. Supp. 2d 870 (W.D. Ky. 2009) .................................................................84

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)...............................................................................75

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op*,
   838 F.2d 268 (8th Cir. 1988) ............................................................................62

*Connecticut v. Am. Elec. Power Co., Inc.*,
   582 F.3d 309 (2d Cir. 2009).........................................................................88, 89

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).............................................................................................15

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)......................................................................................57-60

*Credit Suisse Secs. (USA) LLC v. Billing*,
   551 U.S. 264 (2007)......................................................................80, 85, 86, 88

*In re Currency Conversion Fee Antitrust Litig.*,
   773 F. Supp. 2d 351 (S.D.N.Y. 2011)..............................................................67

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ...................................... 4, 20, 23-26, 30, 31

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012)..............................................................93

*DNAML Pty, Ltd. v. Apple Inc.*,
   No. 13 Civ. 6516 (DLC), 2014 WL 2535113
   (S.D.N.Y. June 5, 2014)..............................................18, 21, 22, 24, 28, 30

*D.R. Ward Const. Co. v. Rohm & Haas Co.*,
   470 F. Supp. 2d 485 (E.D. Pa. 2006) ..............................................................93

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005).......................................................................18, 19, 69

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)........................................................92, 93

*Disabled in Action of Metro. N.Y. v. Hammons*,
   202 F.3d 110 (2d Cir. 2000)...............................................................................84

*In re Elec. Books Antitrust Litig.* ("eBooks"),
   859 F. Supp. 2d 671 (S.D.N.Y. 2012).......................................................*passim*

*In re Elec. Books Antitrust Litig.* ("eBooks II"),
   No. 11 MD 2293 (DLC), 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ...................28, 29, 89

*Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*,
   588 F.3d 128 (2d Cir. 2009)...............................................................................85

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)..................................................................................36

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
 720 F.3d 33 (1st Cir. 2013) ............................................................................38, 39, 50

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
 391 U.S. 253 (1986) .............................................................................................50

*Fishman v. Estate of Wirtz*,
 807 F.2d 520 (7th Cir. 1986) .............................................................................59

*In re Flat Glass Antitrust Litig.*,
 385 F.3d 350 (3d Cir. 2004) ...............................................................................40

*Freeman v. San Diego Ass'n of Realtors*,
 322 F.3d 1133 (9th Cir. 2003) ...........................................................................60

*Friedman v. Salomon/Smith Barney, Inc.*,
 313 F.3d 796 (2d Cir. 2002) ...............................................................................87

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
 343 F.3d 1000 (9th Cir. 2003) ...........................................................................68

*Gordon v. N.Y. Stock Exch.*,
 422 U.S. 659 (1975) .......................................................................................85, 86

*Gross v. New Balance Athletic Shoe, Inc.*,
 955 F. Supp. 242 (S.D.N.Y. 1997) .....................................................................31

*Gucci v. Gucci Shops, Inc.*,
 651 F. Supp. 194 (S.D.N.Y. 1986) .....................................................................60

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
 879 F.2d 1005 (2d Cir. 1989) .............................................................................90

*Hanover Shoe v. United Shoe Machinery Corp.*,
 392 U.S. 481 (1968) .............................................................................................19

*Harold Friedman Inc. v. Thorofare Mkts. Inc.*,
 587 F.2d 127 (3d Cir. 1978) ...............................................................................66

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
 620 F. Supp. 2d 499 (S.D.N.Y. 2009) ...............................................................49

*Hinds Cnty., Miss. v. Wachovia Bank N.A. ("Hinds II")*,
 700 F. Supp. 2d 378 (S.D.N.Y. 2010).............................................36, 72, 77, 86

*Ill. Brick Co. v. Illinois*,
 431 U.S. 720 (1977)........................................................................................4, 19

*Int'l Bus. Machines Corp. v. Platform Solutions, Inc.*,
 658 F. Supp. 2d 603 (S.D.N.Y. 2009).................................................................24

*Int'l Fine Art & Antique Dealers Show Ltd. v. ASU Int'l, Inc.*,
 No. 02 Civ. 534 (DLC), 2002 WL 1349733 (S.D.N.Y. June 20, 2002) ...................83

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
  190 F. Supp. 2d 600 (S.D.N.Y. 2002) ................................................................. 67

*Interstate Circuit, Inc. v. United States*,
  306 U.S. 208 (1939) ............................................................................................ 38

*In re Issuer Plaintiff IPO Antitrust Litig.*,
  No. 00 Civ. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ........ 72-74

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
  190 F.3d 775 (7th Cir. 1999) ............................................................................. 91

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ...................................................................................... 30, 41

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) .................................................................... 89

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
  970 F.2d 1030 (2d Cir. 1992) ............................................................................ 71

*Kasada Inc. v. Access Capital, Inc.*,
  No. 01 Civ. 8896 (GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ............ 91

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*,
  No. 12 Civ. 3012 (WJM), 2014 WL 560462 (D. Colo. Feb. 13, 2014) ................ 49

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ...................................................................................... 71, 77

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
  359 U.S. 207 (1959) ............................................................................................. 2

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
  571 F.3d 672 (7th Cir. 2009) ............................................................................. 89

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................ 68

*La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*,
  No. 12 Civ. 6659 (DLC), 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ................ 92

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ................................................... 17, 18, 21, 22, 26, 88

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
  700 F.2d 785 (2d Cir. 1983) ............................................................................... 23

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*,
  No. 13-cv-2280, 2014 WL 2487188 (2d Cir. June 4, 2014) ......................... 21, 22

*In re Magnetic Audiotape Antitrust Litig.*,
  No. 99 Civ. 1580 (LMM), 2002 WL 975678 (S.D.N.Y. May 9, 2002) ................ 78

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)................................................................43, 54

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 1997)...............................................................14

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2009)..............................................................93

*In re Merrill Lynch Ltd. P'hips Litig.*,
  154 F.3d 56 (2d Cir. 1998).................................................................78

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)...........................................................................32

*N. Carolina State Bd. of Dental Exam'rs v. F.T.C.*,
  717 F.3d 359 (4th Cir. 2013)..............................................................60

*Nat. Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*,
  452 U.S. 378 (1981)...........................................................................87

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)...........................................................................6, 51

*In re Natural Gas Commodity Litig.*,
  337 F. Supp. 2d 498 (S.D.N.Y. 2004).................................................73

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  350 F. Supp. 2d 160 (D. Me. 2004)....................................................93

*New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*,
  651 F. Supp. 802 (S.D.N.Y. 1986)...........................................23, 26, 27

*In re Nine W. Shoes Antitrust Litig.*,
  80 F. Supp. 2d 181 (S.D.N.Y. 2000).............................................73, 78

*Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*,
  No. 85 Civ. 2674 (GET), 1986 WL 15507 (N.D. Ga. Dec. 23, 1986)..................60

*In re OSB Antitrust Litig.*,
  No. 06 Civ. 826 (GD), 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007)....................36

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
  12 Civ. 3515 (JJB), 2014 WL 626555 (N.D. Tex. Feb. 18, 2014).....................54

*Ostrofe v. H.S. Crocker Co., Inc.*,
  740 F.2d 739 (9th Cir. 1984).........................................................67, 69

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
  541 F. Supp. 2d 487 (D. Conn. 2008)..................................................36

*Park v. Thomson Corp.*,
  No. 05 Civ. 2931 (WHP), 2007 WL 119461 (S.D.N.Y. Jan. 11, 2007)................93

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006)....................................................................23, 24, 31

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007)....................................................................69

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08 Civ. 42 (JG) (VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)............36, 46, 73, 75

*Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*,
   219 F.3d 92 (2d Cir. 2000)....................................................................49, 56, 65

*In re Processed Egg Prods. Antitrust Litigation*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................49

*In re Publ'n Paper Antitrust Litig.*,
   No. 304 MD 1631 (SRU), 2005 WL 2175139 (D. Conn. Sept. 7, 2005) ........................72, 77

*Reading Indus. Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980).....................................................................31

*Reg'l Multiple Listing v. Am. Home Realty*,
   No. 12 Civ. 965 (JRT), 2014 WL 1285733 (D. Minn. Mar. 31, 2014) ................................65

*Ricci v. Chicago Mercantile Exch.*,
   409 U.S. 289 (1973).............................................................................88

*Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co., Inc.*,
   708 F. Supp. 2d 257 (E.D.N.Y. 2010) ...................................................71

*Robertson v. Sea Pines Real Estate Cos., Inc.*,
   679 F.3d 278 (4th Cir. 2012) .................................................................60

*Ross v. Bank of Am., N.A.(USA)*,
   524 F.3d 217 (2d Cir. 2008)...................................................................89

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).....................................................................16

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)...................................................................15

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...................................................91

*In re Sadia, S.A. Sec. Litig.*,
   269 F.R.D. 298 (S.D.N.Y. 2010) ..........................................................41

*SCFC ILC, Inc. v. Visa USA, Inc.*,
   36 F.3d 958 (10th Cir. 1994) .................................................................64

*Santana Products, Inc. v. Sylvester & Assocs., Ltd.*,
   121 F. Supp. 2d 729 (E.D.N.Y. 1999) ...................................................70

*Sebelius v. Cloer,*
    133 S. Ct. 1886 (2013)............................................................................82

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,*
    737 F. Supp. 2d 380 (E.D. Pa. 2010).............................................................93

*Silver v. N.Y. Stock Exch.,*
    373 U.S. 341 (1963)...............................................................65, 86, 88

*Singer v. AT & T Corp.,*
    185 F.R.D. 681 (S.D. Fla. 1998)..................................................................93

*Sira v. Morton,*
    380 F.3d 57 (2d Cir. 2004)........................................................................15

*Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.,*
    No. 10 Civ. 3751 (DLC), 2010 WL 5392927 (S.D.N.Y. Dec. 29, 2010)................24

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
    253 F.3d 215 (5th Cir. 2001)......................................................................50

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010)...............................35, 37, 40, 41, 45, 52, 53, 62

*State of N.Y. v. Cedar Park Concrete Corp.,*
    684 F. Supp. 1229 (S.D.N.Y. 1988).............................................................74

*State of N.Y. v. Hendrickson Bros., Inc.,*
    840 F.2d 1065 (2d Cir. 1988)........................................................72, 73, 75

*Strobl v. N.Y. Mercantile Exch.,*
    768 F.2d 22 (2d Cir. 1985)....................................................................84-86

*In re Terazosin Hydrochloride Antitrust Litig.,*
    160 F. Supp. 2d 1365 (S.D. Fl. 2001)...........................................................93

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)..............................................................................61-63

*In re Text Messaging Antitrust Litig.,*
    630 F.3d 622 (7th Cir. 2010)......................................................................40

*Timken Roller Bearing Co. v. United States,*
    341 U.S. 593 (1951).............................................................................61, 62

*In re Titanium Dioxide Antitrust Litig.,*
    959 F. Supp. 2d 799 (D. Md. 2013).............................................................40

*Todorov v. DCH Healthcare Auth.,*
    921 F.2d 1438 (11th Cir. 1991)...............................................................54, 69

*Town of Poughkeepsie v. Espie,*
    402 F. Supp. 2d 443 (S.D.N.Y. 2005)...........................................................78

*Two Old Hippies, LLC v. Catch the Bus, LLC*,
  784 F. Supp. 2d 1200 (D.N.M. 2011) ............................................................36

*United States v. Apple Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013)............................................................38

*United States v. Brown Univ. in Providence in State of R.I.*,
  5 F.3d 658 (3d Cir. 1993)..............................................................................51

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ........................................................................63

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ......................................................................................50

*United States v. Sealy, Inc.*,
  388 U.S. 350 (1967) ......................................................................................60

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ......................................................................................60

*United States v. Wilkinson*,
  754 F.2d 1427 (2d Cir. 1985).........................................................................46

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................................79, 80

*In re Visa Check/Mastermoney Antitrust Litig.*,
  No. 96 Civ. 5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)...................91

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
  661 F. Supp. 2d 1172 (D. Nev. 2009)............................................................86

*Welch v. Am. Psychoanalytic Ass'n*,
  No. 85 Civ. 1651 (JFK), 1986 WL 4537 (S.D.N.Y. Apr. 4, 1986)...............67, 69

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  865 F. Supp. 2d 1002 (C.D. Cal. 2011) .....................................................39, 40

*Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007)............................................................54

*Woelke & Romero Framing, Inc. v. N.L.R.B.*,
  456 U.S. 645 (1982) ......................................................................................84

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
  328 F. App'x 695 (2d Cir. 2009) ....................................................................72

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002)............................................................60

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ......................................................................................71

## Statutes and Rules

12 U.S.C. § 5303 ..........................................................................................................79

15 U.S.C. § 1 ...............................................................................................................83

15 U.S.C. § 2 ...............................................................................................................83

47 U.S.C. § 152 ...........................................................................................................80

7 U.S.C. § 4s(j)(6) .................................................................................................81, 82

7 U.S.C. § 5h(f)(11) ....................................................................................................81

Fed. R. Civ. P. 12(b)(6) ....................................................................................3, 14, 41

Fed. R. Civ. P. 12(e) ...................................................................................................47

## Other Authorities

156 Cong. Rec. E1347-01 (daily ed. July 15, 2010), 2010 WL 2788137........................81, 84, 87

156 Cong. Rec. S5902-01 (daily ed. July 15, 2010), 2010 WL 2788026 ......................84

P. Areeda & H. Hovenkamp, *Antitrust Law* (3d ed. 2007)....................................25, 62

P. Areeda & H. Hovenkamp, *Antitrust Law* (2d ed. 2000)..........................................69

C. Scott Hemphill & Tim Wu, *Parallel Exclusion,*
    122 Yale L.J. 1182 (2013) ......................................................................................91

Daniel R. Karon, *Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to*
    *Consumer Price-Fixing Claims,* 108 W. Va. L. Rev. 395 (2005) ............................93

Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act,*
    64 Colum. L. Rev. 570 (1964) ................................................................................24

*Restatement (Third) of Restitution & Unjust Enrichment* § 1 (2011)...........................92

S. Rep. No. 111-176 (2010) ........................................................................................82

Plaintiffs respectfully submit this consolidated brief in opposition to the motions to dismiss filed by (i) Bank of America Corporation; Bank of America N.A.; Barclays Bank PLC; BNP Paribas; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc.; Credit Suisse AG; Deutsche Bank AG; Goldman, Sachs & Co.; HSBC Bank plc; HSBC Bank USA, N.A.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley & Co. LLC; Royal Bank of Scotland PLC; Royal Bank of Scotland N.V.; UBS AG; and UBS Securities LLC (collectively, the "Dealer Defendants"), (ii) Defendant Markit Group Ltd. ("Markit"), (iii) Defendant BNP Paribas ("BNP"), and (iv) Defendant International Swaps and Derivatives Association ("ISDA") (Dkt Nos. 289, 293, 296, 297, respectively).

## PRELIMINARY STATEMENT

At its core, this case is relatively simple.  It involves a conspiracy among competitors in the credit default swaps ("CDS") market to eliminate market entrants that would have saved the consumers in that market – that is, U.S. investors – a lot of money.  Plaintiffs and the class they seek to represent are the consumers who overpaid the Dealer Defendants on their CDS transactions as a direct result of this conspiracy.

Like virtually any agreement to eliminate market entry, the conspiracy here diminished competition, reduced output, and stifled innovation – and thus led to higher prices.  These are basic economic principles.  But this conspiracy was especially pernicious, because the market entrants that Defendants conspired to eliminate (*i.e.*, exchange trading platforms for CDS) would have immediately allowed investors to buy and sell CDS in a far more efficient, transparent, and inexpensive way.  The ability of exchange trading to bring these benefits to investors is precisely why so many financial products – like stocks, options, and futures – are traded on exchanges.

1

While the Complaint[1] is lengthy, the basic facts and legal principles are straightforward. This is not the first case in which competitors have unlawfully conspired to prevent other companies from entering a market.  For decades, courts have held that "group boycotts" and "concerted refusals to deal" of the type alleged here are *per se* violations of the antitrust laws.[2] Courts have also established that consumers like Plaintiffs have standing to bring claims for the harms they suffered as a result of these market-blocking activities.  If anything is unusual about this case, it is the amount of salient factual detail Plaintiffs have provided in the Complaint, before discovery has even commenced.

The Complaint robustly alleges how the Dealer Defendants conspired among themselves and with Defendants ISDA (an industry trade association) and Markit (a private company that owned rights to important CDS indices) to prevent the emergence of exchange trading for CDS. The conspiracy was hatched in a series of secret meetings beginning in the fall of 2008.  As a result of these meetings, the Dealer Defendants' executives agreed they would boycott exchange trading ventures and that ISDA and Markit would deny those ventures intellectual property licenses that were necessary for them to operate.  In late 2008, they did just this to the Credit Market Derivatives Exchange ("CMDX"), an electronic exchange and clearinghouse that was poised to bring a more efficient, transparent, and inexpensive way of buying and selling CDS to investors.  After making sure that CMDX would not be able to bring its exchange trading platform to market, Defendants then worked together to make sure no other CDS exchange-trading ventures could enter the market in the years that followed.

---

[1] *See* Second Consolidated Amended Class Action Complaint, April 11, 2014 (Dkt. 285) (the "Complaint").  Citations to the Complaint are abbreviated as "(¶__.)."

[2] In 1959, the Supreme Court observed:  "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category."  *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 210 (1959).

Defendants' purpose was to maintain the structure of the over-the-counter CDS market they dominated, which allowed them to reap huge profits. These profits came from their ability to buy low and sell high on every CDS transaction – in both cases dealing directly with Plaintiffs and the class of investors here. The difference between the price at which dealers purchased CDS from investors (the "bid") and the price at which dealers sell the same CDS to investors (the "ask") is called the "bid/ask spread." In the opaque, over-the-counter market they controlled, the Dealer Defendants were able to keep these spreads very wide.

But the Dealer Defendants could not maintain such wide bid/ask spreads if CDS were traded on an exchange because, as a rule, prices are more transparent and spreads are much tighter for financial products traded on an exchange. And that is why when the Dealer Defendants saw that CMDX was poised to bring exchange trading to the CDS market, they conspired to stop that from happening. Defendants' conspiracy prevented CMDX and other exchange-trading ventures from entering the market, thus ensuring that investors continued to overpay when they bought CDS and be underpaid when they sold CDS.[3] This case is brought by the very investors, including some of the nation's largest pension and other funds, directly harmed by Defendants' conduct. Given the large size of this market, the monetary harm to class members could amount to billions of dollars.

Defendants' four motions under Rule 12(b)(6) have no merit. Their arguments are contrary to the overwhelming weight of legal authority and, in many cases, to binding authority which they fail to address. Defendants' arguments are also inconsistent with the well-pleaded

---

[3] As noted, Plaintiffs and the other investors comprising the class are the direct counterparties with the Dealer Defendants on CDS transactions. When Plaintiffs bought CDS, they were direct purchasers on those investments and were overcharged as a result. When Plaintiffs sold CDS, they were the direct sellers on those investments and were underpaid as a result. For ease of reference in this brief, Plaintiffs use the nomenclature "direct purchasers" and "overcharges" to encompass both categories of direct economic harm.

allegations of the Complaint, often egregiously so, even though the truth of the Complaint's allegations must be assumed at this stage.

*Dealer Defendants' Standing Argument*:  The Dealer Defendants' lead argument is that Plaintiffs lack standing to bring claims because their injuries are purportedly too "indirect" and "remote."  But Plaintiffs – the consumers *and* direct purchasers of CDS – are suing for the harms they suffered in transactions *directly* with the Dealer Defendants arising from Defendants' scheme to ensure that Plaintiffs paid too much and received too little for CDS.  Plaintiffs' standing to bring these claims is manifest.  Congress emphatically intended the antitrust laws to protect consumers from the types of injuries alleged here, as recognized by Supreme Court and Second Circuit precedent.  Indeed, this class of consumers and direct purchasers is *the* preferred class of entities to vindicate Congress's goals in providing a private right of action under the antitrust laws.[4]  Defendants' various arguments ignore this dispositive authority and cannot be reconciled with Congress's clear intent.  *See* Section II.

*Dealer Defendants' Plausibility Argument*:  The Dealer Defendants next assert that the alleged conspiracy is implausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  But the Complaint in this case could hardly be more different from the complaint in *Twombly*, where the plaintiffs relied *solely* on an *inference* of collusion arising from *passive* conduct.  Here, the Complaint alleges that Defendants secretly met and conspired and provides, in many instances, the names of the people who met, when and where they met, the terms of their anticompetitive agreements, and what they did as a result.  In addition to making direct

---

[4] *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977) (holding that direct purchasers have "a preferred position as private attorneys general" under the antitrust laws); *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) (holding that consumers have standing when existing competitors are eliminated); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) (holding that direct purchasers have standing when potential competitors are excluded).

allegations of agreement, the Complaint lays out a chronology of events that compellingly shows an abrupt change from seemingly uncoordinated conduct to highly coordinated conduct.  The Complaint also alleges a number of "plus factors" that further bolster the conspiracy allegations.  One of these is that the European Commission has already disclosed that it found evidence that these very Defendants conspired to obstruct exchange trading.  The alleged conspiracy is more than plausible.  *See* Section III.

*BNP's Plausibility Argument*:  BNP separately argues that the allegations against it are insufficient.  But the Complaint clearly alleges, among other things, that BNP joined the conspiracy, that it agreed with the other Dealer Defendants to boycott exchange trading of CDS, and that it acted in lock-step with the other Dealer Defendants in effectuating their conspiracy.  Thus, unsurprisingly, the European Commission has found evidence of BNP's participation in the conspiracy as well.  *See* Section III.E.

*ISDA's Plausibility Argument*:  ISDA, a trade association for the derivatives industry, argues that its alleged involvement in the conspiracy is implausible.  But the Complaint's allegations are also more than sufficient to plead ISDA's participation.  Notably, ISDA abruptly reversed course after having been prepared to provide a license to CMDX, right after the Dealer Defendants held their secret conspiratorial meetings.  It then refused to grant a license for exchange trading to CMDX that would have been in its independent interest, while taking steps identical to Markit's at the exact same time, and it ultimately agreed to license only for *non-exchange* trading on terms that conspicuously favored its alleged co-conspirators – the Dealer Defendants.  Although Plaintiffs need not exclude other possible explanations for ISDA's conduct, the plausibility of any non-collusive version of these events strains credulity.

5

Moreover, ISDA's argument that it could not have joined the conspiracy because it is a non-profit association is contrary to a wealth of precedent.[5]  *See* Section IV.

*Markit's Arguments*:  Markit is a company that also owned intellectual property necessary for exchange trading of CDS and, upon joining the conspiracy, also allegedly agreed not to license those rights to CMDX and other exchange ventures.  Even more so than the other movants, Markit fails to engage the real issues and chooses instead the route of obfuscation.  Its motion consistently misstates the facts and the law when it is not musing about irrelevant topics.  Each of Markit's arguments lacks merit.  First, there is no "controlling shareholder rule" (a rule Markit purports to quote, without attribution) that precludes Markit from conspiring with its shareholders.  To the contrary, the Complaint pleads a legally cognizable conspiracy between Markit and the Dealer Defendants, who are all distinct economic actors.

Second, Markit is not a "joint venture" accused of being a "walking conspiracy" or merely undertaking "core activities."  Instead, Markit is a company that, like other companies, violates the antitrust laws when it conspires with others to restrain trade.  In this case, Markit did so when it agreed with the Dealer Defendants that it would refuse to license its intellectual property in order to prevent exchange trading – a commitment it kept until after this lawsuit was filed.  Third, a *concerted* refusal to license as alleged here is clearly an unreasonable restraint of trade.  Markit's separate standing argument lacks merit as well.  *See* Section V.

*Dealer Defendants' Statute of Limitations Arguments*:  The Dealer Defendants also seek to exclude certain periods from Plaintiffs' claims.  But they misstate the law by claiming that Plaintiffs cannot rely on any *conduct* occurring prior to May 3, 2009, even for the purposes of proving concededly timely claims accruing after May 3, 2009.  Their position is incorrect under

---

[5] *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984).

well-settled Second Circuit authority. *See Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979). To prove their timely claims, Plaintiffs can rely on conduct that is part of Defendants' continuing conspiracy *whenever it occurred*.

In any case, *all* of Plaintiffs' claims are timely here because the statute of limitations was tolled due to Defendants' concealment of their conspiracy, a secretive operation they successfully kept hidden for years. Reports of Defendants' secret meetings did not first emerge until December 2010 and, even then, no one was able to connect those meetings to the alleged conspiracy to shut down CMDX and other exchange ventures. In arguing that Plaintiffs should have known the real truth over nineteen months before these reports emerged, it is Defendants, not Plaintiffs, who make claims that are utterly implausible. *See* Section VI.

*Dealer Defendants' Implied Preclusion Argument*: The Dealer Defendants also argue that Plaintiffs' claims accruing after July 21, 2011 are impliedly precluded by the Dodd-Frank Act. But their argument is repugnant to the Act's plain language and squarely repudiated by the legislative history. *See* Section VII.

*Dealer Defendants' Remaining Arguments*: Finally, Plaintiffs have also properly alleged injury-in-fact, a claim for a conspiracy to monopolize under Section 2 of the Sherman Act, and a claim for unjust enrichment. *See* Sections VIII-X. Accordingly, Defendants' motions should be denied in their entirety.

## STATEMENT OF FACTS

### A.    Defendants Kept the CDS Market Opaque to Reap Supracompetitive Bid/Ask Spreads

A CDS is a type of credit derivative used to hedge credit exposure or speculate on the value of credit protection. (¶¶70-73.) The buyer of CDS protection makes periodic payments to the seller in exchange for the seller's agreement to make the buyer whole if a "credit event"

occurs.  (¶71.)  During the Class Period, the market for CDS was over-the-counter.  (¶4.)  To buy

or sell CDS, investors dealt with "market makers" – *i.e.*, the Dealer Defendants here.  (¶76.)  The

Dealer Defendants provided a "bid" price, at which the dealer would purchase CDS, and an

"ask" price, at which the dealer would sell CDS.  (¶77.)  The dealers kept their "ask" price higher

than their "bid" price and captured the difference, known as the "bid/ask spread."

In the early 2000s, market makers brought liquidity to the over-the-counter market.  But

the value of these services diminished as CDS transaction volume increased, the terms for CDS

transactions were standardized by the ISDA Master Agreement, and many single-name and

index CDS products became highly standardized.[6]  (¶¶81-83.)  These changes put downward

pressure on bid/ask spreads and raised the potential for greater price competition.  (¶87.)

Faced with these prospects, the Dealer Defendants took steps to keep investors in the

dark and the bid/ask spreads they paid artificially wide.  (¶88.)  First, they prevented the

distribution of real-time CDS pricing information by refusing to provide binding CDS quotes and

prohibiting sharing these quotes with other market participants.[7]  (¶¶89-90.)  Second, they

restricted post-transaction price information by prohibiting the publication of real-time

transaction data.  (¶¶92-93.)  The Dealer Defendants also conditioned their licensing of CDS data

on Markit's agreement to average the data and delay its publication.  (¶¶94-98.)  Third, the

Dealer Defendants prevented inter-dealer brokers from providing pricing information to, or

---

[6] The most widely used CDS indices – iTraxx and CDX – were developed by entities owned by certain of the Dealer Defendants and then sold to Markit in an arm's length transaction; Markit now owns and manages the indices.  (¶¶83-84.)

[7] Markit incorrectly equates a consumer in the over-the-counter CDS market to a consumer in an insurance market that can compare quotes among insurers.  (Markit Br. 5.)  As the Complaint alleges, consumers in the over-the-counter CDS market were *prevented* from comparing prices because of a lack of pre-trade transparency and the fact that prices were non-binding; the Dealer Defendants also regularly changed their prices even after giving a quote.  (¶¶88-90.)

soliciting interest from, investors and threatened boycotts when brokers attempted to facilitate trades with non-dealers.  (¶¶99-103.)  By the start of the Class Period, these actions had enabled the Dealer Defendants to maintain supracompetitive bid/ask spreads (¶¶104-05) and an inefficient and opaque over-the-counter market.[8]

### B.  Exchange Trading of CDS Emerges as a Threat

By 2008, the CDS market was ready for a change.  Increased volume and standardization primed the market for exchange trading, and there was high demand for greater transparency, efficiency, and competition – and especially for a way to trade CDS on exchange, just as many other financial instruments (like stocks, options, and futures) are traded.  (¶¶108-09.)  To meet this demand, the CME Group (the operator of the world's leading derivatives marketplace) and the hedge fund Citadel (a buy-side market leader) developed the Credit Market Derivatives Exchange ("CMDX"), an electronic exchange and clearinghouse for CDS.  (¶¶110-12.)

CMDX was an electronic trading, booking, and migration platform for CDS, paired with straight-through processing to CME's clearing facilities.  (¶114.)  CMDX would enable market participants to trade through central limit order booking ("CLOB"), a method that matches customers' orders (bids and offers) so the highest bid is matched with the lowest offer.  Citadel and CME made huge investments in CMDX and conducted extensive testing and modeling to ensure it would deliver a fully-viable electronic trading platform.  (¶113.)

Modeling showed CMDX would support the trading and clearing of 75% of CDS transactions on the day of its launch, would eventually clear more than 90% of CDS trades

---

[8] The Dealer Defendants' role in the over-the-counter market was like a real estate agent selling a house where the buyer knows only what she paid and the seller knows only what she received.  The agent would pocket the difference (*i.e.*, the spread) as her fee, rather than disclose it.  Moreover, only the real estate agent – and neither the buyer nor seller – would have easy access to the prices paid recently for other homes on the same block.  (¶8.)

(¶117), and would be adopted quickly by the market (¶122).  Outside analyses, including one conducted by Defendant JP Morgan, confirmed the market environment was "ideal" for CMDX to achieve rapid adoption.  (¶123.)  CME and Citadel's internal modeling, reports by market analysts, and academic studies have all found that the movement of CDS trading onto an exchange would save investors money by yielding increased pre- and post-transaction transparency and substantially reducing bid/ask spreads, both for CDS products traded on the exchange as well as any products remaining in the over-the-counter market.  (¶¶203-15.)

When Citadel and CME first presented CMDX, it was well received.  Numerous prominent buy-side firms expressed interest in becoming founding members.  (¶125.)  At least six Defendant Dealers – Bank of America, Barclays, Citi, Deutsche Bank, Morgan Stanley, and UBS – also were interested in obtaining equity in CMDX.  (¶¶126-27.)  Some of these banks began to have "advanced discussions" with CME and Citadel; investment in CMDX would give those dealers a first-mover advantage and allow them to achieve growth in the market they had otherwise been unable to achieve.  (¶¶127, 142.)

Citadel and CME also met with Markit to obtain licenses to Markit's CDS indices (CDX and iTraxx) and licenses to use Markit's reference entity database ("RED") codes, which are used to identify the reference entity of each CDS.  (¶¶130-31.)  Markit wanted a licensing deal with CMDX in order to gain significant revenues and greater market adoption of RED codes.  (¶¶132-33.)  Citadel and CME also offered to license data generated by CMDX trading to Markit, which would grow Markit's data subscription business.  (¶¶134-35.)  CMDX and Markit exchanged term sheets providing for the licensing of the CDS indices and RED codes to CMDX, and the payment of revenues and licensing of data to Markit.  (¶135.)

Citadel and CME also met with ISDA to obtain licenses to use the ISDA Master Agreement.  (¶136.)  Because the vast majority of CDS transactions are covered by the Master Agreement, obtaining a license for its use would ensure that exchange trading of CDS would mirror conventions of over-the-counter transactions.  ISDA was interested in licensing to CMDX because it was consistent with its goals of "increasing transparency" and "improving the industry's operational infrastructure."  (¶137.)  ISDA would also gain licensing revenues through broader adoption and use of the Master Agreement on CMDX.  (¶138.)  Notwithstanding its non-profit status, ISDA has long used its intellectual property as a revenue stream.  (¶136.)

By October 2008, if not before, CMDX was operational and ready to launch, subject only to finalization of the aforementioned licensing arrangements and certain regulatory approvals (which were straightforward but could not have been completed until after licensing was complete).  (¶¶140-41.)  As of the beginning of October 2008, Citadel and CME believed CMDX would be processing trades within 30 days.  (*Id.*)[9]

### C.    Defendants Conspire to Block Exchange Trading of CDS

Just as CMDX was poised to bring transparency and competition to the CDS market, the Dealer Defendants conspired to block exchange trading of CDS.  (¶143.)  This conspiracy was orchestrated and carried out through a series of secret face-to-face meetings and telephonic and electronic communications beginning in the fall of 2008.  (¶¶143-44.)  The Dealer Defendants held secret meetings in midtown Manhattan and other locations, including on the third Wednesday of every month, to discuss how to stop CMDX and how to block the emergence of

---

[9] Citadel and CME were not the only entities making proposals to move CDS away from the inefficient over-the-counter market in the U.S.:  European exchange providers Deutsche Börse AG and SIX Swiss Exchange were together launching Eurex Clearing, and NYSE Euronext – owner of the New York Stock Exchange – was launching its own CDS clearing venture, Liffe.  (¶¶141, 177.)

exchange trading.  (¶¶145, 228.)  At these meetings, the Dealer Defendants agreed that none of them would deal with CMDX or any nascent clearinghouse so long as there was a possibility those platforms would allow CDS trading and that they would work together to eliminate the imminent threat presented by CMDX's trading platform by conspiring with Markit and ISDA. (¶¶145-46.)

As a result of their agreement, the Dealer Defendants jointly pressured Markit and ISDA to reverse course, against their economic interest, and to refuse to license their intellectual property to CMDX.  (¶147.)  By wielding pressure and influence, the Dealer Defendants secured the agreement of Markit and ISDA to provide licenses for over-the-counter purposes only, and not for exchange trading.  (¶148.)  In early November 2008, Markit and ISDA, for the first time, notified Citadel and CME that more formal approvals would be required for the requested licenses.  (*Id.*)  Markit and ISDA thereafter, in a coordinated fashion, began sending draft licensing agreements that removed any provision for exchange trading.  They also informed CME and Citadel that they would not agree to a license so long as CMDX could offer exchange trading.  (¶¶149-50.)  In March 2009, after purposefully drawing out the negotiations, Markit and ISDA provided licenses that *expressly precluded* use of licensed intellectual property for an exchange trading platform.  (¶¶152-53.)  The licensing agreements also required that one of the Dealer Defendants must be on one side of every cleared CDS transaction.[10]  (¶154.)

Even after CMDX was denied licenses for exchange trading, the Dealer Defendants jointly boycotted CMDX's clearinghouse component, fearing the venture had exchange trading

---

[10] The Dealer Defendants claim that, "in the fall of 2008, CMDX did not pursue its alleged request for licenses to use the intellectual property of Markit and ISDA for exchange trading" (Dealer Br. 4) and that ISDA and Markit ultimately granted the licenses CMDX had requested (*id.* 11).  Those assertions are false and ignore the allegations that CMDX was seeking licenses for CLOB or exchange trading until it was denied them due to Defendants' conspiracy. (¶¶130, 135, 136, 138, 147-153.)

in its "DNA." (¶¶158-59, 161, 165.)  The Dealer Defendants also boycotted clearinghouses

offered by other exchanges (¶¶160, 177-79), agreeing to clear trades only through ICE Clear – a

clearinghouse they controlled (¶¶161-62, 166).  In March 2009, as a direct result of Defendants'

conduct, CMDX was forced to halt its planned rollout; soon thereafter, other CDS

clearinghouses boycotted by the Dealer Defendants also suspended activity.  (¶¶166, 177-79.)

In June 2009, the Dealer Defendants met with CME and insisted they would clear trades

through CMDX only if it removed all traces of exchange trading.  (¶176.)  They pressured CME

to drop Citadel as an active member in the venture and to give them control of the

clearinghouse's risk committee, which allowed the Dealer Defendants to slow the growth of

CME Clearing, restrict its members, and prevent it from transitioning to an exchange trading

platform.  (¶169.)  The Dealer Defendants also required CME to commit to a multi-year

agreement that CME Clearing would not offer CDS trading in any form.  (¶170.)[11]

### D.    Regulatory Investigations and Statement of Objections

In July 2009, the Department of Justice launched an investigation into the "possibility of

anticompetitive practices in the credit derivatives clearing, trading and information services

industries." (¶¶243-44.)  In 2011, the European Commission began investigating whether banks

had conspired in the CDS market.  (¶245.)

On July 1, 2013, the European Commission disclosed that it had issued a Statement of

Objections – essentially a formal complaint – based on its preliminary conclusion that evidence

showed that *each* of the Dealer Defendants named here, had acted "collectively to shut out

---

[11] The Dealer Defendants thereafter took further steps to ensure exchange trading would
not emerge, including by using the risk committee of ICE Clear to impose high requirements for
minimum capital, sophistication, and default management upon liquidation in order to prevent
smaller, buy-side entities from becoming members of ICE Clear.  (¶¶181-83.)  The Dealer
Defendants also imposed high clearing fees so as to deter use of the clearinghouse by smaller
dealers and end-users.  (¶185.)

exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market," and that they had enlisted ISDA and Markit in their scheme.  (¶247.)

### E.    Defendants' Conduct Harmed Investors Through Inflated Bid/Ask Spreads

As discussed further below (Section II), the Complaint explains how Defendants' conspiracy harmed Plaintiffs and class members by forcing them to pay inflated bid/ask spreads on every CDS transaction.  Absent Defendants' conspiracy, exchange trading would have been adopted quickly (¶¶122-23, 197-202) and would have reduced bid/ask spreads and increased price transparency (¶¶203-15).  The Complaint's allegations regarding the effects of exchange trading on spreads paid by investors reflect an academic consensus, are firmly grounded in empirical evidence, and are confirmed by an economic analysis done for this case.  (*Id.*)  As Kenneth Griffin of Citadel stated in December 2010, CDS investors were forced to pay "a stunning amount of money" as "economic rent" to the Dealer Defendants resulting from the lack of electronic trading which CMDX would have brought to the market.  (¶172; *see also* ¶211.)

## ARGUMENT

### I.    Defendants Disregard Governing Legal Standards

In considering a Rule 12(b)(6) motion, a court "must 'accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *In re Elec. Books Antitrust Litig.* ("*eBooks*"), 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) (Cote, J.) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 1997)).  Rule 12(b)(6) imposes a "plausibility" standard, not a "probability" standard, and "[e]ven if [allegations'] truth seems doubtful, 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).  Thus, "although an

14

innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that the conduct was culpable is not also plausible" – and "it is not the province of the court to dismiss the complaint on the basis of the court's choice among competing plausible alternatives." *Id.* at 190.

A "[c]ourt accepts as true for purposes of the motions to dismiss only those factual allegations that actually appear in the Complaint." *eBooks*, 859 F. Supp. 2d at 686 (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). Courts will not "take judicial notice of the complete contents of articles cited in the Complaint," nor will they "draw inferences against the plaintiffs from those facts that *are* in the Complaint." *Id.*; *see also Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."). In considering a complaint's allegations, "'[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *eBooks*, 859 F. Supp. 2d at 689 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

Defendants disregard these principles. They do not accept as true the Complaint's factual allegations; they do not draw inferences in Plaintiffs' favor; and they fail to consider the Complaint as a whole. Rather, they systematically mischaracterize or ignore well-pleaded factual allegations in an effort to construct a self-serving counter-narrative. They regularly purport to cite the Complaint for propositions that do not exist or are contradicted by the Complaint's allegations. One egregious example is the Dealer Defendants' summary of so-called "facts" at pages 3-4 of their motion, where not a single one of the citations to the

Complaint is accurate.[12]  More flagrant still is Markit's practice of placing quotation marks

around phrases in order to suggest they come from the Complaint; the Complaint does not, in

fact, contain the phrases "own and control," "too much" control, "support service," or still other

phrases – all of which Markit purports to quote.  *See also* Section V.

Defendants also base their arguments on snippets they selectively extract from articles

cited in the Complaint (and some articles they introduce themselves) and seek to rely on the *truth*

of these quotes to rebut the Complaint's well-pled allegations.[13]  The Dealer Defendants'

*Twombly* challenge, for example, is largely based on improper inferences from outside sources.

All of Defendants' arguments based upon these materials should be disregarded.[14]  When the

_____

[12] Contrary to Defendants' assertions, paragraphs 124 and 141 of the Complaint do *not* allege that "government regulators" exercised active oversight of the development of a CDS clearinghouse in 2008 and 2009, much less that no regulators objected to "certain dealers' support of ICE's proposed clearinghouse."  Paragraph 169 does *not* say that the Dealer Defendants "ultimately supported multiple clearing proposals in an effort to foster competition" – it says the opposite:  after squashing the exchange component of CMDX, the Dealer Defendants assumed control of CME Clearing's risk committee in order to "freeze CME Clearing's ability to clear" – that is, to eliminate it as a viable clearinghouse.  Paragraphs 148 and 153 do *not* say CMDX "did not pursue" licenses for exchange trading – they say the opposite:  that the European Commission preliminarily found that the Dealer Defendants secured Markit's and ISDA's agreement "to license only for 'over-the-counter' (OTC) trading purposes and not for exchange trading," and that ISDA and Markit granted licenses for clearing only, while expressly precluding use for exchange trading.  And the Dealer Defendants do not even attempt to support with a citation to the Complaint their false assertion that the "marketplace even now shows little demand for exchange trading of CDS."

[13] *See, e.g.*, Dealer Br. 9 n.4 (citing Federal Reserve Bank of New York press releases not mentioned in Complaint and using them to draw inferences contrary to Complaint); *id.* 10 (relying on truth of statements in news article different from propositions for which it was cited by Complaint); *id.* 11 (disputing allegations by crediting truth of statement in CME Group Press Release not cited in the Complaint), *id.* 37 (drawing inferences contrary to allegations based on news article mentioning letter from officer of BlueMountain Capital Management).

[14] While ignoring this Court's rejection in *eBooks* of the very tactics they try here, the Dealer Defendants cite a single inapposite case to justify their reliance on extraneous material. (Dealer Br. 8 n.3) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).  In *Rothman*, the court took judicial notice of publicly-filed records as to which the authenticity of the contents was not in dispute, in finding that the plaintiff had met its pleading burden.  *Id.* at 88-92.  The decision did not hold that defendants can selectively extract statements from news articles for

allegations are credited, read in context, and all inferences drawn in Plaintiffs' favor, the

Complaint adequately states plausible claims against each Defendant.

## II.    Plaintiffs Have Standing to Pursue Their Antitrust Claims

The Dealer Defendants' lead argument is that Plaintiffs – the buyers, sellers, *and*

consumers of CDS, who paid inflated bid/ask spreads on CDS transactions directly to the Dealer

Defendants – lack standing under the antitrust laws.  (Dealer Br. 13-22.)  Nothing could be

further from the truth.  Antitrust standing has two requirements:  a plaintiff must plead that it

suffered antitrust injury and that it is an "efficient enforcer" of the antitrust laws.  Defendants

contest only the latter of those requirements.[15]  In arguing that Plaintiffs are not "efficient

enforcers," however, Defendants fail to identify a single case holding that direct purchasers lack

standing when the claim is that the defendants conspired to eliminate a competitive alternative

that would have saved those purchasers money.  And for good reason:  Plaintiffs, as the

consumers and direct purchasers of CDS, are *the* principal class of persons who Congress

intended would enforce the antitrust laws through private actions like this one.

Section 4 of the Clayton Act is "broadly defined" to establish a private right of action for

violations of the antitrust laws.  *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of

Carpenters* ("*AGC*"), 459 U.S. 519, 529 (1983).  Whether a plaintiff is a proper party to sue

under Section 4 depends on whether the plaintiff "falls within the class of plaintiffs whom

Congress has authorized to sue."  *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134

---

their truth in order to rebut allegations in a complaint.  Nor does the case cited by ISDA (ISDA
Br. 16 n.10).  In *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59,
64 n.4 & 67 (2d Cir. 1988), the court *declined* to consider a report attached to the defendants'
brief in support of a motion to dismiss.

[15] The Dealer Defendants concede Plaintiffs are direct purchasers and allegedly suffered
an antitrust injury.  (Dealer Br. 14.)  Markit's argument that its failure to provide real-time
pricing information did not inflict antitrust injury (Markit Br. 24-30) is addressed in Section V.

S. Ct. 1377, 1387 (2014).  In defining that class of plaintiffs, the Supreme Court has noted that "the unrestrictive language of the section, and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in a way that will defeat its broad remedial objective." *McCready*, 457 U.S. at 477.  Indeed, in ascertaining the class of plaintiffs, the Supreme Court held in *AGC* – and reaffirmed in *Lexmark* – that Section 4 of the Clayton Act extends to those persons "whose injuries were proximately caused by a defendants' antitrust violations." *Lexmark*, 134 S. Ct. at 1386 (citing *AGC*, 459 U.S. at 532-33).

### A.     As the Consumers and Direct Purchasers of CDS, Plaintiffs are *the Preferred Enforcers of the Antitrust Laws*

Consumers like Plaintiffs are *the* presumptively favored entities authorized by Congress to enforce the antitrust laws under Section 4 of the Clayton Act.[16]  As the Supreme Court recognized in *AGC*:  "The legislative history of the section shows that Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets."  459 U.S. at 530. Plaintiffs here are those very consumers (and direct purchasers) allegedly forced to pay excessive prices (*i.e.*, inflated bid/ask spreads) directly to the giant trust and combinations (*i.e.*, the Dealer Defendants) in the CDS market.  *See also id.* at 538 ("As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition"); *DNAML Pty, Ltd. v. Apple Inc.*, No. 13 Civ. 6516 (DLC), 2014 WL 2535113, at *3 (S.D.N.Y. June 5, 2014) ("'Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices.'") (quoting *AGC*, 459 U.S. at 530); *Daniel v. Am. Bd. of*

---

[16] While the "proximate cause" analysis for assessing standing is appropriate "[i]n the absence of direct guidance from Congress," *McCready*, 457 U.S. at 477, there is *direct guidance* from Congress with regard to this class of entities.  *See id.* at n.13 ("It bears affirming that in identifying the limits of an explicit statutory remedy, legislative intent is the controlling consideration.").

*Emergency Med.*, 428 F.3d 408, 451 (2d Cir. 2005) (Katzmann, J., concurring in part) (observing that "there is agreement that competitors and consumers constitute a baseline set of parties that generally *do* meet these tests" and collecting cases).

Since *McCready* and *AGC*, three decades of case law have made clear that direct purchasers have "a preferred position" to sue under the antitrust laws for injuries caused by the elimination of competition in the market in which they are consumers.[17]  In *McCready*, the Supreme Court held that a class of consumers alleging harm from the exclusion of existing competitors had standing under the antitrust laws; the class alleged that a group health plan conspired with psychiatrists to boycott clinical psychologists from receiving compensation under the plan.  457 U.S. at 470.  The Supreme Court rejected the defendants' argument that the consumers lacked standing because the conspiracy "was directed by its protagonists at psychologists."  *Id.* at 478.  The Court held that "the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market."  *Id.* at 479.

Instead, the Court held that the plaintiffs had standing because, as consumers "within that area of the economy" endangered by the "breakdown of competitive conditions," the plaintiffs suffered an injury that "was inextricably intertwined with the injury the conspirators sought to inflict" on the excluded competitors.  *Id.* at 480-84.  In describing its holding later that year in *AGC*, the Court "stressed the fact that 'McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.'"  *AGC*, 459 U.S. at 538 (quoting *McCready*, 457 U.S. at 483).

---

[17] In *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Supreme Court held that direct purchasers have "a preferred position as private attorneys general" and are thus deemed to suffer the full amount of overcharge damages, without any off-set from damages passed on to indirect purchasers.  *Illinois Brick*, 431 U.S. at 747.

Defendants ignore *McCready*, which confers antitrust standing on consumers to sue for a scheme to eliminate existing competitors.  They also largely ignore a controlling Second Circuit decision, applying *McCready*, which held that direct purchasers had standing when *potential* competitors were excluded from the market.  *See DDAVP*, 585 F.3d 677.

In *DDAVP*, the Second Circuit held that purchasers of a pharmaceutical drug had standing where the defendants prevented generic competitors from entering the market.  The Court explained that even to the extent "the defendants' conduct at issue targeted their competitors," the direct purchasers of the drug had standing because their "claimed injury of higher prices was 'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.'"  *DDAVP*, 585 F.3d at 688 (quoting *McCready*, 457 U.S. at 484).  *McCready* and *DDAVP* are squarely on point and, as discussed more fully below, reject the very arguments that Defendants make here.

**B.    Plaintiffs Have Alleged Injuries Proximately Caused by Defendants' Conspiracy and are "Efficient Enforcers" of the Antitrust Laws**

In *AGC*, the Supreme Court set forth a test for determining the class of plaintiffs whom Congress has authorized to sue under the Clayton Act.  459 U.S. at 535-36.  This "efficient enforcer" test considers the:  (i) directness of the asserted injury, (ii) existence of an identifiable class of persons whose self-interest would normally motivate them to sue, (iii) speculativeness of the alleged injury, and (iv) difficulty in identifying and apportioning damages to avoid duplicative recovery.[18]  The Supreme Court recently observed, in discussing these factors in the

---

[18] The Court considered these various factors in *AGC* because, unlike the situation in this case, the question of whether Congress intended the plaintiffs in *AGC* to enforce the antitrust laws was not straightforward.  The claims were brought by labor unions, asserting they were harmed because a multiemployer association and its members coerced certain third parties to enter into business relationships with nonunion firms, which in turn allegedly affected the trade of certain unionized firms, which negatively restrained the business activities of the unions.

20

context of the Lanham Act, that the latter two factors are "problematic" and "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects."  *Lexmark*, 134 S. Ct. at 1392; *see also DNAML*, 2014 WL 2535113, at *7 (applying *Lexmark* to the Clayton Act).

Here, the Complaint clearly alleges that Defendants' anticompetitive conduct caused the class's injury and that, but for the Defendants' conspiracy, Class members would have traded CDS on an electronic exchange, with far greater transparency and substantially reduced bid-ask spreads.  (*E.g.*, ¶196.)  The Complaint is equally clear that Defendants' anticompetitive conduct was the proximate cause of Plaintiffs' injuries:  inflated bid/ask spreads paid by consumers were "within the scope of the risk created by" the Defendants' elimination of exchange trading, Plaintiffs' injuries were "a natural or probable consequence" of the boycott, and there were no "superseding or intervening cause[s]" responsible for the inflated bid/ask spreads Plaintiffs paid. *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*, No. 13-cv-2280, 2014 WL 2487188, at *15 (2d Cir. June 4, 2014).  Indeed, the Complaint describes in great detail how Plaintiffs' injuries were the direct and intended consequence of Defendants' misconduct.  (¶¶171-72, 196, 215-16.)

Defendants argue that Plaintiffs have failed to satisfy the four "efficient enforcer" factors. (Dealer Br. 14.)  But *Lexmark* clarified that these factors are merely a proxy for the proximate cause analysis, which is easily met here, *and* suggested that the third and fourth factors may no longer be appropriate to consider.  *Lexmark*, 134 S. Ct. at 1392.  Nevertheless, as shown below, Plaintiffs satisfy each "efficient enforcer" factor.

1. **Plaintiffs' Injuries are Direct**

Defendants claim that Plaintiffs lack standing because their "injuries flow indirectly" from injuries to nonparties such as CMDX.  (Dealer Br. 15.)  Defendants are wrong.  "Directness

21

in the antitrust context means close in the chain of causation." *DNAML*, 2014 WL 2535113, at *7. As this Court observed, "[t]his is essentially a proximate cause analysis and asks 'whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'" *Id.* (quoting *Lexmark*, 134 S. Ct. at 1390). Here, Plaintiffs' injuries – the payment of inflated bid/ask spreads – were proximately caused by Defendants' anticompetitive conduct.

This harm to Plaintiffs "is not some far-flung consequence of" the conduct challenged in the Complaint; rather it is "'precisely the type of loss that [defendants' conduct] would be likely to cause.'" *Id.*, at *5 (quoting *McCready*, 457 U.S. at 479.) The elimination of exchange trading directly hurt CDS investors: in addition to robbing the market of competition and innovation, reducing output, and diminishing choice, it blocked an offering (*i.e.*, exchange trading) that would have directly reduced the inflated bid/ask spreads that Plaintiffs otherwise had to pay. Indeed, the very purpose of Defendants' scheme was to keep the bid/ask spreads paid by Plaintiffs artificially wide. No other class of persons paid these unlawful overcharges on CDS transactions, and no intermediaries stood between Plaintiffs and Defendants. In fact, Plaintiffs as direct purchasers are the *only* entities who can pursue these overcharge damages. Under *every* formulation of the proximate cause inquiry, Plaintiffs' injuries are within the ambit of the Clayton Act. *See Lotes*, 2014 WL 2487188, at *15.

Defendants' assertion that Plaintiffs' injuries are not "direct" is based on the false premise that only the excluded competitors themselves have "direct" injuries for antitrust purposes. This premise is wrong: the existence of other injured parties does not make Plaintiffs' injuries "indirect." In *McCready*, the Supreme Court "quickly disposed of" the argument that "because the alleged conspiracy was directed" at competitors, consumers lacked standing to sue. 457 U.S. at 478. The Court explained that the antitrust remedies "cannot reasonably be restricted

22

to those competitors whom the conspirators hoped to eliminate from the market." *Id.* at 479. Because the injury to consumers "was clearly foreseeable" and the "injury alleged is so integral an aspect of the conspiracy," the consumers had standing. *Id.*

The Second Circuit rejected this same argument in *DDAVP*, holding that the plaintiffs' claim for damages was direct because "harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." *DDAVP*, 585 F.3d at 688. So, too here: Defendants eliminated CMDX and other exchange trading ventures as a means to charge Plaintiffs inflated spreads. *See also Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 821-22 (2d Cir. 1983) (holding "it avails [defendant] little to argue that customers [lacked standing] because the anticompetitive effect . . . was aimed at [competitors] rather than customers").[19]

Defendants' reliance on *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), is misplaced. In *Paycom*, a merchant sought damages allegedly caused by a MasterCard policy providing that member banks could not be issuers or acquirers of other payment cards. Paycom's damages theory was unusually circuitous and vacuous: it claimed that, had that particular policy not existed, other payment cards like American Express and Discover would have made more sales which would have caused MasterCard to adopt some different but *unspecified* policy which would have, in some *unidentified* way, benefited Paycom. *Id.* at 293.

---

[19] *See also Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 72 (1st Cir. 2005) (noting that, in group boycott case, consumers "are presumptively favored as appropriate plaintiffs to assert antitrust injury"); *New York Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) ("Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market."); *Brokers' Assistant, Inc. v. Williams Real Estate Co., Inc.*, 646 F. Supp. 1110, 1124 (S.D.N.Y. 1986) (rejecting argument "that the victim of an allegedly successful boycott designed to support a broad policy of market limitation lacks standing") (quotations omitted).

Paycom's injury was deemed "indirect" because any harm from the policy was "derived from the reduced issuance/transaction volumes" of the other payment cards, and the resulting but unspecified change to MasterCard's policy. *Id.* Here, there is no circuitous, indirect, or unspecified route from the alleged conspiracy to the harm suffered by Plaintiffs:[20] the alleged conspiracy directly deprived Plaintiffs of a CDS trading platform on which they could have bought and sold CDS more efficiently, transparently, and inexpensively.

## 2.   <u>Plaintiffs are Not Too Remote to Assert Claims</u>

Defendants next argue that the exchanges they excluded from the market are "less remote private parties" that are better motivated to enforce the antitrust laws. (Dealer Br. 16.) But, as noted above, there is no need to choose between Plaintiffs and the excluded competitors: these distinct entities suffered distinct injuries due to Defendants' conspiracy; they seek different categories of damages; and *both* have standing. *See DDAVP*, 585 F.3d at 689; *see also DNAML*, 2014 WL 2535113, at *7.

---

[20] In the cases Defendants cite for the proposition that Plaintiffs' injuries are "derivative," the injury suffered by the plaintiff was (unlike here) passed through an intermediary. In *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008), the directly injured parties were wheat exporters forced to sell wheat at lower prices, and the parties with derivative injuries were the farmers from whom the exporters bought wheat. In *Int'l Bus. Machines Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 612 (S.D.N.Y. 2009), the plaintiff was a reseller for manufacturers that were directly injured by an antitrust conspiracy. In both cases, the plaintiff only contracted with the party that felt the direct antitrust injury. Here, Plaintiffs dealt directly with the Dealer Defendants and suffered a direct injury.

Defendants' characterization of Plaintiffs' injuries as "derivative" is itself misplaced. A party with a "derivative" injury is typically one "in a business relationship with an entity that failed" or was injured "as a result of an antitrust violation" but "has not suffered the antitrust injury" itself. *Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*, No. 10 Civ. 3751 (DLC), 2010 WL 5392927, at *4 (S.D.N.Y. Dec. 29, 2010) (quoting *Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995)). Thus, "injuries sustained by employees, officers, stockholders, and creditors of an injured company" are "derivative" injuries. *Id.* Plaintiffs, by contrast, suffered injuries directly by being overcharged on every CDS transaction with the Dealer Defendants. *See also* Note, *Standing to Sue for Treble Damages Under Section 4 of the Clayton Act*, 64 Colum. L. Rev. 570, 582 (1964) (distinguishing derivative from direct claims).

In fact, choosing between Plaintiffs and the excluded competitors for standing purposes would be inconsistent with the antitrust laws.  While an excluded competitor would seek lost profits on its venture, Plaintiffs seek *overcharge* damages due to their payment of inflated bid/ask spreads on CDS transactions.  If only excluded entrants could bring claims, then defendants would not be forced to disgorge the full "fruits of their illegality" *and* consumers would be denied compensation for the distinct harms they suffered.  *See McCready*, 457 U.S. at 473 n.10.  This would turn the antitrust laws upside down:  while there is no need to choose between consumers and competitors in a standing analysis, Congress was *most* concerned with the former in enacting the antitrust laws.[21]

Consistent with these principles, the Second Circuit in *DDAVP* squarely rejected the argument that only the *most* motivated plaintiff has standing to bring suit, explaining that courts must look "for a class of persons naturally motivated to enforce the antitrust laws," but "not *the* entity most motivated by self-interest."  *DDAVP*, 585 F.3d at 688-89.  "Even if a competitor might be the most motivated" where "plaintiffs are also significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible," they also have standing.  *Id.* at 689.  Here, Plaintiffs are a class of persons naturally motivated to enforce the antitrust laws.

Defendants argue that the "silence" of CME, Citadel, and others is "telling."  (Dealer Br. 17.)  But it "tells" nothing of legal significance.  Those entities may have decided not to file suit for any number of reasons – including because of the Dealer Defendants' clout across markets in

---

[21] The antitrust laws are principally intended to protect consumers, not competitors. Indeed, a competitor can only sue under the antitrust laws when it can show that the challenged conduct affected *competition* – which generally refers to harm to consumers.  *See* P. Areeda & H. Hovenkamp ("Areeda"), *Antitrust Law* ¶339d (3d ed. 2007) ("[P]rotecting consumers from higher prices resulting from monopoly is the central goal of the antitrust laws, while protecting rivals' profits is not.  So in that sense we might say that the consumers' injury is the 'primary' one, while the rival's injury is only 'secondary.'").

which these entities operate.  *Cf. DDAVP*, 585 F.3d at 691 (noting excluded competitors "may

not have the strategic interest or the resources to start or win" a battle); *New York Citizens

Comm.*, 651 F. Supp. at 812 (noting "plausible explanations for [other parties'] silence" such as

that they "may fear retaliation" or that they "too are affiliated with [defendants] in other

markets").  Whatever the reason, the fact remains that Plaintiffs – including some of the larger

pension and other funds in the nation who have stepped forward to press these claims on behalf

of the class – are appropriately motivated and positioned to pursue their claims.

### 3.     **"Other Factors" Do Not Favor Dismissal**

Defendants next argue that Plaintiffs' injuries are "speculative" and present "difficult

problems of quantifying and apportioning damages."  (Dealer Br. 18-22.)  As noted, *Lexmark*

clarified that neither of these factors could be an independent basis to deny Plaintiffs standing,

134 S. Ct. at 1392, and Defendants are wrong in any event.

### (a)     **Plaintiffs' Injuries are Not Speculative**

Defendants claim that Plaintiffs' injuries are speculative.  (Dealer Br. 18.)  As they

cannot deny that the alleged conspiracy reduced choice, output, and market innovation, this

argument is, in essence, a premature challenge to Plaintiffs' damages theories.  In any case, the

Complaint robustly alleges, and cites a wealth of evidence confirming, that trading CDS on

exchanges would save consumers significant money by reducing bid/ask spreads.

At least five different types of mutually reinforcing sources (which Defendants largely

ignore) confirm that the elimination of an exchange trading platform for CDS made class

members pay inflated bid/ask spreads, costing them billions of dollars.  These sources include

modeling by CME and Citadel, statements by government and other market analysts, expert

work in this case, and even studies by Defendants themselves.  (¶¶203-16.)  According to a study

by JP Morgan, for example, bid/ask spreads would have dropped much as 75% when CDS went

on exchange.  This conclusion is further confirmed by the academic literature, where there is a

consensus that exchange trading significantly narrows bid/ask spreads and that it would have

done so here.[22]

In addition, the Complaint also alleges that:

- CMDX, which was operational and ready to launch in the fall of 2008, was operated by the CME, the world's largest derivatives exchange, and has a track record of launching successful exchanges for other financial products.  Dealer Defendants, among others, touted CME as having the best trading technology, a strong management team, and a strong likelihood of success.  CMDX was also operated by Citadel – one of the world's largest buy-side firms – which developed proprietary technology for CMDX. (¶¶10, 110-12.)

- CME and Citadel made huge financial investments in CMDX and conducted extensive modeling and testing to ensure the exchange trading platform was fully viable.  By the time CMDX was ready to launch, it had secured the support of top buy-side firms and interest from dealers such as Barclays, Citi, Bank of America, Morgan Stanley, UBS, and Deutsche Bank.  (¶¶113, 125-26.)

- Extensive modeling showed CMDX would support the electronic trading of 75% of CDS products on day one, and eventually more than 90% of all CDS products, and would be adopted quickly by the market.  CME's previously launched exchanges were rapidly adopted by the market.  JP Morgan and Barclays predicted a quick migration of CDS from the over-the-counter market to on-exchange.  (¶¶117, 122-23, 128.)

In light of this, Defendants' assertion that this case is so speculative it cannot move

forward is hardly credible.  The ample, non-speculative support Plaintiffs have provided for their

claims goes well beyond what has been found to be sufficient in other cases.  In *New York

Citizens Committee*, for example, cable television subscribers sued the local cable company and

an affiliated programmer (HBO), alleging that the cable company refused to deal with

---

[22] Studies examining the transition of stock index futures trading from open outcry to electronic markets, the introduction of post-trade transparency into the corporate bond market through the adoption of TRACE, and the differences between the NYSE Bonds trading system and over-the-counter corporate bond markets *all* show that electronic trading narrows bid/ask spreads.  In the 1990s, some of these very same banks colluded to enforce a minimum spread of $0.25 in an over-the-counter system by refusing to post odd-eighth quotes for most large NASDAQ stocks.  Following the discovery of this conspiracy, and subsequent litigation and SEC enforcement, the introduction of additional players in the NASDAQ market resulted in a narrowing of spreads of roughly 30%.  (¶212.)

unaffiliated programmers (such as Showtime). 651 F. Supp. at 805. Plaintiffs alleged they were injured because multiple pay-cable programmers would have pushed down the overall price of cable, even if the cable company retained its local monopoly. *Id.* at 811. Holding that the subscribers had standing, the court noted that "[b]asic economics dictates that the existence of only one seller in a given market would lead to higher prices charged to the buyer in that market," that "*logic dictates* that lower prices in the 'wholesale' market are *likely* to result in lower prices to consumers," and "*it is rational to infer* that competition for ultimate consumers *would be likely to result*." *Id.* at 812 (emphasis added). Plaintiffs rely on far more than basic economics and inferences here.

Similarly, in *DNAML*, this Court held that the plaintiff, a seller of e-books that had "only just entered the market" and was allegedly injured by a price-fixing conspiracy among Apple and major book publishers, was "entitled to a chance to prove its case." 2014 WL 2535113, at *8. The Court found the plaintiff had standing despite noting that the plaintiff "will find it difficult to show that the adoption of the agency model" for selling e-books as a result of that conspiracy "was the cause of the harm DNAML has identified," the fact that other actions by Apple appeared to be "the more immediate and direct cause of harm," and the fact that the plaintiff's ability to show lost profits "may be challenging in the extreme." *Id.* Plaintiffs do not face those obstacles here.

In an effort to manufacture complexity, Defendants break up the Complaint's causation theory into eight bullet points, which they stuff full of confusing and extraneous details, impermissible inferences, invented "facts," and ominous italics. (Dealer Br. 18-19.)[23] The

---

[23] To the extent Defendants' use of italics for the words "if" and "would have" is meant to be pejorative, they fail to appreciate that those phrases are how a "but for" world is appropriately described. *Cf., e.g., In re Elec. Books Antitrust Litig. ("eBooks II")*, No. 11 MD

Complaint's own account of causation is straightforward:  *if* Defendants had not unlawfully conspired to block electronic trading, *then* CMDX would have entered the market, reduced bid/ask spreads, and saved the class a lot of money.  ISDA, for its part, has no trouble concisely articulating the Complaint's causation allegations.[24]  The Dealer Defendants' bullet points are simply an effort to manufacture confusion.

Despite their assertions, for example, the Complaint never alleges that the Dealer Defendants' involvement in *other* "clearinghouse proposals" was necessary to lay the "groundwork" for CMDX entering the market.  (Dealer Br. 18.)  Rather, the Complaint alleges that *CMDX itself* was an exchange and clearinghouse that was operationally ready to enter the market until Defendants conspired to prevent that from happening.  (¶¶13, 122, 146.)  Similarly, Defendants' suggestion that causation somehow depends on CMDX immediately expanding "to cover *all* CDS purchased or sold by plaintiffs" is false.  (Dealer Br. 19.) (emphasis added).  Defendants' final four bullets all state the same straightforward point in different, but overly complex, ways:  a CDS exchange would have narrowed bid/ask spreads.

Defendants question the Complaint's robust allegations about CMDX's viability on the flimsiest of grounds.  (Dealer Br. 19-20.)  They improperly cite snippets, outside of the Complaint's four corners, from a *Barclays'* analyst report that suggested that *some* in the industry might not be enthusiastic about exchange trading and it might be challenging to move *some* CDS to an exchange.  But these should not be considered (*see* Section I) and, even if they

---

2293 (DLC), 2014 WL 1282293, at *27 (S.D.N.Y. Mar. 28, 2014) (noting that in "calculating what the prices for a given e-book *would have* been had [defendants] not conspired" an expert must "compare collusive pricing to competitive pricing and thereby to capture pricing that *would have* prevailed in the but-for world") (emphasis added).

[24] "According to the Complaint, ISDA's licensing denial was part of a conspiracy among Defendants, including ISDA, to perpetuate OTC trading, block the emergence of electronic exchange trading, and thereby artificially raise, fix, maintain, and stabilize bid/ask spreads allegedly associated with OTC trading of CDS."  (ISDA Br. 7).

are, self-serving statements by one analyst mean little in the face of the overwhelming evidence that CMDX had a fully-blown and well-tested exchange-trading platform that was poised to support 75% of CDS transactions on the day of its launch.  Defendants' further claim that CMDX's viability is an "illusion" (Dealer Br. 20) relies on grounds that are also exceedingly thin; they cannot stand against the Complaint's well-pleaded factual allegations.

In *DDAVP*, the Second Circuit rejected similar efforts to frame injuries as "speculative" based on assertions about the difficulties of accounting for the effects of the excluded competition.  585 F.3d at 689.  The Court expressed "little doubt that those effects can be sufficiently estimated and measured" and that this was "especially so when '[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'"  *DDAVP*, 585 F.3d at 689 (quoting *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265 (1946)).[25]  The same is true here.

Defendants argue the situation here is different because, while *DDAVP* "involved a common form of competition between a single drug and 'a generic version of the compound, . . . plaintiffs' claimed injuries here rest on speculative competition from an entirely new and untested method of trading highly customized CDS."  (Dealer Br. 21 n.9.)  Setting aside the perverse logic of a rule that would deny standing in cases where new and innovative offerings were prevented from entering the market – a rule rejected in *DNAML* and other cases – the

---

[25] *See also J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981) (the wrongdoer is in a poor position "to insist upon specific and certain proof of the injury which it has itself inflicted" especially when the "vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Bigelow*, 327 U.S. at 265 ("the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable").

Complaint alleges that CMDX *was* tested, exchange trading was *not* new, and the bulk of CDS trading was highly *standardized*. (¶¶83, 85, 113, 202.)[26]

(b)     <b><u>No Damages Apportionment Issues Exist</u></b>

Finally, contrary to Defendants' argument that it "would be virtually impossible to apportion damages" (Dealer Br. 21), Plaintiffs' claims present no danger of duplicative recovery or problems of damages apportionment. Plaintiffs seek damages for *overcharges* on CDS transactions while entities such as CME or Citadel, which were launching exchange-trading platforms, would seek *lost profits* – with no overlap and no need for apportionment. *See DDAVP*, 585 F.3d at 689 (lost profits and overcharges are "conceptually different measures").[27]

## III.   <u>The Complaint Pleads a Plausible Conspiracy Claim Against Each Defendant</u>

The Dealer Defendants next argue that the Complaint fails to allege a plausible conspiracy. But the Complaint's detailed allegations are more than sufficient to state a claim that Defendants conspired to boycott, and to prevent market entry from, CDS exchanges.

---

[26] Defendants rely on *Paycom* in asserting that the allegations here are "attenuated." (Dealer Br. 18.) But Paycom made no allegations whatsoever about the but-for world – that is, what sort of policy MasterCard would have replaced its existing policy with and how it would have benefited merchants. *Paycom*, 467 F.3d at 293. The other cases cited by Defendants also involved unusually convoluted theories of injury. For instance, in *Reading Indus. Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980), the plaintiffs alleged the defendants conspired to suppress prices for refined copper, which had the alleged effect of *raising* prices for scrap copper in a manner the court deemed was unexplained. The theory of injury in *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 247 (S.D.N.Y. 1997), was deemed "attenuated" because of "significant intervening causative factors," namely the "independent pricing decisions of non-conspiring retailers" that sold to consumers.

[27] Defendants argue that "the fact finder would need to determine what the price would have been for each" CDS transaction and "the fact finder then would need to deduct any fees or other charges that the clearinghouses and exchanges would have imposed." (Dealer Br. 21-22.) These are not pleading issues. In any event, given the standardization in the CDS market and the fact that pricing on exchanges is predictable and itself standardized, this case will ultimately present relatively straightforward damages issues for the class.

Evidence of joint or concerted action is required to prove a conspiracy.  *See eBooks*, 859 F. Supp. 2d at 681 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)). "Because unlawful conspiracies tend to form in secret, such proof will rarely consist of explicit agreements.  Rather, conspiracies 'nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.'"  *Id.* (quoting *Anderson News*, 680 F.3d at 183).  At the pleading stage, a complaint must only contain "enough factual matter (taken as true) to suggest that an agreement was made."  *Twombly*, 550 U.S. at 556.  This standard, however, "does not require a plaintiff to show that the allegations suggesting agreement are more likely than not true or that they rule out the possibility of independent action."  *Anderson News*, 680 F.3d at 184.  Rather, "[t]he choice between or among plausible inferences or scenarios is one for the fact finder."  *Id.*  Plaintiffs must merely "nudge[] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

The Complaint here unquestionably meets, and indeed exceeds, this standard.  First, in marked contrast to the allegations at issue in *Twombly*, the Complaint alleges actual, unlawful agreements among the Defendants.  Second, the Complaint alleges in compelling detail highly orchestrated conduct by Defendants that "indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."  *Twombly*, 550 U.S. at 557 n.4.  Third, the Complaint alleges a number of factual enhancements (or "plus factors") that further support the conspiracy allegations.

## A. The Complaint Directly Alleges Defendants Met and Conspired

Unlike the complaint found lacking in *Twombly*, the Complaint here does not seek to merely to draw an inference of collusion from passive parallel behavior.[28]  Rather, as in *Anderson News* and *eBooks*, the Complaint directly alleges that Defendants met and reached an "actual agreement."  *Anderson News*, 680 F.3d at 187; *see also eBooks*, 859 F. Supp. 2d at 682.  In such a case, the *Twombly* inquiry is easily answered.

The Complaint explains exactly how the conspiracy arose.  It alleges that, after CMDX was introduced to the market, Defendants engaged in seemingly uncoordinated activities.  Some Dealer Defendants, seeing an opportunity to invest in CMDX on attractive terms and to gain a first-mover advantage and market share, were interested in CMDX and engaged in "advanced discussions" about the terms of their equity stakes.  (¶142.)  Markit and ISDA, meanwhile, began having their own independent discussions about the terms on which they would provide licenses for exchange trading – with these entities, separately, exchanging multiple term sheets and closing in on a deal.  (¶¶135-39.)

All of this then changed after the Dealer Defendants began meeting in secret "throughout the fall of 2008 in order to eliminate the exchange trading of CMDX."  (¶144.)  The Complaint alleges much of the who, when, and where of these meetings.  (¶¶12, 143-45, 163-64, 180-81, 228.)  Contrary to Defendants' claims, the Complaint expressly alleges these were *not* legitimate board or committee meetings and that Defendants sometimes met under the guise of phony entities that had no legitimacy whatsoever.  (¶¶144, 229.)

---

[28] The *Twombly* complaint offered *no reason* to believe there was an unlawful agreement other than allegations that the defendants had engaged in some limited, largely passive, parallel conduct.  *See Twombly*, 550 U.S. at 564-65.

The Complaint also pleads the specific terms of agreements reached in furtherance of the conspiracy: The Dealer Defendants agreed to boycott CMDX and any clearinghouse with exchange trading in its "DNA." (¶165.) They successfully pressured Markit and ISDA to agree that they "would not grant any license that made reference to a CLOB or exchange trading platform." (¶147.) The Complaint alleges specific terms of licensing agreements by Markit and ISDA that expressly prohibited exchange trading and required a Dealer Defendant on one side of every CDS transaction. (¶154.) The Dealer Defendants agreed to clear CDS transactions only through ICE Clear and not any other clearinghouses. (¶¶160-62.) And they also required CME to enter into a plainly anticompetitive, multi-year agreement that kept CME from offering exchange trading until, at the earliest, 2012. (¶170.)

The Complaint specifies when the agreements were reached and when anticompetitive acts in furtherance of the agreements were carried out. For example, the Complaint alleges that Markit and ISDA agreed with the Dealer Defendants to refuse to license for exchange trading of CDS in early November 2008 and that Markit and ISDA conveyed their refusal to license to CMDX on the same day. (¶¶149-50.)

These well-pleaded allegations, which must be credited at this stage, are alone sufficient to plead an unlawful conspiracy. In *Anderson News*, for example, the Second Circuit held that the complaint alleged an "actual agreement" where it alleged "various dates" on which the defendants' "executives, ten of whose names or positions [were] specified . . . had met or communicated with their competitors," and "that in those meetings and communications the defendants planned a concerted boycott." 680 F.3d at 187. Similarly, in *eBooks*, this Court held that a complaint sufficiently alleged an agreement where it "described specific conversations

from which it is fair to infer that the [defendants] had agreed among themselves to adopt a joint strategy." 859 F. Supp. 2d at 682.

Defendants nonetheless claim to lack "fair notice" of the anticompetitive agreements into which they are alleged to have entered. (Dealer Br. 22.) In arguing that the Complaint "fail[s] to specify any particular conduct" and does not plead the "specific time, place, or person involved" (*id.* 25), Defendants ignore the foregoing allegations (as well as others) and misstate the law. *Twombly* does not require "that a plaintiff identify the specific time, place, or person related to each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). Yet the Complaint here often does just this.[29]

Defendants argue that the Complaint "must do more than assert that individuals from certain defendants met in a non-public setting." (Dealer Br. 26-27.) It does so. It alleges who met, where, and when, what they discussed, what they agreed upon, and the affirmative steps they took as a result. That is not to say that Plaintiffs have been able, without discovery, to plead *every detail* of every meeting and communication. But they do not have to. Indeed, Plaintiffs could not realistically be expected to provide more detail unless they had been sitting in the rooms where the conspiracy was hatched. Of course, "conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of the conspiracy can be laid bare in court with . . . precision," *Anderson News*, 680 F.3d at 183 (quotations omitted), and here, as the Complaint alleges, the conspirators were deliberately secretive. (¶¶144-45, 181, 227-40.)

The Dealer Defendants cherry-pick a few allegations to argue they are "conclusory" because they refer generally to the "Dealer Defendants" as a group. (Dealer Br. 24-25.) But the

---

[29] If Defendants mean that a plaintiff must be able to name specific *days* in a complaint, no such rule exists. But, in any case, Defendants themselves can figure out on which days in the fall of 2008 the third Wednesday of the month fell. (¶228.)

Complaint generally uses the shorthand "Dealer Defendants" because, as this is a group boycott and conspiracy case, the Dealer Defendants most often *all did the same thing*.[30]  For example, *all* of the Dealer Defendants agreed to and did boycott CMDX and other clearinghouses with exchange trading in their "DNA," (¶165), and *all* of the Dealer Defendants conspired with Markit and ISDA to deny licensing of necessary intellectual property to CMDX.  (¶147-50.)

The European Commission, of course, names *all* of the Dealer Defendants in its preliminary conclusion that they "acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."  (¶171.)  Moreover, where there was a reason to differentiate among the Dealer Defendants, the Complaint does so.  The Complaint alleges, for example, which Dealer Defendants pursued equity stakes in CMDX before agreeing with the other Dealer Defendants to boycott CMDX.  (¶¶12-13, 126-29, 142-46.)  It alleges the specific executives known to have attended secret meetings.  (¶145.)  And, contrary to the Dealer Defendants' suggestion (Dealer Br. 25), the Complaint *does* identify which Defendants sat on Markit and

---

[30]  The Complaint here exceeds its pleading burden by pleading overt acts by each Defendant, even though there is, in fact, no requirement that a complaint "be detailed with overt acts by each defendant," *Hinds Cnty., Miss. v. Wachovia Bank N.A. ("Hinds II")*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010).  *See also Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 (JG) (VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012) (rejecting defendants' objection "to the use of the term 'defendants' or to defined groups of defendants in the individual claims"); *In re OSB Antitrust Litig.*, No. 06 Civ. 826 (GD), 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant.").  None of Defendants' cases are remotely comparable.  In *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007), and *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 541 F. Supp. 2d 487, 491-92 (D. Conn. 2008), the complaints failed to allege *any* particular acts by *any* particular defendants supporting the alleged conspiracy.  Defendants also rely on *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999), a summary judgment decision addressing questions of proof.  *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1218 (D.N.M. 2011), was not an antitrust case, and its analysis regarding the complaint's failure to differentiate between a limited liability company defendant and its individual members is wholly inapplicable here.

ISDA's boards and on the ICE risk committee (although not all members of that committee are known).  (¶¶60-66, 163-64, 169.)  Nothing more is required.

### B.      The Complaint Alleges a Course of Conduct That is Highly Associated With an Agreement

Apart from its direct agreement allegations, the Complaint also provides a detailed and compelling chronology of the type of conduct that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" but that instead is precisely "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."  *Twombly*, 550 U.S. at 557 n.4 (quotations and alteration omitted); *see also Starr*, 592 F.3d at 322 (same); *eBooks*, 859 F. Supp. 2d at 681-82 (same).

The Complaint explains exactly how seemingly uncoordinated conduct abruptly and dramatically changed to highly orchestrated conduct right after the secret meetings took place; it details how companies that had apparently been acting independently abruptly started doing the *same thing*, taking the *same position*, sometimes on the *same day*.

Despite the fact that at least six banks had been in advanced discussions on the terms of their investment in CMDX, *all* of the Dealer Defendant abruptly and uniformly took the position that they would not deal with CMDX so long as it had a trading component; and they did all this at the same time, in November 2008.  (¶¶127-30, 142-43, 146.).  Then, after the Dealer Defendants pressured Markit and ISDA to deny licenses for exchange trading (¶¶147-50), ISDA and Markit, who had been exchanging term sheets to provide CMDX with licenses, each abruptly reversed course as well and began stalling the progress of the negotiations and driving them to the same place – a place that, lo and behold, directly benefitted their co-conspirators – the Dealer Defendants.  (¶¶152, 154.)  The Complaint explains how this conduct continued for

years – with Markit, for example, continuing to deny licenses to trading ventures until after these lawsuits were filed.  (¶¶174, 193.)

This is precisely the type of highly orchestrated conduct that would result from a common plan.  *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 222 (1939) (discussing how defendants all imposed the terms of the conspiracy in a "radical departure from the previous business practices"); *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 690 (S.D.N.Y. 2013) (Cote, J.) ("An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference."); *eBooks*, 859 F. Supp. 2d at 676 (noting the "sudden and dramatic change in the business practices" of defendants).

*Anderson News* is again on point.  There, the Second Circuit held that the plaintiff, a magazine wholesaler, had adequately alleged that magazine publishers conspired to refuse to deal with it in order to drive it out of business.  680 F.3d at 187.  The Court held that the complaint's "allegations as to the chronology" sufficiently alleged a conspiracy because they established that the publishers had previously done business with Anderson News, but after entering into a conspiracy "all of the defendants ceased, in virtual lock-step, to deal with Anderson News."  *Id.* at 187.

A recent First Circuit decision relied on *Anderson News* to reach the same conclusion.  In *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36-37 (1st Cir. 2013), a new entrant into the market for polystyrene products had developed a way to recycle polystyrene, which would reduce costs for consumers.  The success of plaintiff's recycling model was predicated on the participation of one or more of the five major producers of polystyrene, as only they had the production capacity to meet consumer demand.  *Id.* at 38.  At least one of those producers "demonstrated interest" in the recycling method, but through a trade association, major

producers conspired to refuse to deal with the plaintiff to "ensure that polystyrene products will

remain non-recyclable . . . so that Defendants' existing market shares will not be disrupted, the

status quo will be maintained, and the Defendants will be able to offer higher-priced products."

*Id.* Citing the "defendants' parallel conduct following the [trade association] meeting as well as

their global failure to adopt [plaintiff's recycling] system" and the one producer's "abrupt[]

withdr[a]w[al]" of its interest, the First Circuit held that the allegations made an agreement

plausible. *Id.* at 47-48.

### C. The Complaint Alleges Numerous "Plus Factors"

The Complaint also alleges a series of "further factual enhancement[s]," *eBooks*, 859 F.

Supp. 2d at 681, or so-called "plus factors," *Evergreen*, 720 F.3d at 45, which additionally

support an inference of conspiracy.

*First*, the Dealer Defendants were motivated to conspire to make sure exchange trading

did not emerge.  The emergence of exchange trading presented all "the hallmarks of a classic

collective action problem," *eBooks*, 859 F. Supp. 2d at 684, because while all of the Dealer

Defendants profited from the inflated bid/ask spreads on the over-the-counter market, there was

great demand for exchange trading and CMDX offered sizeable early-mover advantages to any

Dealer Defendant that joined the venture.  (¶¶126-30.)  No single Dealer Defendant on its own

could guarantee that exchange trading would not emerge, so each had a strong incentive to gain

that advantage – and those with lower market shares had a particular incentive to do so.  The

Dealer Defendants were thus highly motivated to conspire to make sure none of them would

break ranks to pursue individual advantages. *See id.* at 683.

*Second*, the Dealer Defendants also had a plethora of opportunities to conspire.  (¶¶65-67,

143-45.)  *See Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987) (recognizing "a high

level of interfirm communications" supports inference of a conspiracy); *In re WellPoint, Inc.*

*Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D. Cal. 2011) (allegations of communications at trade association conferences and board meetings "demonstrate[] how and when Defendants had opportunities to exchange information or make agreements").[31]

*Third*, numerous parties, including the six Dealer Defendants offered attractive equity stakes, Markit, *and* ISDA, acted against their economic self-interest.  (¶¶133-38.)  Such conduct tends to exclude the possibility of independent parallel behavior.  *See Starr*, 592 F.3d at 327 (noting that allegations of "behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals" support conspiracy's plausibility) (quotations omitted); *eBooks*, 859 F. Supp. 2d at 683 (noting that an action "would have contravened that defendant's self-interest in the absence of similar behavior by its rivals" is conduct that helps "raise[] a suggestion of preceding agreement"); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (observing that "evidence that the defendant acted contrary to its interests" is an important plus factor).

*Fourth*, the CDS market was ripe for collusion because it was highly concentrated, dominated by the Dealer Defendants who had a history of working together, had high barriers to entry, and lacked regulatory oversight.  (¶¶4, 6, 79, 82-85, 88-98, 224-25.)  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (reversing dismissal where complaint "allege[d] a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion"); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 826-27 (D. Md. 2013) (finding market was conducive to collusion where it was highly concentrated, dominated by cartel members, and had high barriers to entry).

---

[31] Defendants state that the "mere opportunity to conspire" at board meetings of ISDA or Markit "does not *by itself* support the inference" of conspiracy.  (Dealer Br. 26.) (emphasis added).  While the opportunity to conspire may not, *by itself*, be sufficient to infer a conspiracy, the opportunity to conspire is certainly a factor that is probative of a conspiracy.

*Finally*, while courts have found the very existence of government investigations to be a plus factor, *see Starr*, 592 F.3d at 324-25, such investigations do not just exist here; rather, the European Commission's investigation has preliminarily found that *each* of the Dealer Defendants acted "collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market," and they enlisted ISDA and Markit in their scheme.  (¶247.)  This fact alone makes it *plausible* that discovery will reveal evidence of the alleged conspiracy.[32]

## D.  Defendants' Alternative Explanations are Unavailing

Defendants assert that their alleged conduct is more plausibly the result of "independent self-interested conduct" in "reaction to the global economic crisis."  (Dealer Br. 28.)  But such arguments are "misdirected," since "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Anderson News*, 680 F.3d at 189-90.  While Defendants are free to present their alternative explanations to a fact-finder, they cannot prevail at the pleading stage.

Nor are their explanations particularly credible.  Defendants' appeal to the financial crisis does nothing to explain their secret meetings and coordinated actions that resoundingly echo of an orchestrated plan.[33]  It does not explain why seemingly uncoordinated conduct changed overnight into highly coordinated conduct.  There is no reason why the financial crisis would necessarily have made each of the Dealer Defendants independently do the same thing at the

---

[32] While Defendants argue that the Court should disregard the European Commission's finding because that body applies different law (Dealer Br. 17 n.6), they cannot explain why any features of the European Union's antitrust laws would negate the European Commission's determination that there is evidence of a *conspiracy* among direct horizontal competitors.

[33] *Cf. In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 317 (S.D.N.Y. 2010) (rejecting defendants' "don't blame me, blame the financial crisis" defense).  Similarly, Defendants' appeal to the uncertainty created by the very economic crisis they had helped to create does not "come with very good grace."  *J. Truett*, 451 U.S. at 566-67 (citations and quotations omitted).

same time or why ISDA and Markit would have reversed course at the same time, chosen to draw out negotiations in the same way, started taking the same new positions on the same days, or driven the negotiations to the same terms favoring their alleged co-conspirators – or why any of the other highly coordinated conduct alleged in the Complaint would have taken place.

More basically, it can hardly be denied that conspiracies occurred during the financial crisis, including among these very financial institutions.  If anything, the financial crisis may have increased the motivation of such entities to conspire so they could maintain their high profits in the face of a more challenging environment.

Defendants also argue that the "tremendous profits" in the existing market structure explains each actor's independent desire to see that structure continue.  (Dealer Br. 28.)  But if things were that simple, none of the Dealer Defendants would have pursued equity stakes in CMDX, as the Complaint alleges they did.  (¶¶126-29, 142-44.)  As noted above, the problem the Dealer Defendants faced is that no individual bank could have been certain that exchange trading would not emerge and thus each risked being left behind.

Thus, the Complaint alleges that many Dealer Defendants saw an opportunity to gain a first-mover advantage and to grow market share.  Given that opportunity, it would not have made sense for those banks to boycott CMDX unless they knew that all of the others would do so as well.  Nor could Defendants' "tremendous profits" argument explain the highly coordinated conduct by ISDA and Markit.  And this argument also incredibly portrays CME and Citadel – two sophisticated entities – as utter fools, wasting time and resources on an offering doomed to fail.  Again, Defendants can argue otherwise to the fact finder, but their innocuous explanation cannot prevail at this stage.  As noted in *Anderson News*:  "The presentation of a common economic offer may well lend itself to innocuous, independent, parallel responses; but it does not

provide antitrust immunity to respondents who get together and agree that they will boycott the offeror."  680 F.3d at 192.  The Complaint alleges Defendants did just this.

Defendants further argue that an "uncertain legal environment following the introduction and subsequent enactment" of Dodd-Frank would also have made each of them cautious about moving towards exchange trading.  (Dealer Br. 29.)  This argument, however, is premised on assertions wholly outside the Complaint:  the paragraph Defendants cite alleges that Dodd-Frank became law *in 2010*.  Dodd-Frank was not even *introduced* in Congress until July 2009 – after the conspiracy was put into place.  Moreover, rather than being "cautious," the Complaint alleges that Defendants held secret meetings to conspire.  In any event, the exercise of caution would not naturally result in the type of highly orchestrated affirmative conduct described in the Complaint.

Defendants rely upon *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013), in which the Second Circuit held that the defendants' "*en masse* flight from a collapsing market in which they had significant downside exposure [] made perfect business sense." *Id.* at 138.  But there, the Second Circuit noted an *absence* of alleged "interfirm communications," and characterized the defendants' decision to withdraw as the "only rational business decision." *Id.* at 138-39.  Here, the Complaint alleges that Defendants secretly met, conspired, and reached agreement; nor can it be said as a matter of law that a refusal to engage in exchange trading was the "only rational business decision" available to the Dealer Defendants.  Again, CME and Citadel are sophisticated entities that would not have made huge investments of time and money in an offering that was inevitably doomed to fail.

### E.     The Complaint Adequately Pleads a Claim Against BNP

In its separate motion, BNP asserts that "the balance of plaintiffs' allegations affirmatively showed that [it] played no part" in the conspiracy.  (BNP Br. 1.)  But in so arguing, BNP improperly dismembers the Complaint and ignores the well-pleaded allegations against *all*

43

of the Dealer Defendants, proceeding as if the only allegations against BNP are the ones that

expressly name it.  They are not.  As noted above, the Complaint most often refers to the Dealer

Defendants as a group because they acted as a group.  And as numerous courts have held, it is

perfectly acceptable for a complaint to make allegations that refer to defendants collectively,

when such pleading refers to all of the defendants, as it does here.[34]  Here, the allegations

regarding the Dealer Defendants – which includes BNP – are more than sufficient to state a

claim.  The minor differences between BNP's conduct and the rest of the Dealer Defendants'

conduct are just that, exceedingly minor.

　　　The Complaint alleges that BNP conspired with the Dealer Defendants to boycott CMDX

and other ventures that had exchange trading in their "DNA."  (¶¶143-44, 162.)  The Complaint

specifically alleges, for example, that, after an initial favorable reaction to CMDX, BNP reversed

course and moved in lock-step with the other Dealer Defendants.[35]  (¶¶129, 160.)  It alleges that

BNP conspired with the other Defendants to refuse to license necessary intellectual property to

CMDX, to prevent its operation.  (¶¶137, 147-50.)  It alleges that these agreements were reached

in secret meetings,[36] sometimes under the auspices of Markit and ISDA's boards – both of which

---

[34] BNP relies on the same cases cited by the Dealer Defendants in arguing that specific allegations are required.  (BNP Br. 8.)  But as noted above, these cases are inapposite.  *See* Section III.A., n.30, *supra*.

[35] BNP argues that, because it is not one of the six *named* Dealer Defendants that was offered equity in CMDX, it did not have the opportunity to join the venture.  (BNP Br. 5.)  But this argument requires an improper leap (or inference) from the fact that it was not expressly named in this allegation.  The Complaint alleges that "*at least* six banks" were offered equity (¶126) (emphasis added); it does not say others were not or could not join.  BNP also takes issue with Plaintiffs' interpretation of a statement by a BNP official as "praising" or expressing a "favorable reaction" to CMDX.  (BNP Br. 5-6.)  But its differing interpretation of this statement cannot prevail on a motion to dismiss.

[36] BNP argues that because it was not named in the *New York Times* it was not part of these meetings.  (BNP Br. 2-3.)  But the Complaint only cites the meetings discussed therein as *examples* of the meetings that were being held – meaning, as alleged in the Complaint, there were others.  (¶145.)  Moreover, because the details of the meetings described in the *New York*

44

BNP was a member.[37]  (¶¶ 48, 60-61, 64, 143-44, 162-64.)  The Complaint provides the names

and titles of BNP's representatives on those boards, and expressly alleges they used their

influence to pressure both entities to refuse to license to CMDX.  (¶¶147-51, 163-64.)

The Complaint also alleges that BNP conspired with the other Dealer Defendants to

refuse to deal with CMDX as a clearinghouse and later CME Clearing.  (¶¶158-60, 165, 176.)

The Complaint specifically alleges that BNP was offered favorable terms to join CME Clearing,

but declined pursuant to its conspiracy with the other Dealer Defendants.  (¶¶158-60.)  These

allegations are bolstered by the fact that, as a Defendant with a smaller market share, BNP was a

prime candidate to join CME Clearing.  (¶165.)  BNP argues that, because it did not join CME

Clearing when other Dealer Defendants did in the fall of 2009, somehow it could not plausibly

be part of the concerted refusal to deal with CME.  (BNP Br. 6.)  But, that BNP continued *not to

deal* with CME hardly proves that it was not a part of that agreement.[38]

The role of BNP in the conspiracy is also confirmed by a number of other factual

enhancements, most notably the European Commission's findings that the Dealer Defendants –

*including* BNP, which is named specifically – conspired to boycott exchange trading ventures.

(¶¶148, 157, 171.)  *See Starr*, 592 F.3d at 324-25.  Additionally, the claims against BNP are also

bolstered by each of the other "plus factors" identified above applying to all of the Dealer

---

*Times* were secret and are still not completely known today, BNP cannot exonerate itself simply
because it was not identified by name.

[37] BNP argues that its membership in a trade association is not sufficient to allege its
involvement in the conspiracy.  (BNP Br. 1.)  But opportunities to conspire, including
membership in trade associations, are factual enhancements that support the pleading of a
conspiracy.  *See* Section III.C, *supra*.

[38] BNP tries to frame the allegations concerning CME Clearing as only relating to what
happened once the Dealer Defendants took over CME Clearing's risk committee (BNP Br. 6),
but that ignores all of the preceding allegations regarding the Dealer Defendants' group boycott.
Nor is there any reason why *all* of the Dealer Defendants needed to be on CME Clearing's risk
committee to accomplish their objective of making sure it posed no threat.

Defendants.  *See* Section III.C., *supra.*  BNP was motivated to maintain the opaque market structure it had helped cultivate (¶¶88-97, 99-105); it had ample opportunities to conspire through interfirm communications with the other Dealer Defendants (¶¶48, 60-61, 64, 163-64); it acted against its independent self-interest (¶¶129, 160, 165); and it operated in a highly concentrated market conducive to collusion (¶¶4, 6, 79, 82-85, 88-98, 224-25).

BNP argues that, because it was not identified as a member of ICE Clear's risk committee, it could not plausibly be part of the conspiracy.[39]  (BNP Br. 3-4.)  But the Complaint alleges that BNP *did* join ICE Clear.  (¶¶48, 65.)  The fact that it did not do so right away hardly means that it did not conspire.  *Cf. Precision Assocs.*, 2013 WL 6481195, at *22 (allegations that defendant joined a global conspiracy at a "later date" were sufficient, where the conspiracy already had been established).  It is well recognized that "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result."  *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).  Indeed, as the Second Circuit has repeatedly explained, "once a conspiracy is shown, only slight evidence is needed to link another defendant with it."  *Apex Oil*, 822 F.2d at 257 (citations omitted); *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir. 1985) (same).

In any event, whether BNP was involved in each act in furtherance of the conspiracy is irrelevant to the central allegations against it – in particular, that BNP agreed to the group boycott of CMDX and other entities perceived as threats and agreed to pressure Markit and ISDA to deny licenses for exchange trading to the Dealer Defendants' potential competitors.

---

[39] BNP impermissibly cites extraneous material regarding its purported interest in using ICE Clear's European competitor, LCH.Clearnet.  (BNP Br. 5.)  But that source – which should not be considered on a motion to dismiss – is discussing the *European* clearing market.  It says nothing of BNP's willingness to deal with ICE Clear in the U.S.

(¶160.)  As noted, the European Commission has preliminarily found that the Dealer Defendants along with Markit and ISDA *did* conspire to eliminate exchange trading of CDS, and that BNP *did* participate in this conspiracy.  It is certainly *plausible* that it did, and thus its motion should be denied.

## IV.    ISDA's Claim That Its Participation in the Conspiracy is Implausible Lacks Merit

ISDA separately argues that the Complaint does not plausibly allege that its refusal to grant licenses for exchange trading to CMDX and other entities was pursuant to an agreement with the Dealer Defendants or part of its participation in a broader antitrust conspiracy.  (ISDA Br. 2-3, 9-16.)  In making these arguments, ISDA disregards the well-pleaded allegations in the Complaint and draws inferences against Plaintiffs.[40]  Notably, contrary to ISDA's suggestion, the Complaint does *not* allege that ISDA was merely a "passive facilitator" (*id.* 11) of a conspiracy – as is the case with the trade associations in virtually every decision upon which ISDA relies.  Rather, the Complaint specifically alleges that ISDA reached an agreement with the Dealer Defendants to help eliminate market entry by CDS exchanges by denying licenses for exchange trading and that it took numerous affirmative steps in furtherance of that agreement.  Accepting the Complaint's allegations as true, ISDA's motion lacks merit.[41]

The Complaint alleges a specific agreement was entered into between ISDA and the Dealer Defendants in late October or early November 2008 whereby ISDA would not license its intellectual property for exchange trading.  (¶¶147-49.)  Pursuant to that agreement, the

---

[40] Among these misstatements, ISDA claims that its conduct "increased competition between and among the Dealer Defendants and precipitated *lower* bid/ask spreads."  (ISDA Br. 5.)  The absence of a citation to the Complaint for this statement speaks for itself.

[41] ISDA's argument that it is "entitled to a more definite statement under Rule 12(e) of the Rules of Civil Procedure" because "the Complaint does not articulate which of those products ISDA allegedly refused to license or which were 'necessary' for exchange trading" is baseless.  (ISDA Br. 6, n.7.)  The Complaint expressly alleges, for example, that ISDA refused to license its Master Agreement.  (¶136.)

Complaint alleges that ISDA informed CME and Citadel that "more formal approvals by representatives of the Dealer Defendants would be required" before ISDA would provide licenses for its Master Agreement to CMDX.  (¶149.)  The Complaint then alleges that ISDA drew out the negotiations and drove them to a result that was in the interests of the Dealer Defendants.  (¶¶152-54.)  The Complaint alleges ISDA acted with the goal and purpose of sabotaging the CMDX exchange.  (¶¶269, 273.)

The Complaint alleges that ISDA entered into this agreement because it succumbed to pressure from the Dealer Defendants, which are its largest clients.  The Dealer Defendants also provide considerable revenue for ISDA by using the ISDA Master Agreement, and they also have representatives who sit on ISDA's board.  (¶¶147-48, 164.)  The Complaint alleges a number of facts probative of the existence of ISDA's agreement to join their scheme, including: (1) ISDA's abrupt reversal of its prior position following a series of productive licensing negotiations (¶¶149-51); (2) conduct against its self-interest in the form of lost revenue from licensing to CMDX (¶¶151, 155); (3) its statements to CME and Citadel that each time were nearly identical to statements made by Markit, often on the same day (¶150); (4) its exchange of licensing agreements without provision for exchange trading, immediately after stating that "more formal approvals by . . . the Dealer Defendants would be required" (¶149); (5) its delaying of licensing until the same time as Markit (¶¶152-53); and (6) its insistence on licensing terms that were both identical to those insisted upon by Markit and unquestionably favoring the Dealer Defendants, with no benefit to ISDA itself.  (¶¶153-55.)  These facts overwhelmingly point to a common plan.

The Complaint's allegations are further bolstered by the preliminary findings of the European Commission that "the Dealer Defendants secured Markit's and ISDA's *agreement* to

license only for 'over-the-counter' (OTC) trading purposes and not for exchange trading."
(¶148) (emphasis added).  The Complaint's direct allegations of an agreement, its origins, its
terms, and its execution meet – and, indeed, exceed – what is required at this stage.

ISDA's arguments are unavailing.  *First*, ISDA argues that the fact that the Dealer
Defendants are its largest customers, and that representatives of the Dealer Defendants sit on its
board, does not create an inference of agreement.  (ISDA Br. 10-11.)  But that is not Plaintiffs'
claim.  The Complaint alleges that ISDA entered into an agreement with the Dealer Defendants
outside of the context of their membership in ISDA and that ISDA took affirmative steps in
furtherance of the conspiratorial scheme.  ISDA's conduct is unlawful, not because of who its
members are, but because it *agreed* to refuse to license to CMDX and then did so.  *See
Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 102 (2d Cir. 2000) (holding
that a *concerted* refusal to license is unlawful).  In the cases relied upon by ISDA, in contrast, the
trade association was sued solely based on the association's passive conduct or the conduct of its
members.[42]  (ISDA Br. 9-11.)

Additionally, the Complaint alleges that the Dealer Defendants occupied the majority of
seats on ISDA's board, as well as its three executive positions (¶60); they paid the largest annual
fees to ISDA (¶147); they dominated the market for over-the-counter derivatives (¶¶217, 224-
25); and thus they had the ability to pressure ISDA into a conspiracy (¶148).  These allegations

---

[42] The complaint in *In re Processed Egg Prods. Antitrust Litigation*, 821 F. Supp. 2d 709,
749-50 (E.D. Pa. 2011), alleged only "common resources and membership between" the trade
groups that were dismissed and the fact that they attended meetings together.  Similarly, in *Hinds
Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009), the allegations
were limited to defendants' involvement with trade associations and attendance at meetings, and
never pled that defendants "met and agreed" to conspire.  *Kissing Camels Surgery Ctr., LLC v.
Centura Health Corp.*, No. 12 Civ. 3012 (WJM), 2014 WL 560462, at *6 (D. Colo. Feb. 13,
2014), on which ISDA repeatedly relies, held that the complaint failed to state a claim against the
trade association because its "role as the venue for conspiratorial meetings" alone was
insufficient.

are sufficient to allege the motive for ISDA's involvement.[43]  The Supreme Court has refused to

distinguish between conspirators who actively promote conspiracies and those who participate as

a result of coercion.  *See Evergreen Partnering*, 720 F.3d at 49 n.4 (quoting *United States v.*

*Paramount Pictures, Inc.,* 334 U.S. 131, 161 (1948)) (affirming liability although defendants

were coerced by co-conspirators because "acquiescence in an illegal scheme is as much a

violation of the Sherman Act as the creation and promotion of one").[44]  Contrary to ISDA's

suggestion (ISDA Br. 14), Plaintiffs need not ascribe any additional, independent motive to

ISDA.  *See Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th

Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even

reluctant participants have been held liable for conspiracy").[45]

 *Second*, ISDA argues that its refusal to license was not against its self-interest.  (ISDA

Br. 11-12.)  *See* Section III.C, *supra*.  But the Complaint alleges that ISDA *did* profess an

---

 [43] ISDA's suggestion that "the Complaint does not posit how or why ISDA stood to
benefit economically" by conspiring misses the point.  (ISDA Br. 12.)  The Complaint alleges
that ISDA joined the conspiracy because of pressure and influence applied by the Dealer
Defendants.  (¶148.)  It is well recognized that associations can be corrupted by members to take
anticompetitive actions.  *See, e.g., Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456
U.S. 556, 562, 571 (1982) (holding antitrust laws applied to trade association where one of its
members, who competed with the plaintiff, "successfully used its position within ASME in an
effort to thwart [plaintiff's] competitive challenge," and noting such organizations "can be rife
with opportunities for anticompetitive activity").

 [44] *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249 (10th Cir. 2006) (ISDA Br.
10-11) is not to the contrary.  *Abraham* affirmed a grant of summary judgment and, as such,
spoke to the quantum of evidence necessary to create a genuine issue of material fact as to
concerted conduct.  No such question of the weight of evidence is presented here.

 [45] ISDA argues that the Complaint must allege how ISDA "would have shared in any
profits generated by such a conspiracy."  (ISDA Br. 14.)  But its cases are easily distinguishable.
Unlike *First National Bank* or *Bookhouse*, which acknowledged plaintiffs' "inability to provide a
plausible motive" for defendants to join the alleged conspiracy, the Complaint in this case
assigns a motive to ISDA and also alleges numerous "plus factors" from which to infer an illegal
agreement among the Defendants.  *See First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S.
253, 279-80 (1986); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.,* No. 13 Civ. 1111
(JSR), 2013 WL 6311202, at *4 n.2, *6 (S.D.N.Y. Dec. 5, 2013).

interest in "reducing counterparty credit risk, increasing transparency, and improving the industry's operational infrastructure" (¶137) – all of which exchange trading would do (¶¶11, 108-10, 115-16, 196, 203-16).

ISDA also had a financial interest in the CMDX proposal.  ISDA claims that, because it is a non-profit, it was not interested in licensing revenues.  (ISDA Br. 11.)  But that argument disregards the Complaint's allegations that ISDA pursues revenues from its licenses as evidenced by the fact that it has pursued litigation seeking lost revenues from unlicensed use of its Master Agreement.[46]  (¶136-38.)  It is well recognized that non-profit entities do seek to maximize revenues and that they are fully subject to the antitrust laws.  *See, e.g.*, *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 100 n.22 ("There is no doubt that the sweeping language of § 1 applies to nonprofit entities, and in the past we have imposed antitrust liability on nonprofit entities which have engaged in anticompetitive conduct."); *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 666 n.7 (3d Cir. 1993) (a nonprofit institution of higher education could be motivated undertake actions to "enhance[] 'revenues,' if not 'profits,' which can be allocated to any conceivable internal institutional purpose").

ISDA also argues that foregoing short-term revenues is not against its interest, citing *Alvord-Pork, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3d Cir. 1994).  (ISDA Br. 12.)  But its claim that denying licenses for exchange trading would "manifestly" benefit ISDA in the

---

[46] ISDA claims that the "court cannot infer anticompetitive intent" from its lawsuit.  (ISDA Br. 11, n.9.)  But the Complaint does not claim that ISDA's decision to protect its copyrights through litigation constitutes anticompetitive behavior.  Rather, the fact that ISDA has sought lost revenues from unlicensed use of its Master Agreement demonstrates that it has an interest in revenues despite its non-profit status, and that foregoing such revenues was contrary to its economic self-interest.

long term is, to say the least, highly speculative.[47] (¶¶ 136-38, 151, 155.)  This argument also inappropriately asks this Court to draw an inference directly contrary to Complaint.  *See Starr*, 592 F.3d at 325 (rejecting arguments that plaintiffs must allege facts that tend to exclude independent self-interested conduct).

*Third*, ISDA claims that its refusal to license was the result of "independent, rational judgment against use of its products in a new and untested way during a period of enormous uncertainty." (ISDA Br. 12.)  But this argument, which largely blames the financial crisis, is improper for the reasons addressed above; simply put, the financial crisis cannot remotely explain the highly coordinated conduct alleged here, which compellingly points toward a common plan.  *See* Section III.B, *supra*.  None of the facts upon which ISDA relies are in the Complaint.

Rather, as the Complaint alleges, ISDA *was* interested in licensing to CMDX, before it suddenly reversed course (at the exact same time that Markit did).  (¶¶130, 138-39, 146-51.)  ISDA's purported concern with licensing during the financial crisis – a concern that does not make sense given the Complaint's allegations that exchange trading *increases* stability, transparency, and efficiency of the market – is at odds with its prior course of conduct, which is evidence of *conspiracy*, not independent judgment.  On a motion to dismiss, the question "is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."  *Anderson News*, 680 F.3d at 189.  Here, there are sufficient allegations to do so.

---

[47] *Alvord-Pork* is distinguishable because it found, at summary judgment, that there was sufficient evidence to demonstrate that the actions taken by defendants were in, rather than against, their economic self-interest.  Indeed, the court found that the plaintiff's generic allegations of an agreement were insufficient "in the face of uncontradicted testimony that only informational exchanges took place."  *Alvord-Pork*, 37 F.3d at 1014.

*Finally*, ISDA argues that in spite of the fact that the Complaint's chronology is unmistakably consistent with an agreement, the strikingly identical acts of ISDA and Markit can be explained as responses to "contemporaneous licensing requests by CMDX." (ISDA Br. 15.) To the contrary, the Complaint alleges that, while licensing negotiations with ISDA and Markit were proceeding independently *prior* to the conspiracy, upon conspiring with the Dealer Defendants, ISDA and Markit undertook a nearly identical, sudden reversal of course that is highly indicative of an unlawful agreement. (¶¶149-50.) *See Anderson News*, 680 F.3d at 187 (reversing dismissal of complaint alleging that defendants ceased dealing with plaintiffs in unison after meeting or communicating with competitors in preceding two week period); *Starr*, 592 F.3d at 324-25 (simultaneous price increase supported inference of conspiracy).

The Complaint alleges that, in an about-face on the same day, ISDA and Markit notified CMDX that they would not license for exchange-trading after separately indicating that they would do so previously. (¶149.) They made additional demands in parallel – again, often on the same day – over the course of several months. (¶150.) They both purposefully delayed the negotiations to further the Dealer Defendants' interests. (¶152.) Then, again closely together, both ISDA and Markit finally agreed to license to CMDX in March 2009, but with nearly identical terms of which the Dealer Defendants were the key beneficiaries: the licenses granted by ISDA and Markit included terms expressly precluding use in any CLOB or exchange-trading platform (¶153) and required that one of the Dealer Defendants be on at least one side of every clearing transaction (¶154). That none of these terms benefitted ISDA's (or Markit's) independent interests (¶151) strongly supports the conspiracy's plausibility.

ISDA also claims that these allegations are insufficient because ISDA and Markit are not competitors. (ISDA Br. 15.) But that is precisely why *ISDA's* position is the one that is

implausible:  especially since they are not competitors, there is no credible explanation for ISDA's and Markit's simultaneous, abrupt reversal of course and insistence on nearly identical terms on identical days.[48]  ISDA's suggestion that its refusal to license was the only rational response to an event like the failing of the ARS market (as it was in *Mayor & City Council of Baltimore*) or the emergence of the Internet (as it was in *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litigation*), gives no credit to and cannot explain the allegation that ISDA and Markit were previously willing to deal with CMDX, and then suddenly reversed course in a highly coordinated fashion following the Dealer Defendants' secret meetings.[49]

## V.   Markit's Arguments Misconstrue the Complaint and Lack Merit

Markit's separate brief creates a dense fog that obscures much of what it says.  But when the fog is lifted, it is apparent that Markit's entire brief is an effort to re-frame the Complaint as suggesting that Markit did nothing except engage in legitimate cooperative or unilateral conduct. Markit thus sets the tone by arguing that its motion "turns on whether cooperation is permissible when competitors must work together to develop the 'support services' that enable their competition."  (Markit Br. 1.)  But to pursue this line of attack, Markit must brazenly misconstrue the Complaint's allegations, and so its brief is largely addressed to a series of straw men.  The Complaint's claims, for example, do *not* concern competitors working together (by

---

[48] The case law cited by ISDA for this argument is entirely inapplicable.  In *Twombly*, *Mayor & City Council of Baltimore*, *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991), and *Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*, 516 F. Supp. 2d 270, 291 (S.D.N.Y. 2007), the courts held that parallel action by competitors is not sufficient to plead a claim, addressing allegations that have no resemblance to the facts alleged here.

[49] ISDA's reliance on *Online Travel* is particularly misplaced, as there the market shift in question, which took place over two years, was the kind of "gradual" pricing change courts regarded as "unsuspicious," as opposed to the "sort of abrupt change in pricing indicative of a conspiracy seen in the cases Plaintiffs cite."  2014 WL 626555, at *12 (N.D. Tex. Feb. 18, 2014). *Wellnx Life Sciences* is also inapposite.  There the defendants were offered the same financial inducement and responded the same way.  The case does not consider *dramatic* reversals of course and subsequent coordinated conduct.

necessity or otherwise) to develop "support services" – indeed, the phrase Markit purports to quote, "support services," does not even appear in the Complaint (like many other phrases it purports to quote). This pattern of obfuscation and misdirection permeates Markit's brief.

Markit's efforts to appeal to some necessary cooperation between it and the Dealer Defendants fail not just on the facts but on the law as well. Even if Markit and the Dealer Defendants did have to cooperate in some areas of Markit's business, that does not mean they are incapable of conspiring under the antitrust laws. Indeed, this very argument was rejected by the Supreme Court in *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) – a case that resolves nearly every one of Markit's arguments.

In *American Needle*, the Supreme Court considered whether an agreement among the 32 members of the National Football League and an entity they had formed to develop, license, and market their intellectual property rights was subject to scrutiny under the antitrust laws. The Court concluded that it was because, notwithstanding their substantial cooperation, these 33 entities did not have a "complete unity of interest" or "the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action." *Id.* at 196. Rather, despite their substantial cooperation, the entities were "separate economic actors pursuing separate economic interests" and thus the agreement among them "deprive[d] the marketplace of independent centers of decisionmaking." *Id.* at 197.

The same is true here. The Complaint alleges an agreement among twelve Dealer Defendants, who are horizontal competitors of each other, and Markit, a company that pursues its own business interests that do not entirely coincide with those of the Dealer Defendants. As the Court observed in *American Needle*, the necessity of cooperation that actually existed in that case (but does not exist here) was ultimately irrelevant: "a nut and a bolt can only operate

together, but an agreement between nut and bolt manufacturers is still subject to § 1 analysis." *Id.* at 198-99.

A.   **Markit Can and Did Conspire With its Shareholders, and No Rule Immunizes it From That Conspiracy**

Markit first argues that, because the Complaint supposedly challenges only the exercise of the Dealer Defendants' "lawfully-obtained corporate governance rights in a manner that promoted their interests in over-the-counter trading," Markit cannot be liable under what it terms the "controlling shareholder rule." (Markit Br. 9, 11.) Markit is wrong on the facts and the law.

As an initial matter, the Complaint does *not* allege that the conspiracy involved the exercise of "corporate governance rights" (*id.* 9) by the Dealer Defendants.[50] It alleges that they *unlawfully* conspired in *secret* meetings held **outside** of Markit and **outside** of any legitimate forum. (*E.g.,* ¶229, 144-46.)

The Complaint then alleges that, after entering into the conspiracy, the Dealer Defendants exerted pressure on Markit and ISDA to join the conspiracy – principally by "leveraging the fact that the Dealer Defendants are Markit's and ISDA's *largest customers*." (¶147) (emphasis added). The Complaint then alleges that Markit succumbed to the pressure and influence of the Dealer Defendants and agreed to join the conspiracy. (¶¶147-51.) These allegations – which are incompatible with Markit's assertion that the Complaint alleges only lawful corporate governance actions – comprise a *per se* unlawful conspiracy. *See Primetime 24*, 219 F.3d at 102 (concerted refusal to license is a "classic *per se* violation of the Sherman Act"). Because this conspiracy was reached among "separate economic actors pursuing separate economic interests"

---

[50] Notably, the Dealer Defendants themselves never argue that the Complaint concerns their exercise of "lawfully-obtained corporate governance rights." It plainly does not.

– *i.e.*, the Dealer Defendants, Markit, and ISDA – it "deprive[d] the marketplace of independent centers of decisionmaking" and is unlawful.  *Am. Needle*, 560 U.S. at 195.[51]

Markit claims that a "controlling shareholder rule" (Markit Br. 11, 13) immunizes it from liability because the twelve Dealer Defendants collectively owned a majority of its shares.  But while Markit professes to find this rule in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), no such rule comes from *Copperweld* or its progeny.  Markit does not cite a single case discussing such a rule; nor does any case on Westlaw or Lexis appear to discuss a rule by that name.  Markit is apparently quoting itself.[52]

As *American Needle* explains, the test for determining whether "entities are capable of conspiring under § 1" turns on whether the conspiracy is "amongst 'separate economic actors pursuing separate economic interests'" and thus "joins together 'independent centers of

---

[51] Even if, counterfactually, the Complaint did only challenge agreements reached *within* Markit, those agreements would still be subject to the antitrust laws.  *See Am. Needle*, 560 U.S. at 200 ("Agreements made within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action.").  Here, the Complaint expressly alleges the conspiracy was not in Markit's own interest and that it was, instead, pressured to join ongoing concerted action among the Dealer Defendants.  (¶¶ 147-48, 151, 155.)

[52] In its effort to invoke a "controlling shareholder rule" that does not exist, Markit does not just speciously put this rule in quotes, it also pretends to quote the Complaint to say things about control it does not actually say.  Markit thus purports to quote the phrase "own and control" at least three times, despite the fact the Complaint does not use this phrase.  Markit claims that "the plaintiffs . . . say the Dealer Defendants exercised 'too much' control" (Markit Br. 7), although that phrase does not appear in the Complaint either.  It again misrepresents the Complaint when it purports to quote it as saying that "the banks controlling [Markit] instructed [it] to license only for 'over-the' counter' trading purposes and not for exchange trading."  (*Id.* 10.)  The first portion of the purported quote ("the banks controlling . . .") is, again, not in the Complaint; the paragraph Markit cites is discussing the *European Commission's* findings.

Markit's accusations (*id.* 2 n.2) about "pleading games" are barely worthy of comment; these falsely-quoted phrases generally were not in the prior complaint either.  In any event, Plaintiffs are entitled to refine their allegations; the inapposite case Markit cites concerned an effort to avoid removal jurisdiction.  More fundamentally, for the reasons discussed above, Markit's efforts to gin up quotes to support its made-up rule are irrelevant.

decisionmaking.'" 560 U.S. at 196 (quoting *Copperweld*, 467 U.S. at 769). *Copperweld* held a parent corporation and its wholly owned subsidiary were incapable of conspiring because they had "a complete unity of interest," their "objectives [were] common, not disparate," and "their general corporate actions [were] guided or determined not by two separate corporate consciousnesses, but one." 467 U.S. at 771. By contrast, *American Needle* held that 32 NFL teams were capable of conspiring with the NFLP, an association they created to exploit their intellectual property, because "[t]he teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's financial well-being." 560 U.S. at 201.

Markit and the twelve Dealer Defendants are separate economic actors with separate economic interests; they are not a single center of decisionmaking or a single aggregation of economic power, and they do not share a complete unity of interest. The Dealer Defendants are separately owned and controlled horizontal competitors, comprising twelve different centers of decisionmaking. (¶¶44-57.) Markit is its own company with large shareholders besides the Dealer Defendants and independent directors. (¶¶62-63.) It pursues its own business interests in the market, which are not co-extensive with the Defendant Dealers'.

While the Dealer Defendants own shares in Markit, these banks are also Markit's *customers*, and, indeed, these banks own stakes in numerous actors in the industry, including Markit's competitors. The fact that the Dealer Defendants and Markit may have *some* common interests or interests that "coincide" does not render them a single entity; "commonality of interest exists in every cartel." *Am. Needle*, 560 U.S. at 201 (quotation omitted). *See also id.* at 198 ("Although NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned.").

Markit argues that a company's interests are defined by its controlling shareholders, citing cases concerning the relationship between a parent and its subsidiary.  (Markit Br. 11-14.) But unlike the relationship between a parent and *wholly owned* subsidiary, a corporation is not bound to follow the wishes of any particular subset of shareholders.  That is why corporations make decisions that are sometimes unpopular with, and even can trigger litigation by, shareholders.  Indeed, courts have expressly rejected the extension of *Copperweld* to shareholder-corporation relationships, holding that even when a *single investor* has a controlling interest in a firm, that investor is capable of conspiring with the firm.  *See Am. Vision Ctrs., Inc. v. Cohen*, 711 F. Supp. 721, 723 (E.D.N.Y. 1989) (owner of 54% of common stock capable of conspiring with corporation); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 541 n.19 (7th Cir. 1986) (*Copperweld* "should not be extended to shelter independent actors" that have acquired interests as shareholders).

But even if there were a "controlling shareholder rule," Markit does not have *a* controlling shareholder.  Instead, it argues that the twelve Dealer Defendants' shares, if *aggregated*, *would be* controlling.  Thus, its claim is far more attenuated than the rejected single-shareholder claims noted above.  Under Markit's proposed rule, parties to a conspiracy could evade the reach of the antitrust laws by acquiring stock in their co-conspirator.  But a cartel cannot "evade the antitrust laws simply by creating a joint venture" or "shar[ing] in profits or losses from a venture."  *Am. Needle*, 560 U.S. at 201-02 (citations omitted).

Unsurprisingly, Markit has not identified a single case in which a court aggregated the minority stock ownership of numerous separate shareholders and held that, because those entities

collectively had a controlling interest, they were incapable of conspiring with the corporation.[53]

This is unsurprising since, if Markit's rule existed, *American Needle* would have been differently

decided.  Indeed, numerous lower courts have held that a firm, venture, or association is capable

of conspiring with its members or shareholders for antitrust purposes.  *See N. Carolina State Bd.*

*of Dental Exam'rs v. F.T.C.*, 717 F.3d 359, 372 (4th Cir. 2013) (members of state board capable

of conspiring with it because they have separate economic interests); *Robertson v. Sea Pines*

*Real Estate Cos., Inc.*, 679 F.3d 278, 285-88 (4th Cir. 2012) (incorporated joint venture capable

of conspiring with its members who sat on its board); *Freeman v. San Diego Ass'n of Realtors*,

322 F.3d 1133, 1149-50 (9th Cir. 2003) (corporation was capable of conspiring with its

shareholders, who lacked common ownership and did not share profits).

So has the Supreme Court, which has repeatedly found firms liable for conspiring with

shareholders (including those whose shares collectively were controlling) to restrain competition.

In *United States v. Sealy, Inc.*, for example, Sealy (the licensor of mattresses) was held liable for

conspiring with its licensees (mattress manufacturers) that were in fact Sealy's shareholders who

sat on its board and exercised "control" of its "day-to-day business."  388 U.S. 350, 352-53

(1967); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608-09 (1972) (holding that

a conspiracy among grocery store association and its grocery store stockholders, which also sat

on the association's board and controlled its operations, could violate Section 1).  Similarly here,

---

[53] Each of the cases cited by Markit concern control of an entity by a *single* owner – not a collection of shareholders.  In *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002), for example, the court declined to treat Cablevision and its affiliates as separate entities because the plaintiffs had previously conceded that Cablevision "is a vertically integrated entity" with a "controlling interest in its affiliates" that rendered it a "single force."  Similarly, in *Gucci v. Gucci Shops, Inc.*, 651 F. Supp. 194, 197 (S.D.N.Y. 1986), the court found that two separate entities were incapable of conspiring because they were "under common ownership" by a single person.  And in *Novatel Commc'ns, Inc. v. Cellular Tel. Supply, Inc.*, No. 85 Civ. 2674 (GET), 1986 WL 15507, at *6 (N.D. Ga. Dec. 23, 1986), the court applied *Copperweld* because it was a parent-subsidiary relationship.

the complaint alleges that Markit conspired with companies that were shareholders to eliminate competition that otherwise would have existed – a plainly anticompetitive outcome.

**B.      Markit is Not an "Integrative Collaboration" or a Joint Venture With the Dealer Defendants**

Markit next argues that it is a "*limited-purpose, product-creating* enterprise[] the Dealer Defendants formed" (Markit Br. 16), and thus, under the Supreme Court's decision in *Texaco Inc. v. Dagher*, 547 U.S. 1 (2006), its "core activities" cannot be grounds for liability.  Markit is again wrong on the facts and the law.

Markit's description of itself as a "limited-purpose" joint venture formed by the Dealer Defendants contradicts the Complaint's allegations and is false.[54]  Markit is *not* a joint venture (or even a "limited-purpose, product-creating enterprise," whatever that means) and it was *not* formed by the Dealer Defendants.  Rather, Markit is a large, diversified company with numerous business interests that is currently going public.  (¶¶63, 94.)

Nor are the indices that Markit agreed not to license for exchange trading the result of any ongoing "industry collaboration."  (Markit Br. 16-17.)  The CDS indices at issue were created by separate consortiums of banks, and then sold to Markit in arms'-length transactions. (¶83.)  Similarly, Markit's data services were created *before* the Dealer Defendants purchased shares in Markit.  (¶¶94-95.)  Markit cannot avoid liability by clouding the facts about its corporate existence – a trick the Supreme Court has rejected.  *See Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951) ("Nor do we find any support in reason or authority for the proposition that agreements between legally separate person and companies to suppress

---

[54] Markit's sole citation to the fact that it is purportedly a joint-venture (Markit Br. 7) is, misleadingly, to ¶69 of the Complaint, which is simply the general "co-conspirator" paragraph.

competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled.").

Nor does *Dagher* offer Markit any protection. In *Dagher*, the Supreme Court held only that it was not *per se* illegal for an "economically integrated joint venture," whose formation was approved by government regulators, to internally set a price at which the venture would sell its own oil. 547 U.S. at 3. The Supreme Court held that the internal decision of how to price that fully-integrated joint venture's product in a market in which the venturers did not compete was not *per se* unlawful. *Id.* at 5-6. *See* Areeda, *Antitrust Law* ¶1478d2 (noting that the venture in *Dagher* "was akin to a merger" because of the "salient fact" that the participants "ceased all of their separate operations").

Markit cannot possibly be considered a *completely integrated* joint venture with the Dealer Defendants, who remain competitors in the CDS market and customers of Markit. The Dealer Defendants are supposed to compete and make their own decisions, as is Markit. Their conspiracy not to do so, but to proceed jointly by agreement, is *per se* unlawful.[55] And even if Markit were such a joint venture, "the complaint contains many allegations of conduct that took place outside of" Markit – including its conspiracy with the Dealer Defendants – and therefore is "not affected by *Dagher*." *Starr*, 592 F.3d at 327.

Markit's only discernible efforts to distinguish *American Needle* are unavailing. It argues that while the defendants in *American Needle* placed pre-existing, independently-owned property

---

[55] Unlike the present case, where "the members were actual or potential competitors of each other" and "therefore had pursued interests antithetical" to each other and Markit, in *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op*, there was "no evidence that any defendant ever pursued interests antithetical to those of the cooperative." 838 F.2d 268, 276 (8th Cir. 1988). Markit also cites *AD/SAT*, 181 F.3d 216, but that case, among others, only stands for the irrelevant proposition that "membership in [an] association will not automatically involve all members in [the] violation" of the antitrust laws. *Id.* at 234.

under common control, here the Dealer Defendants developed intellectual property through Markit. (Markit Br. 18.)  Again, the Complaint says the opposite:  the CDS indices *were* independently owned and then sold to Markit. (¶83.)  But the distinction Markit tries to draw is also irrelevant:  *American Needle* turned on the fact that the NFL teams were separate economic actors, not on the origin of the intellectual property. *Am. Needle*, 560 U.S. at 195.

Markit also argues that, "unlike in *American Needle*, the conduct here erected a new single center of economic power out of whole cloth."  (Markit Br. 18.)  But Markit's oblique reference to "the conduct here" misses the point.  The conduct challenged here is Markit's decision to agree with the Dealer Defendants that it would deny licenses for exchange trading to entities that wanted those licenses. (¶¶147-51.)  That conduct did not create anything.  It eliminated competition that otherwise would have existed.

Nor does this case challenge Markit's "core activities" or Markit's *internal* licensing decisions.  (Markit Br. 19.)  Under *Dagher*, "core activities" refer only to internal decisions, like setting the price of a product sold by a single entity, which are necessary to the functioning and purpose of the venture.  But while such an entity can set its own prices, it cannot then turn around and conspire with other companies about that price. *See Am. Needle*, 560 U.S. at 202-04 (noting that while NFL teams "must cooperate in the production and scheduling of games" that does not render them immune from § 1 "when it comes to the marketing of . . . intellectual property").[56]  Similarly, while Markit could (and indeed, should) make its own decisions about the terms on which it will license its intellectual property, it cannot agree with *other companies* that it will refuse to provide licenses for exchange trading to thwart market entry.

---

[56] *See also United States v. Microsoft Corp.*, 253 F.3d 34, 62-63 (D.C. Cir. 2001) (rejecting as "border[ing] upon the frivolous" the argument that licensing restrictions are "legally justified because, in imposing them, Microsoft is simply 'exercising its rights as the holder of valid copyrights'").

The Complaint does not challenge core activities; it challenges Markit's agreement to conspire with other companies. For similar reasons, Markit's protest that it is not a "walking conspiracy" is a straw man. The Complaint does not allege that Markit itself is a walking conspiracy; it alleges that Markit unlawfully conspired *with others*.

### C.   The Complaint Alleges an Unreasonable Restraint of Trade

Markit next argues that the Complaint "alleges only that the Dealer Defendants collaborated to create, or invest in, services that they intended to use for their own benefit." (Markit Br. 21.) Again, that is a brazen mischaracterization. The Complaint does not challenge any collaboration (unless one considers the conspiracy to eliminate market entry by exchanges a collaboration). The Complaint alleges that certain Dealer Defendants sold intellectual property to Markit, an independent company. (¶¶94-97, 130.) It alleges that Markit later entered into negotiations to license those rights to a company that was poised to bring exchange trading to the CDS market. (¶¶130-35.) It alleges that the licensing terms were attractive to Markit and in its economic interests. (¶133.) But it also alleges that Markit succumbed to pressure and agreed with the Dealer Defendants to deny the license to CMDX and other such entities in order to squash exchange trading. (¶¶146-52, 189-93.) That is an "unreasonable" restraint of trade.

Contrary to Markit's assertions, Plaintiffs are not advocating "for a rule of enforced sharing."[57] (Markit Br. 22.) The antitrust laws may not force Markit to provide a license to anyone. But they do forbid Markit from conspiring with others to deny licenses to prospective market entrants: "While it is true in a very general sense that one can dispose of his property as

---

[57] *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) (Markit Br. 23) is inapposite. There, following a jury trial, the Tenth Circuit held, utilizing a rule-of-reason standard, that Visa's refusal to admit Sears to its joint venture did not restrain trade, relying on evidence showing that the restraint in question (a bylaw) did not "change any present pattern of distribution" in the market, "bar Sears from access to this market," prevent it "from developing its new card," "harm consumers," or prevent Sears from competing "vigorously." *Id.* at 971-72.

he pleases, he 'cannot go beyond the exercise of this right, and by contract or combination, express or implied, unduly hinder or obstruct . . . interstate trade." *Associated Press v. United States*, 326 U.S. 1, 15 (1945) (quotation omitted); *see also Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 347 (1963) (holding that a refusal to deal with nonmembers of the Exchange "by collective action of the Exchange and its members would . . . constitute a per se violation of § 1" because it was "a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market"); *Primetime 24*, 219 F.3d at 102 (holding that a *concerted* refusal to license is unlawful).

The other Defendants understand that the Complaint is not about enforced sharing. The Dealer Defendants do not claim that the conspiracy alleged by Plaintiffs is actually lawful. Neither does ISDA, which recognizes that Plaintiffs are challenging *concerted* conduct: "Plaintiffs do not challenge ISDA's licensing decisions on a stand-alone basis as violative of the antitrust laws" but rather "challenge ISDA's licensing decision solely to the extent it allegedly suggests ISDA's participation in the Bid/Ask Conspiracy."  (ISDA Br. 10 n.8.)

A recent decision from the District of Minnesota is instructive:  In *Reg'l Multiple Listing v. Am. Home Realty*, No. 12 Civ. 965 (JRT), 2014 WL 1285733, at *2-3 (D. Minn. Mar. 31, 2014), an online residential real estate service alleged a real estate listing service company and its affiliated brokers conspired to suppress competition by collectively refusing to license the plaintiff data feeds containing listing data based on the plaintiff's business model and whether it provided buyer-side referrals.  Plaintiff alleged that defendants' conspiracy forced new business models out of the market that would allow consumers to save money.  *Id.* at *3.  The defendants argued that "competitors cannot be forced to cooperate with each other" or be compelled "to

license [their] intellectual property." *Id.* at *10.  The court, rejecting defendants' argument, held that the alleged conspiracy was an actionable group boycott.  *Id.*

The same is true here:  Plaintiffs' claims do not challenge any unilateral decision by Markit not to provide licenses to its indices; rather, they challenge its agreement to join an unlawful conspiracy to block exchange trading of CDS.[58]

### D.     Markit's Additional Standing Arguments are Unavailing

Markit also makes a perfunctory standing argument, in which it asserts that Plaintiffs lack standing to bring "information opacity claims" because "their claimed harm does not flow from any elimination of competition."  (Markit Br. 24.)  By "information opacity claims," Markit is not actually referring to distinct claims; it is referencing approximately five paragraphs of the Complaint that discuss Markit's agreement, prior to the start of the Class Period in 2008, to place limits on its dissemination of CDS pricing information to others in the market.  (¶¶94-98.)

There are no separate "information opacity" claims.  Instead, these allegations principally provide context for the Complaint's allegations regarding Defendants' conspiracy to prevent competition from exchange trading.  They show how the Dealer Defendants had rigged the over-the-counter CDS market in their favor, keeping prices opaque.  Markit's effort to dismember the Complaint's allegations and conduct a standing inquiry on five paragraphs in isolation is improper.

---

[58] Markit's musings about what Macy's and Nordstrom's could do if they were building a shopping mall are merely a distraction.  Contrary to Markit's assertion (Markit Br. 21-22), for example, Macy's and Nordstrom's agreement to refuse an anchor tenancy to Saks Fifth Avenue could, in fact, be subject to antitrust scrutiny.  *See, e.g., Harold Friedman Inc. v. Thorofare Mkts. Inc.*, 587 F.2d 127, 142 (3d Cir. 1978) (Section 1 claim based on conspiracy to prevent plaintiff from maintaining its store in shopping center).  In any event, the allegations in this case are not remotely comparable to the building of a shopping mall.  This case does not challenge the *creation* of intellectual property; it challenges the concerted decision to eliminate competition from exchanges by denying intellectual property rights to those exchanges.

Plaintiffs have clearly pleaded injury that "stems from a competition-*reducing* aspect or effect of the defendants' behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990). The Complaint alleges a series of anticompetitive practices including Defendants' boycott of CMDX and other nascent ventures which had exchange trading in their "DNA," their concerted refusals to license necessary intellectual property, their agreement with the CME restraining the offering of exchange trading, and their agreement to restrict real-time pricing information and prevent its dissemination to the consumers of CDS. This is sufficient.[59]

Plaintiffs do not need to show that any discrete series of allegations yielded antitrust injury in isolation. *See Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739, 743 (9th Cir. 1984) (rejecting arguments "tightly compartmentalizing" in assessing antitrust injury) (quotations omitted); *Welch v. Am. Psychoanalytic Ass'n*, No. 85 Civ. 1651 (JFK), 1986 WL 4537, at *10 (S.D.N.Y. Apr. 4, 1986) ("plaintiffs may challenge defendants' extended course of conduct, not just the conduct which has been shown to affect them directly").

Even if Plaintiffs' claims were dependent on these "information-opacity" allegations (which they are not), Plaintiffs would, in fact, have standing to bring such claims. Defendants' agreement to restrict access to real-time pricing information constitutes a classic antitrust injury because it diminished price transparency and competition.[60]

---

[59] Notably, no Defendant seriously contests that Plaintiffs' core allegations regarding the elimination of exchange trading suffice to plead an *antitrust* injury. Markit's standing argument regarding antitrust injury thus ignores the core of Plaintiffs' case.

[60] *See, e.g.*, *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 613-14 (S.D.N.Y. 2002) (holding that defendants "attempt to monopolize the information necessary to compete in the relevant market" through control of necessary data caused an "antitrust injury"); *In re Currency Conversion Fee Antitrust Litig.*, 773 F. Supp. 2d 351, 372-73 (S.D.N.Y. 2011) ("reduced choice in the marketplace as a result of Amex's alleged collusion with the Banks" constituted an antitrust injury).

Nor is the agreement addressed in ¶¶94-98 – *i.e.*, an agreement to restrict investors'
access to real-time pricing information – a "collaborative" activity "in an area in which
defendants never did and never were intended to compete."  (Markit Br. 25.)  Markit is not a
"collaboration," and neither is its CDS data service.  Markit is a company that obtains raw CDS
pricing data from the Dealer Defendants pursuant to licensing, and a condition in those
agreements restrict the ways Markit may sell that data to buy-side entities.  The pricing data is
not "collaborative data" (*id.* 26), but rather data from each of the Dealer Defendants to which
they and Markit have access, but which they restrict from consumers.  Contrary Markit's
suggestion, Defendants *do* (or, are supposed to) compete on price, and by agreeing to restrict
access to real-time pricing, Defendants restrained that competition.  Thus, Markit's restrictions
"dressed up as a competitor collaboration" still are the result of an agreement to restrain
competition, from which Plaintiffs suffered an antitrust injury.  *Glen Holly Entm't, Inc. v.
Tektronix Inc.*, 343 F.3d 1000, 1013 (9th Cir. 2003).[61]

Markit's related arguments that Plaintiffs are not "efficient enforcers" to pursue these so-
called "information opacity claims" fail for similar reasons.  Plaintiffs do not need to prove they
are efficient enforcers with respect to every allegation in the Complaint, merely with respect to

---

[61] The *LIBOR* decision (Markit Br. 25-27) is inapposite.  In *LIBOR*, the court held that
"the process of setting LIBOR was never intended to be competitive" but rather "was a
cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their
borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate
index."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 688
(S.D.N.Y. 2013).  Thus "by conspiring to submit artificial estimates," the plaintiffs' injury there
"resulted from defendants' misrepresentation, not from harm to competition."  *Id.*  Here,
Plaintiffs allege that Defendants *restrained competition* by agreeing to restrict access to pricing
information, not that they misrepresented hypothetical prices in a benchmark-setting exercise.
Additionally, the plaintiffs in *LIBOR* argued that their antitrust injury was derived from the
LIBOR-setting process itself, not from "any harm to competition between sellers of those
instruments [referencing LIBOR] or between buyers of those instruments."  *Id.*  By contrast,
Plaintiffs' allegations squarely allege harm to competition in the buying and selling of CDS.

the claims taken as a whole.  *See Ostrofe*, 740 F.2d at 743; *Welch*, 1986 WL 4537, at *10.  As

demonstrated in Section II.B, *supra*, Plaintiffs have done so.  Even considering the "information

opacity" allegations in isolation, Plaintiffs are, in fact, consumers in the purported "information

services market" as they are subscribers to Markit and buy its data packages.[62]

## VI.    Defendants' Statute of Limitations Arguments Lack Merit

Plaintiffs have pled timely claims.  That is not in dispute.  Defendants concede that,

because the first class action complaint was filed on May 3, 2013, Plaintiffs' claims for damages

suffered on or after May 3, 2009 are timely.  (Dealer Br. 36.)  Instead, Defendants argue that

"claims arising from conduct occurring before May 3, 2009" are time-barred.  (*Id.*)  This

argument lacks merit because a statute of limitations defense cannot limit the *conduct* that

Plaintiffs rely on to prove liability arising out of Defendants' unlawful, continuing conspiracy.

The most Defendants could do is limit the *damages period* for which Plaintiffs can sue, but even

that effort relies on fact-intensive questions related to whether Plaintiffs are entitled to tolling of

the limitations period that cannot be resolved at the pleading stage.

### A.    Plaintiffs' Claims May Rely on Conduct Occurring Before May 3, 2009

Plaintiffs are entitled to base their claims on *all* of Defendants' anticompetitive conduct

related in any way to Defendants' conspiracy to block the emergence of exchange trading and

---

[62] The other authorities cited by Markit are also inapposite as they are focused on claims
by *competitors* not *consumers*.  For example, Markit cites Areeda, *Antitrust Law* ¶348 (2d ed.
2000).  The title of that paragraph is "Competitor Suits" and focuses exclusively on the
possibility of a rival suing its competitor under the various antitrust laws.  That section, in fact,
states that "consumers almost *always* have the correct incentives for suit" while "rivals do not."
*Id.* (emphasis added).  Similarly, the opinions in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977), *Daniel*, 428 F.3d 408, and *Todorov*, 921 F.2d 1438, all concerned
allegations of injuries to *competitors* of the defendants, not an injury to competition.  Moreover,
*Port Dock*, which Markit cites, reinforces that plaintiffs forced to pay higher prices, have
suffered an antitrust injury.  *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117,
123-24 (2d Cir. 2007) ("Those who would suffer from the defendant's exercise of monopoly
power would be the . . . consumers who were forced to buy at higher prices.").

keep bid/ask spreads artificially wide.  The four-year statute of limitations for federal antitrust claims precludes recovery of *damages* occurring outside of the four-year period (absent tolling). It does not preclude recovery for timely damages claims that rely on *conduct* occurring outside the four-year period that was part of a continuing conspiracy.  *See Berkey*, 603 F.2d at 295 ("the conduct element of the offense may be satisfied by wrongful action occurring before the limitations period but that nevertheless made an enduring contribution to the monopolist's ability to charge an excessive price"); *In re Buspirone Antitrust Litig.*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("if a party commits an initial unlawful act that allows it to maintain market control and overcharge purchasers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings"); *Santana Products, Inc. v. Sylvester & Assocs., Ltd.*, 121 F. Supp. 2d 729, 734 (E.D.N.Y. 1999) ("A cause of action is not barred [] simply because anti-competitive conduct began outside the statutory period, so long as some overt act injuring the plaintiff is committed within the limitations period.").

This point of law (which Defendants misstate) is well settled.  Defendants' unlawful conspiracy to block the emergence of exchange trading of CDS began well before May 2009 and continued through 2013.  Defendants took a number of specific, overt acts *after* May 3, 2009 that constitute a continuing course of conduct aimed at blocking exchange trading and keeping bid/ask spreads artificially wide.  For instance, the Complaint alleges that Defendants continued to refuse to deal with exchange-trading ventures, refused to deal with rival clearinghouses, entered into an agreement with CME to prevent exchange trading, co-opted clearinghouses to prevent them from offering exchange trading, and continued to refuse to license necessary intellectual property for exchange trading.  (¶¶166-67, 169-70, 178-79, 189.)

70

The case law is clear that, where anticompetitive practices have resulted in continuing and accumulating harm to plaintiffs within the limitations period (here, the overcharges the class continued to pay after May 3, 2009), plaintiffs may rely on *conduct* prior to the limitations period to prove their claims.  This is consistent with the general rule that antitrust claims accrue every time a plaintiff suffers an injury, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), such that where a conspiracy creates a "series of unlawfully high priced sales over a period of years . . . each sale to the plaintiff[] starts the statutory period running again."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir. 1992).[63]

### B.   The Complaint Adequately Alleges Equitable Tolling Due to Defendants' Fraudulent Concealment

In addition to being able to rely on *conduct* from before May 2009, Plaintiffs also may sue for *damages* occurring prior to that time because, as the Complaint clearly alleges, the statute of limitations was tolled due to Defendants' fraudulent concealment of their unlawful conspiracy.  (¶¶226-56.)

In an antitrust action, the limitations period is tolled where a plaintiff "establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  Because Plaintiffs

---

[63] Defendants' assertion that claims accrue upon "injury to competition" (Dealer Br. 36) is not accurate where plaintiffs are customers.  Under such circumstances, "[a] purchaser plaintiff's cause of action accrues when he or she actually pays an overcharge," – that is, *every time* he or she pays an overcharge – not "at the time of the defendant's anticompetitive conduct." *Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co., Inc.*, 708 F. Supp. 2d 257, 264 (E.D.N.Y. 2010).

have pled that Defendants concealed the existence of their conspiracy, that they remained

ignorant until at the earliest 2010, and that their ignorance was not attributable to a lack of

diligence, dismissal based on the statute of limitations at the pleading stage is inappropriate.  *See*

*Hinds II*, 700 F. Supp. 2d at 400 ("Resolution of a claim of fraudulent concealment so as to toll

the statute of limitations is intimately bound up with the facts of the case and is thus not properly

decided on a motion to dismiss.") (quotations omitted); *In re Publ'n Paper Antitrust Litig.*,

No. 304 MD 1631 (SRU), 2005 WL 2175139, at *6 n.7 (D. Conn. Sept. 7, 2005) ("the ultimate

question whether the plaintiffs' investigation or lack thereof was reasonable is one of fact"); *In*

*re Issuer Plaintiff IPO Antitrust Litig.*, No. 00 Civ. 7804 (LMM), 2004 WL 487222, at *5

(S.D.N.Y. Mar. 12, 2004) (fraudulent concealment required a determination of facts

"inappropriate on a motion to dismiss").

Defendants' "attack[s] [on] the adequacy of the proof offered" with regard to tolling is "a

matter the court does not consider on a motion to dismiss." *In re Air Cargo Shipping Servs.*

*Antitrust Litig.*, No. 06 MD 1775 (JG) (VVP), slip. op. at 31 (E.D.N.Y. Sept. 22, 2010).  In fact,

almost all of the cases cited by Defendants are summary judgment decisions or do not concern

antitrust claims, and in the two cases in which antitrust claims were dismissed, there were either

"no facts pleaded on which a claim for fraudulent concealment" could be based or the

anticompetitive scheme was "open and notorious."[64]  All such cases are inapposite here given

that the Complaint more than adequately pleads each element of fraudulent concealment.

*First*, the Complaint alleges that Defendants concealed their conspiracy from the Class.

Concealment may be pleaded by "showing either that the defendant took affirmative steps to

prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a

---

[64] *See In re Buspirone*, 185 F. Supp. 2d at 380 and *World Wrestling Entm't, Inc. v. Jakks
Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009), respectively.

nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083. Defendants' conspiracy here was inherently self-concealing as secrecy was necessary to Defendants carrying out their boycott of exchange trading. A group boycott, like the other types of conspiracies that have been recognized as inherently self-concealing,[65] "is the kind of enterprise that requires a number of participants," "is designed to endure over a period of time," and "must remain concealed to be successful." *Id.* at 1084 (quotation and citation omitted).

Because "[a]ny knowledge of the conspiracy would lead plaintiff to seek action immediately and result in collapse of the conspiracy," *id.*, "the secrecy on which illegal boycotts often depend" is essential, *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 7 n.4 (1st Cir. 1977). The fact that the Complaint alleges that the conspiracy was "agreed to and implemented through private meetings under the guise of the defendants' trade association membership" – specifically ISDA and ICE Clear (¶229) – which "provided the defendants a 'cover,'" is further support for finding the alleged conspiracy to be inherently self-concealing. *See Precision Assocs.*, 2011 WL 7053807, at *51 (E.D.N.Y. Jan. 4, 2011). Without the secrecy of Defendants' conspiracy, they would not have been able to carry it out over a period of years without running into huge problems, including potential criminal liability.

Thus, because the Complaint pleads a self-concealing conspiracy, "Plaintiffs are not required to show that Defendants took independent affirmative steps to conceal their conduct in order to satisfy the first prong of the fraudulent concealment analysis." *In re IPO Antitrust Litig.*, 2004 WL 487222, at *4; *see also State of N.Y. v. Cedar Park Concrete Corp.*, 684 F.

---

[65] *See, e.g.*, *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (Parker Jr., J.); *In re IPO Antitrust Litig.*, 2004 WL 487222, at *4. *See also In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513 (S.D.N.Y. 2004) (holding that, where the complaint alleged that the defendants engaged in manipulative trades and reported false trades, the conduct was "self-concealing").

Supp. 1229, 1232 (S.D.N.Y. 1988).  Nevertheless, the Complaint alleges that Defendants did

actively conceal their conspiracy (¶¶232-36), preventing Plaintiffs from discovering it through a

series of "explanations [] designed to 'lull' purchasers into believing that [bid/ask spreads] were

the normal result of competitive market forces rather than the product of collusive efforts."  *Air

Cargo*, slip. op. at 32.

The Complaint alleges, for example, that Defendants stated that exchange trading would

be helpful while falsely asserting that the failure of CMDX was a result of *technical issues*.

(¶232-33.)  It also alleges that Defendants made a series of public statements supporting

increased price transparency to "mislead the market."  (¶234.)  These allegations, coupled with

the Complaint's extensive allegations regarding the steps Defendants took their conspiracy secret

(¶¶228-30, 235-36) and their public denials (¶¶237-39), are more than sufficient to allege active

concealment of the conspiracy.[66]

*Second*, the Complaint alleges that Plaintiffs remained ignorant of Defendants'

conspiracy until, at the earliest, December 2010 (¶¶241-49), which is well within four years of

the commencement of this action.  Contrary to Defendants' suggestion, the relevant standard for

assessing whether Plaintiffs "remained in ignorance of [their] cause of action," *Hendrickson

Bros.*, 840 F.2d at 1083, is ***not*** "reason to suspect the probability of any manner of wrongdoing"

---

[66] Defendants cite two inapposite cases for the proposition that "mere denials of
wrongdoing" or "mere silence" are not tantamount to fraudulent concealment.  (Dealer Br. 39-
40.)  *Statistical Phone* arose in the context of summary judgment and simply holds that
fraudulent concealment may not be based solely on denials of wrongdoing.  *Fidenas* involved the
alleged issuance, sale, and subsequent dishonoring of millions of dollars of fraudulent notes.
The statement that "mere silence" is not fraud appears in a discussion of the elements of a cause
of action (as opposed to a basis for tolling) for fraudulent concealment, which requires, *inter
alia*, a duty to disclose.  Of course, no such duty is at issue here.

or "facts that should arouse suspicion."[67]  (Dealer Br. 40.)  Rather, a plaintiff must have "actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence."  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974); *see also Precision Assocs.*, 2011 WL 7053807, at *53 ("the requisite notice required to defeat a claim of fraudulent concealment is an awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action").

Here, there was nothing in the public domain prior to May 3, 2009 showing that Defendants had engaged in an unlawful conspiracy.  Defendants fail to identify any disclosure that put Plaintiffs on notice of their claims before that time *as a matter of law*.

Defendants argue that their attendance at FRBNY meetings, the sale of TCC to ICE, the terms of licensing obtained by CMDX in March 2009, the failure of CMDX to offer exchange trading, and the Dealer Defendants' membership in ISDA should have alerted Plaintiffs to their conspiracy.  (Dealer Br. 38.)  But if Plaintiffs could plausibly allege Defendants' conspiracy on those facts alone, Defendants' *Twombly* challenge now makes little sense.  *See Air Cargo*, slip. op. at 36 ("*Twombly* stands for the proposition that parallel conduct by itself . . . does not give rise to a plausible claim, and the same consideration should hold when considering whether these announcements effectively put the plaintiffs on notice of the cause of action.").

Moreover, much of this information was not public *at the time*, and in any event, attendance at FRBNY meetings, the TCC sale, and the Dealer Defendants' membership in ISDA alone hardly have alerted Plaintiffs to Defendants' collusion.  Similarly, the terms of licensing by

---

[67] Several of the cases Defendants' cite for this standard arise from since-repudiated notions of "inquiry notice" in the securities context.  Notably, *131 Main St. Assocs. v. Manko* characterizes the passage that Defendants quote – "all that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing" – as the approach taken by "one district court."  179 F. Supp. 2d 339, 348 (S.D.N.Y. 2002).

Markit and ISDA, and CMDX's ultimate offering without exchange trading, were not known until, at the earliest, CME Clearing's launch in *September 2009*. (¶168.)  Nor was there any way for Plaintiffs to know at the time *why* those licensing terms resulted, or what caused CMDX to drop its exchange trading platform.  There was certainly no way for Plaintiffs to link these facts to a secretive conspiracy among the Defendants.

Defendants assert that it is "implausible" that their conspiracy was concealed because certain victims (*e.g.*, CME and Citadel) would have been aware of their exclusion.  (Dealer Br. 40.)  But even if CME and Citadel knew *some* of the facts now alleged in the Complaint, they could not have known of Defendants' *secret* conspiracy to block exchange trading prior to May 2009.  In fact, many elements of the conspiracy happened *after* May 2009.

The Complaint also alleges why, even if those entities did have suspicions of unlawful conduct, they would not have made public accusations.  As of June 2009, both CME and Citadel were still holding out hope for a profitable business relationship with the Dealer Defendants (¶¶165-67), and the Dealer Defendants' tremendous industry clout strongly discourages criticism (¶¶236, 242).[68]  The first reports of a Department of Justice investigation into the CDS industry did not come until July 14, 2009.  (¶249.)  And even with that announcement, because of the lack of information provided by the Antitrust Division and the structure of the CDS market and the secretive nature of the conspiracy, Plaintiffs remained ignorant of Defendants' conspiracy. (¶¶243-44.)  *See Hinds II*, 700 F. Supp. 2d at 399 ("isolated disclosure" by DOJ "was not sufficient to put Named Plaintiffs or Class members on notice").

---

[68] The letter from BlueMountain (Dealer Br. 37) does not accuse the Dealer Defendants of conspiring and, in any event, this letter was disseminated on June 1, 2009 – *less* than four years prior to the first class action in this case.  Nor could statements in a single letter undermine the reality of the Dealer Defendants' tremendous clout in the market.

As noted, even the *New York Times* reporter who first uncovered and exposed in late 2010 the existence of Defendants' secret meetings (with the benefit of protected anonymous sources) could not explain why CME ended its electronic trading initiative. (¶242.)  It is simply not plausible that *Plaintiffs* should have known the truth – that this was due to Defendants' unlawful conspiracy – as a matter of law eighteen months earlier.

*Lastly*, the Complaint sufficiently alleges that Plaintiffs' lack of knowledge was not the result of any lack of diligence.  Because due diligence is typically a "fact-based question," *Klehr*, 521 U.S. at 196, it is "not resolvable on a motion to dismiss."  *In re Publ'n Paper*, 2005 WL 2175139, at *6 n.7.  As one of the cases upon which Defendants rely acknowledges, "the question of whether a plaintiff exercised reasonable diligence is frequently a question of fact to be decided by a jury."  *131 Main*, 179 F. Supp. 2d at 349 (cited at Dealer Br. 40-41).  Thus, a complaint need only allege the inquiries Plaintiffs undertook in the exercise of their due diligence, *or* that diligence was futile.  The Complaint alleges both.

Plaintiffs regularly monitored their investments and conducted due diligence to avoid being harmed by financial misconduct.  (¶251.)  They monitored news on the financial industry and CDS market, utilized investment managers to monitor CDS pricing, made inquiries to the Dealer Defendants regarding CDS price movements, and issued standing instructions to their investment managers to obtain the most favorable executions and best pricing possible.  (¶¶252-54.)  There was nothing more they could have done.  (¶¶254-56.)

Such allegations have been held fully sufficient by courts in this Circuit.[69]  *See, e.g., Air Cargo*, slip. op. at 35 (holding that a complaint adequately alleged diligence prong of fraudulent

---

[69] Defendants, citing *In re Merrill Lynch Ltd. P'hips Litig.*, 154 F.3d 56, 60 (2d Cir. 1998), argue that Plaintiffs must allege "specific inquiries."  But Plaintiffs do allege their due diligence, and the language Defendants quote addressed a situation in which a plaintiff *failed to*

concealment despite being "short on how, other than by generic assertions, the [plaintiffs] in fact exercised due diligence" because plaintiffs asserted that "any inquiries would have been futile"); *see also Nine W. Shoes*, 80 F. Supp. 2d at 193 (plaintiffs "could not have discovered the conspiracy at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed"); *In re Magnetic Audiotape Antitrust Litig.*, No. 99 Civ. 1580 (LMM), 2002 WL 975678, at *3 (S.D.N.Y. May 9, 2002) ("Without a tip-off that a price-fixing conspiracy existed, plaintiffs had no reason to exercise due diligence.").[70]  Accordingly, the Complaint adequately pleads allegations to toll the statute of limitations for injuries arising prior to May 3, 2009.

## VII.   Dodd-Frank Explicitly Permits Plaintiffs' Claims After Its Enactment and, in Any Event, Does Not Impliedly Preclude Application of the Antitrust Laws

At the end of their brief, the Dealer Defendants toss in an argument that Congress "implicitly" precluded application of the antitrust laws to the conduct in this case when it passed Dodd-Frank.  (Dealer Br. 42.)  They concede, as they must, that in Dodd-Frank itself, Congress included a broadly-worded antitrust savings clause, specifically providing that "[n]othing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified." 12 U.S.C. § 5303.  But they

---

*plead* that concealment made discovery through reasonable diligence impossible.  Here, the Complaint makes this very allegation.  (¶¶240-41, 250.)

[70] Defendants contend that "monitoring public data is insufficient to show the diligence required for tolling," citing *131 Main*, and that allegations of impossibility are no substitute for particularized allegations of inquiries, citing *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 453 (S.D.N.Y. 2005).  (Dealer Br. 41.)  Neither case supports the proposition Defendants attribute to it.  *131 Main* found no fraudulent concealment because of constructive notice of the claim and a "gap" in diligence; it does not say that active monitoring of public data cannot show diligence.  *Poughkeepsie* involved a failure to undertake basic diligence in the face of obvious constructive notice, and thus provides no support for Defendants' claim that knowledge of certain anodyne aspects of the CDS industry gave investors the duty or ability to investigate and uncover a secret conspiracy.

claim that reliance on the "general savings clause" is misplaced because Congress expressly provided otherwise in the Dodd-Frank legislation itself.  (Dealer Br. 47-49.)

As demonstrated below, these arguments are meritless; they ignore the plain meaning of the savings clause as well as the relevant legislative history.  Even if the savings clause does not bar the implied preclusion analysis (which it does), preclusion is inappropriate because there is no potential conflict between the antitrust laws and Dodd-Frank regarding the conduct at issue.

### A.    Dodd-Frank Explicitly Preserves Existing Antitrust Law

Congress made clear its intent that Dodd-Frank would have no effect upon the application of the antitrust laws, except in four discrete instances unrelated to the anticompetitive conduct challenged in this case.  Nowhere is this intent more explicit than the *antitrust-specific* savings clause, which reads:

> Antitrust Savings Clause.  Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified.

12 U.S.C. § 5303.  Where, as here, Congress expresses its intent to preserve antitrust laws by including an antitrust-specific savings clause in an enactment, the doctrine of implied preclusion does not apply.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004).

In *Trinko*, the Supreme Court considered whether the Telecommunications Act of 1966 impliedly repealed the antitrust laws with respect to the conduct it regulates.  The Court noted that the regulatory regime created by the 1996 Act would be "a good candidate" for implied immunity from the antitrust laws but for the fact that Congress had specifically precluded any implied immunity challenge by including a savings clause stating that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the

applicability of any of the antitrust laws." 540 U.S. at 406. The Court held that this provision "bars a finding of implied immunity." *Id.*

The antitrust savings clause in the Telecommunications Act is effectively identical to the antitrust savings clause in Dodd-Frank, apart from Dodd-Frank's inclusion of the phrase "unless otherwise specified."[71] Thus, as in *Trinko*, Dodd-Frank's antitrust savings clause preserves application of the antitrust laws in all instances except where the statute "specifie[s]" that the antitrust laws have been "modif[ied], impair[ed], or supersede[d]."[72] Dodd-Frank so specifies in only four places:

- **Dodd-Frank § 210(a)(1)(G)(ii)(III):** This provision changes the premerger notification period "under section 7A of the Clayton Act" so that it "end[s] on the 15th day after the date on which the Attorney General and the Federal Trade Commission receive such notification" for the merger of a "covered financial company with another company," rather than the 30 day period provided for under section 7A of the Clayton Act;

- **Dodd-Frank § 210(h)(11):** This provision changes the premerger notification period "under section 7A of the Clayton Act" so that it "end[s] on the 15th day after the date on which the Attorney General and the Federal Trade Commission receive such notification" for a "transaction involving the merger or sale of a bridge financial company," rather than the 30 day period provided for under Section 7A of the Clayton Act;

---

[71] Section 601(b)(1) of the Telecommunications Act of 1996 provides that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws." *Trinko*, 540 U.S. at 406 (quoting 110 Stat. 143, 47 U.S.C. § 152, note).

[72] Contrary to the Dealer Defendants' contention (Dealer Br. 49 n.22), *Credit Suisse Secs. (USA) LLC v. Billing*, 551 U.S. 264 (2007), does not undermine this conclusion. The *Billing* savings clauses are distinguishable because they are not *antitrust-specific savings clauses*. *See* 551 U.S. at 271 (distinguishing *Trinko* as a case where the "regulatory statute[] explicitly state[s] whether [it] preclude[s] application of the antitrust laws"). Thus, in *Billing*, the Court dealt with the distinct inquiry that arose "[w]here regulatory statutes *are silent in respect to antitrust*," in which case "courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws." *Id.* at 271 (emphasis added); *see also id.* at 275 (declining to consider argument that the general savings clauses in *Billing* were so broad as to explicitly preserve all antitrust actions because not raised below). Where, as here, the court is confronted with an antitrust-specific savings clause, the *Billing* analysis does not apply.

- **Dodd-Frank § 163(b)(5):** This provision eliminates the exemption from premerger notification requirements for transactions involving acquisition, by a bank holding company, of a company engaging in activities that are financial in nature, where the total consolidated assets acquired exceed $10 billion; and

- **Dodd-Frank § 604(e)(2)(iii):** This provision correspondingly amends the Bank Holding Company Act of 1956 to eliminate the exemption from premerger notification requirements for transactions involving acquisition, by a bank holding company, of a company engaging in activities that are financial in nature, where the total consolidated assets acquired exceed $10 billion.

None of these four provisions appear in Title VII of Dodd-Frank, which covers regulation of derivatives and swaps and which is the only even arguably relevant part of the Act for purposes of this case.  Thus, the antitrust savings clause is unqualified as to the enactments in Title VII, and, under *Trinko*, there can be no implied preclusion.

Defendants seize upon certain "Antitrust Considerations" clauses contained in Title VII and argue that these clauses evince a congressional intent to modify or supersede the antitrust laws beyond the four provisions quoted above.   But these clauses do no such thing.  Each appears in a section of the statute enumerating the "Duties" or "Core Principles" of the various participants in the swap markets.  *See, e.g.*, 7 U.S.C. § 4s(j)(6) (swap dealers and major swap participants); 7 U.S.C. § 5h(f)(11) (swap execution facilities).  While each "Antitrust Considerations" provision is worded slightly differently, the following provision (related to the "duties" of swap dealers and major swap participants) is illustrative:

> Antitrust Considerations.—Unless necessary or appropriate to achieve the purposes of this Act, a swap dealer or major swap participant shall not—
>
> (A) adopt any process or take any action that results in any unreasonable restraint of trade; or
>
> (B) impose any material anticompetitive burden on trading or clearing.

7 U.S.C. § 4s(j)(6).

These "considerations" do not modify, impair, or supersede the antitrust laws.  Instead, they are *additional considerations* these entities are directed to take into account in formulating their operational rules.  There are exceptions to these directives for situations in which the entity believes pursuing them itself is inconsistent with its other obligations under the relevant securities or commodities laws (that is, these greater duties apply "[u]nless" pursuing them would be inconsistent with "achiev[ing] the purposes" of Dodd-Frank).  *Id.*  But the fact that the entity may be excused from the new directives under those circumstances does not alter the application of the antitrust laws.  Nor does the fact that the entity follows these directives in its own rulemaking supplant the operation of the antitrust laws.

This reading is buttressed by the fact that these clauses make no mention of the Clayton Act at all.  Had Congress intended to override the antitrust laws in Title VII, it clearly knew how to do so – it did so very clearly in the four provisions addressed above.  *See generally Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) ("We have long held that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997)).

This reading that Dodd-Frank does not modify, impair, or supersede the antitrust laws in Title VII is also consistent with the purpose of Title VII to create transparency and open access in derivatives trading.  *See, e.g.*, S. Rep. No. 111-176, at 34 (2010) (Conf. Rep.) ("Trading more derivatives on regulated exchanges should be encouraged because it will result in more price transparency, efficiency, and liquidity.").  There is no reason why Dodd-Frank's *expanded*

82

directives for swap dealers would somehow absolve them of their more targeted obligations under existing antitrust laws – and that was plainly not Congress's intent.[73]

### B.    The Legislative History Conclusively Confirms the Plain Language of the Antitrust Savings Clause

This straightforward reading of the plain language of Dodd-Frank is confirmed by the Act's legislative history.  *See Int'l Fine Art & Antique Dealers Show Ltd. v. ASU Int'l, Inc.*, No. 02 Civ. 534 (DLC), 2002 WL 1349733, at *2 (S.D.N.Y. June 20, 2002) ("If the meaning of a statute is ambiguous, the court may . . . look to legislative history and statutory purpose to determine the intent of Congress," and even a "restrictive meaning for what appear to be plain words may be indicated . . . by the persuasive gloss of legislative history.").

Dodd-Frank's legislative history, which the Dealer Defendants conspicuously avoid, decisively rejects their spin on the Act.  Testifying on his committee's conference report to the House, Representative John Conyers Jr., the Chairman of the Judiciary Committee that was responsible for inserting the savings clause into the statute, explained:

> The final bill contains a number of provisions ***to ensure that the antitrust laws remain fully in effect***.
>
> First and foremost is the antitrust savings clause in section 6 of the bill.  It is the standard antitrust savings clause found in other statutes.  It applies to the entire Act, and all amendments made by the Act to other laws.  The phrase 'unless otherwise specified' is added ***in reference to four provisions in the bill***.  In two places—

---

[73] Indeed, the Dealer Defendants construe the "Antitrust Considerations" clauses precisely backwards.  Rather than preclude the application of existing antitrust law, the "Antitrust Considerations" clauses direct key derivative market participants to observe certain considerations *on top of the conduct barred by existing antitrust law*.  Unlike the antitrust laws, where application is generally limited to two circumstances – *i.e.*, where (1) there is an *agreement* which unreasonably restrains trade or (2) the culpable party *possesses and unlawfully maintains* monopoly power in a relevant market (*see* 15 U.S.C. §§ 1 & 2) – the "Antitrust Considerations" clauses establish, as "Core Principles" or "Duties," that various swaps entities should generally not take competition-harming actions in the swaps market *regardless* of whether their conduct involves an agreement or an unlawful possession or maintenance of monopoly power in a defined relevant market.

sections 210(a)(1)(G)(ii)(III) and 210(h)(11) of the bill—the standard pre-merger waiting period under section 7A of the Clayton Act is explicitly shortened. And in two other places—section 163(b)(5) of the bill, and the amendment to section 4(k)(6)11(B) of the Bank Holding Company Act made in section 604(e)(2) of the bill—there are cross-references to the exception to pre-merger review in section 7A(c)(8) of the Clayton Act that explicitly make that exception inapplicable.

***The phrase "unless otherwise specified" refers only to those four specific provisions*** that explicitly modify the operation of those specified provisions of the antitrust laws in specified ways, ***and is not a basis for courts to consider whether any other provision in the bill might be intended as an implicit modification of how the antitrust laws operate. The savings clause is intended to make clear that it is not***.

156 Cong. Rec. E1347-01 (daily ed. July 15, 2010) (statement of Rep. Conyers, Jr.), 2010 WL 2788137 (emphasis added).[74]  These are, of course, the same four provisions discussed above, which specifically reference the sections of the Clayton Act that are being altered or replaced.[75]

The legislative history also refutes the Dealer Defendants' claim regarding the "Antitrust Considerations" provisions in Title VII.  On this point, Representative Conyers further stated:

[I]n a number of places in the bill, there are provisions referring to "Antitrust Considerations" that various securities and commodities entities . . . are directed to take into account in formulating their operational rules.  There are exceptions to these

---

[74] Courts routinely look to legislative history when analyzing Congressional intent in the implied preclusion context.  *See Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 28 (2d Cir. 1985); *Churchill Downs Inc. v. Thoroughbred Horesemen's Grp., LLC*, 605 F. Supp. 2d 870, 885 n.22 (W.D. Ky. 2009) (legislative history stating that "legislation in no way modifies or affects the scope or application of antitrust laws" is "convincing" evidence that the regulatory regime in question does not preempt antitrust liability).  The statement by the Chairman of the Judiciary Committee from the conference report stage is among the best indicators of legislative meaning.  *See Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 656 & n.9 (1982) (an "explanation during subsequent congressional debate" by the chairman of a committee that included the legislative provision in question "is entitled to substantial weight."); *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("The conference report stage is closest to final passage and is generally thus the best indicator of legislative meaning apart from the statute itself.").

[75] Senator Herb Kohl, chairman of the Senate Judiciary Sub-Committee on Antitrust, added during the Senate floor debate that Dodd Frank "includes a broad antitrust savings clause that makes clear that nothing in the act will modify, impair, or supersede the operation of any of the antitrust laws."  156 Cong. Rec. S5902-01 (daily ed. July 15, 2010) (statement of Sen. Kohl), 2010 WL 2788026.

directives for situations in which the entity believes pursuing them itself is inconsistent with its other obligations under the relevant securities or commodities laws. ***The fact that the entity is excused from the new directives, however, does not alter the application of the antitrust laws. Nor does the fact that the entity follows these directives in its own rulemaking supplant the operation of the antitrust laws***.

*Id.* (emphasis added).

Thus, the Dealer Defendants' interpretation of the Act was expressly disclaimed by Congress. The Dealer Defendants do not, and *cannot*, cite any contrary legislative history that supports their interpretation.

### C.    Even Absent the Savings Clause, Implied Preclusion is Unwarranted

But even if the explicit antitrust savings clause did not bar the implied preclusion analysis (which it does), preclusion would still be inappropriate because there is no conflict between Dodd-Frank and applying the antitrust laws to Plaintiffs' claims, and preclusion of the antitrust laws would be antithetical to Congress's purposes in enacting Dodd-Frank.

"Repeal of the antitrust laws by implication is not favored and not casually to be allowed," and is to be implied "[o]nly where there is a 'plain repugnancy between the antitrust and regulatory provisions.'" *Strobl*, 768 F.2d at 27 (quoting *Gordon v. N.Y. Stock Exch.*, 422 U.S. 659, 682 (1975)). Courts consider four factors when analyzing whether there is "a plain repugnancy between the antitrust and regulatory provisions" such that the antitrust laws are implicitly precluded. *Billing*, 551 U.S. at 272. These factors are: "(A) location within the heartland of securities regulations; (B) [] authority to regulate; (C) ongoing [] regulation; and (D) conflict between the two regimes." *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) (citing *Billing*, 551 U.S. at 285).

The fourth factor – conflict – is the linchpin of this analysis. As courts have recognized, "repeal of antitrust jurisdiction cannot be implied simply when the antitrust laws and a regulatory scheme overlap." *Strobl*, 768 F.2d at 27. Rather, they must be in actual or potential conflict.

*See id.* (noting "the 'plain repugnancy' found in *Gordon* was the potential for *conflicting* standards and the fact that application of the antitrust laws would render [a particular provision] of the Securities Exchange Act nugatory") (alterations added).  Where, as here, the purportedly anticompetitive conduct alleged would be forbidden under the competing regulatory regime in any event, there is no risk of conflict and therefore no implied immunity from the antitrust laws. *See id.* at 28 (where two buyers in the potato market conspired to manipulate potato prices downward, antitrust claims were not implicitly precluded because "price manipulation is an evil that is always forbidden under every circumstance by both the Commodity Exchange Act and the antitrust laws").[76]

The conspiracy challenged in the Complaint is precisely the type of "evil" that is equally repugnant under Dodd-Frank.  *See Strobl*, 768 F.2d at 28.  Dodd-Frank in no way endorses agreements among competitors to block market entry by innovative and competition-enhancing competitors.  *See Silver*, 373 U.S. at 347 (group boycott violated Sherman Act and was not justified by self-regulatory goals of the exchange or precluded by securities laws).  Thus, there is no actual or potential conflict between the antitrust laws and the securities laws, and no grounds for implied preclusion even ignoring the savings clause.[77]

The Dealer Defendants' conflict argument (Dealer Br. 45-47) misapprehends the Complaint.  This action does not seek "to compel broad-based CDS clearing or electronic trading."  (*Id.* 46.)  It challenges a conspiracy among competitors to eliminate competition.  The

---

[76] *See also In re W. States Wholesale Natural Gas Antitrust Litig.*, 661 F. Supp. 2d 1172, 1183 (D. Nev. 2009) ("Rather than find the antitrust laws completely ousted, the Court concludes that given the allegations of intentional price manipulation in Plaintiffs' Complaints, the antitrust laws and the CEA are reconcilable, as both preclude such conduct[.]").

[77] The DOJ Antitrust Division's investigation into the conduct of the Defendants in this Action stands in stark contrast to *Billing*, where the SEC affirmatively sought total preclusion of the antitrust laws.  *See Hinds II*, 700 F. Supp. 2d at 404.

Dealer Defendants' assertion (*id*. 45) that minimum quote requirements on SEFs, and blocking trade exceptions to real-time reporting somehow conflict with the antitrust law's bar on collusive boycotts is misguided for the same reason:  the antitrust laws do not force market participants to trade on an exchange, or to disseminate their bids and offers to the world – but they do prohibit dealers from conspiring to eliminate the *option* to trade in a more open and transparent market.

Implied preclusion is also independently inappropriate because it would be directly antithetical to Congressional intent.  *See Nat. Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 389 (1981) (Congress's "intent governs"); *see also Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 800 (2d Cir. 2002) (same).  As discussed above, the legislative history of Dodd-Frank expresses a clear and unequivocal intent to preserve antitrust authority.  Indeed, Representative Conyers anticipated that Dodd-Frank's purpose would be frustrated by marketplace "concentrat[ion] . . . with companies that are even bigger, with more market power, and with less incentive to be responsive to the consumers they are supposed to serve, leaving less opportunity for new entry and innovation," 156 Cong. Rec. E1347-01, which is why Dodd-Frank included the antitrust savings clause in the first place.[78] Implying preclusion of the antitrust laws to the conduct challenged here would directly contradict Congress's goals.

---

[78] Representative Conyers stressed that "it is essential that the antitrust laws, the laws protecting our economic freedoms against monopolization, anticompetitive restraints of trade, and undue market concentration, remain in place" following and regardless of the enactment of Dodd-Frank.  The antitrust savings clause in Dodd-Frank acts as a "reinforcement of the well established principle that . . . 'there is a strong presumption against the[] normal operation [of the antitrust laws] being superseded by some other statutory regime' [citing *Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 302-03 (1973) and *Silver*, 373 U.S. 341, 347 (1963)] . . . [and that the] antitrust laws are superseded only 'where there is a plain repugnancy between the antitrust and regulatory provision' [quoting *Billing*, 551 U.S. at 272]."  156 Cong. Rec. E1347-01.  This testimony reflects Congress's specific contemplation *and rejection* of implied preclusion and *Billing* in drafting Dodd-Frank.

## VIII.   The Complaint Adequately Alleges Injury-in-Fact

Under the guise of a challenge to Plaintiffs' "injury-in-fact," the Dealer Defendants ask this Court to determine, at the pleading stage, *precisely* when the damages period in this case begins.  (Dealer Br. 34.)  They do not cite a single case supporting this type of grossly premature examination.  Instead, they cobble together two unrelated cases – one articulating an Article III injury-in-fact requirement and the other discussing antitrust injury[79] – neither of which requires the identification of the exact date of injury at the pleading stage.  Notably, Defendants do not actually argue that Plaintiffs have failed to allege injury-in-fact; they concede Plaintiffs have done so after December 23, 2008.  (Dealer Br. at 34.)  Instead, the Dealer Defendants ask the Court to rule – based on their speculation and reliance on extraneous materials[80] – that there could not possibly have been any injury-in-fact prior to December 23, 2008 because CMDX was not ready to enter the market before that time.

Whether framed as an Article III standing or an antitrust injury requirement, this is a dispute for another day.  *See Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 333 (2d Cir. 2009) (for Article III injury-in-fact "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specifics that are necessary to support the claim."), *rev'd on other grounds*, 131 S. Ct. 2527 (2011) (quotations omitted); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551

---

[79] *Lexmark*, 134 S. Ct. at 1386, only states the general Article III standing requirements. *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004), by contrast, describes the requirements for antitrust injury, which Plaintiffs have unquestionably satisfied (*see* Section II, *supra*).

[80] Defendants' suggestion (Dealer Br. 35) that it would have taken significant time for CLOB trading to follow CDS clearing is speculation, contrary to the Complaint's well-pleaded allegations, and unsupported by even the extraneous materials Defendants improperly rely upon from outside the Complaint.

(D.N.J. 2004) ("What the applicable period for the calculation of damages may be does not need to be decided on this motion to dismiss.").

The determination of when the class first suffered damages will be the subject of discovery and expert analysis.  There is no way to resolve this issue on the pleadings, and it would be unfair to prejudge this issue before any discovery has occurred.  The Complaint alleges that Defendants conspired not just to deny licenses to CMDX, but also to thwart the entry of exchange trading and to maintain inflated bid-ask spreads.  (¶¶146-52, 156.)  The extent to and time frame in which Defendants' conspiracy delayed exchange trading and caused investors to pay artificially high bid-ask spreads is a fact-specific question, not a matter of law appropriate for resolution on motion to dismiss.  Plaintiffs have fully met the "low threshold," *Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 222 (2d Cir. 2008), for alleging injury-in-fact.  The parties can later dispute, based on the evidence, precisely when the class first suffered damages.[81]

## IX.    The Complaint States a Claim for Conspiracy to Monopolize

The Complaint also pleads a Section 2 claim that Defendants conspired to exclude competition from the CDS market in order to maintain their dominance and monopoly power, including their pricing power, in that market.  The Dealer Defendants assert that a Section 2 claim can never be based on a "shared monopoly" or "joint monopoly" theory.  (Dealer Br. 32-34.)  But Defendants cannot identify any binding authority rejecting such a claim, and the Supreme Court and Second Circuit have suggested such claims are viable.

---

[81] While the Class Period begins on January 1, 2008, there is no requirement that, at the pleading stage, Plaintiffs must demonstrate that the beginning of a class period precisely correlates to the beginning of the damages period.  *Cf. eBooks II*, 2014 WL 1282293, at *22 (observing, in the class certification context, that "at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown") (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC,* 571 F.3d 672, 677 (7th Cir. 2009)).

In *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), the Supreme Court affirmed the conviction of the "big three" tobacco companies for conspiracy to monopolize under Section 2, based on evidence they had jointly acted to maintain their collective dominant position in the cigarette market.  In that case, no single defendant held a monopoly or controlling share of the market; rather, the companies collectively held a controlling share of the market.  *Id.* at 794-95.  The Court found this collective market power sufficient to support the conspiracy to monopolize conviction.  *Id.* at 797-98 ("With this background of a substantial monopoly . . . the jury could have found from the actual operation of the [defendants] that there existed a combination or conspiracy among them *not only in restraint of trade, but to monopolize a part of the tobacco industry*.") (emphasis added).[82]

Similarly, the Second Circuit has held that competitors' market shares cannot be aggregated to form the basis for an *attempt to monopolize* claim, but declined to extend that prohibition to conspiracy to monopolize claims.  *See H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018-19 (2d Cir. 1989) (affirming dismissal of conspiracy claim only for insufficient evidence and noting that, in contrast to the attempt claim, a "dangerous probability of success" need not be proven to establish a conspiracy to monopolize).

Many of the decisions the Dealer Defendants cite (Dealer Br. 33-34) address *actual or attempted monopolization* claims based on a "shared monopoly" theory; they do not address

---

[82] The Court thus affirmed the trial court's instructions that monopolization meant: "the *joint* acquisition or maintenance by the members of a conspiracy formed for that purpose, of the power to control and dominate interstate trade and commerce in a commodity to such an extent that they are able, *as a group*, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power."  *Id.* at 785 (emphasis added).

*conspiracy to monopolize* claims.[83]   In contrast, several courts have upheld conspiracy to monopolize claims where, as here, the conspiracy involved a monopoly held jointly by multiple participants.[84]

Finally, while some have argued that a conspiracy to monopolize claim is redundant of a Section 1 claim (a point with which Plaintiffs do not agree[85]), courts recognize that even *this* is not grounds for dismissal.  *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 779-80 (7th Cir. 1999) (collecting cases recognizing conspiracy count and noting unlikelihood of juror confusion).  In this case, the Dealer Defendants did conspire to maintain their power in and control of an opaque, inefficient market.  If the facts support it, Plaintiffs should be able to present a claim challenging that conduct – under Section 2 – to a jury.

---

[83] Even cases cited by the Dealer Defendants acknowledge the Supreme Court "arguably implicitly recognized" a "shared monopoly" conspiracy count.  *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 236 n.13 (E.D.N.Y. 2009) (refusing to consider conspiracy count because raised for first time in pleadings, and insufficient facts to sustain the claim in any event); *Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 2d 556, 580 (S.D.N.Y. 2007) (Lynch, J.) (conspiracy claim inadequately pled, but noting the Supreme Court "has given some courts pause about categorically rejecting" theory).

[84] *See* Order, *American Express Travel Related Servs. Co., Inc. v. Visa USA, Inc.*, Nos. 04 Civ. 8967 (BSJ), 04 Civ. 7844 (BSJ) (S.D.N.Y. Aug. 29, 2005) (denying motion to dismiss claims that Visa, Mastercard, and bank defendants "collectively combined and conspired to monopolize the general purpose card network services market in violation of Section 2 of the Sherman Act,"); *Kasada Inc. v. Access Capital, Inc.*, No. 01 Civ. 8896 (GBD), 2004 WL 2903776, at *2, *9 (S.D.N.Y. Dec. 14, 2004) (denying motion to dismiss complaint alleging that multiple defendants "acted as 'one'" in conspiring to monopolize those markets in violation of Section 2); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96 Civ. 5238 (JG), 2003 WL 1712568, at *6-*8 (E.D.N.Y. Apr. 1, 2003) (upholding conspiracy to monopolize claim).

[85] A Section 2 conspiracy claim may, in some circumstances, embrace parallel exclusions of competition that for technical reasons fall short of a Section 1 "agreement" in restraint of trade.  *See* C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 Yale L.J. 1182, 1240-41 (2013).

### X.   The Complaint States a Claim for Unjust Enrichment

Finally, Plaintiffs also adequately plead an unjust enrichment claim based on the fact that Defendants' unlawful efforts to preserve the over-the-counter market they dominated allowed them to unjustly profit from the Plaintiffs.  "A person who is unjustly enriched at the expense of another is subject to liability in restitution."  *Restatement (Third) of Restitution & Unjust Enrichment* § 1 (2011).  A claim for unjust enrichment requires allegations "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

Defendants argue that Plaintiffs' unjust enrichment claim fails to "allege distinct and different damages."  (Dealer Br. 49.)  For an unjust enrichment claim, restitution is measured by the benefit the defendant received, *see In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411 (S.D.N.Y. 2011), while damages for an antitrust claim are based on the loss the plaintiffs sustained, *see Pueblo Bowl-O-Mat*, 429 U.S. 477.  Discovery will reveal the exact contours of these measures in this case, but they are by no means necessarily identical and cannot be assumed so as a matter of law at this stage.[86]

Defendants further argue that unjust enrichment is "'not available where it simply duplicates, or replaces, a conventional [legal] claim.'"  (Dealer Br. at 49 (quoting *La. Mun. Police Emps. Ret. Sys. v. JPMorgan Chase & Co.*, No. 12 Civ. 6659 (DLC), 2013 WL 3357173, at *16 (S.D.N.Y. July 3, 2013) ("*LAMPERS*")).  But Defendants have improperly changed this Court's language to suit their purposes, replacing the words "*contract or tort*" with "legal."

---

[86] ISDA's claim (ISDA Br. 16 n.10) that it has not unjustly benefited fails for similar reasons.  To what extent ISDA financially benefited from its participation in the Dealer Defendants' conspiracy is a fact specific question that cannot be answered on the pleadings.

2013 WL 3357173, at *16 (emphasis added).  As numerous courts have held, unjust enrichment actions may proceed in parallel with antitrust claims, which are not conventional contract or tort claims.  *See eBooks*, 859 F. Supp. 2d at 693 ("The defendants argue that the failure of plaintiffs' Sherman Act claim is fatal to their state claims and to their unjust enrichment claim.  Given that plaintiffs have successfully pled a Sherman Act violation, these arguments are inapposite.").[87]

The Dealer Defendants' also argue that Plaintiffs "do not identify the state jurisdictions upon whose law the claim is predicated."  (Dealer Br. 50.)  At the pleading stage, however, it is not essential that the complaint specifies the state law upon which the unjust enrichment claim is based.  Courts have recognized that the elements of unjust enrichment are materially the same in every state.[88]  Defendants certainly have made no showing that any differences among state laws are material at this stage.[89]

---

[87] *See also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012) (unjust enrichment and antitrust claims not inconsistent); *In re Digital Music*, 812 F. Supp. 2d at 414 (denying motion to dismiss unjust enrichment claims where defendants failed to demonstrate unavailability under state law); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 449 (E.D. Pa. 2010) (same); *Park v. Thomson Corp.*, No. 05 Civ. 2931 (WHP), 2007 WL 119461, at *10 (S.D.N.Y. Jan. 11, 2007) (same); *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 506 (E.D. Pa. 2006) (same); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 211-12 (D. Me. 2004) (same); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S.D. Fl. 2001); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671, 669 (E.D. Mich. 2000) (same).

[88] *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 58 (D.N.J. 2009) ("While there are minor variations in the elements of unjust enrichment under the laws of the various states, those differences are not material."); *Singer v. AT & T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998) ("breach of contract and unjust enrichment . . . are universally recognized causes of action *that are materially the same* throughout the United States.").  *See also* Daniel R. Karon, *Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-Fixing Claims*, 108 W. Va. L. Rev. 395, 409-10 (2005) ("[S]ince all states' common law grew from shared historical roots (including universally accepted fairness concerns), it isn't surprising that all states' unjust-enrichment laws contain virtually identical elements.") (footnote omitted).

[89] To the extent specificity about state laws is necessary here, which it is not, Plaintiffs can easily cure.  The Dealer Defendants failed to advance this argument before Plaintiffs

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motions to dismiss the Second Consolidated Amended Class Action Complaint.


DATED:    New York, New York                    QUINN EMANUEL URQUHART &
          June 20, 2014                             SULLIVAN, LLP


                                          By: /s/ *Daniel L. Brockett*
                                              Daniel L. Brockett
                                              Steig D. Olson
                                              Justin T. Reinheimer
                                              Nick T. Landsman-Roos
                                              51 Madison Avenue, 22nd Floor
                                              New York, New York 10010
                                              Telephone:  (212) 849-7000
                                              Fax:  (212) 849-7100
                                              danbrockett@quinnemanuel.com
                                              steigolson@quinnemanuel.com
                                              justinreinheimer@quinnemanuel.com
                                              nicklandsmanroos@quinnemanuel.com

                                              PEARSON, SIMON & WARSHAW, LLP
                                              Bruce L. Simon
                                              George S. Trevor
                                              Aaron M. Sheanin
                                              44 Montgomery Street, Suite 2450
                                              San Francisco, California 94104
                                              Telephone:  (415) 433-9000
                                              Fax:  (415) 433-9008
                                              bsimon@pswlaw.com
                                              gtrevor@pswplaw.com
                                              asheanin@pswlaw.com

                                              ***Interim Co-Lead Class Counsel***

---

amended their Complaint.  Accordingly, to the extent the Court reaches this argument, it should
give Plaintiffs the opportunity to replead to allege the applicable state laws.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 20, 2014, I filed and therefore caused the foregoing document to be served via the CM/ECF system in the United States District Court for the Southern District of New York on all parties registered for CM/ECF in the above-captioned matter.


/s/ *Daniel L. Brockett*
Daniel L. Brockett