UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                      :       <u>OPINION & ORDER</u>

IN RE CREDIT DEFAULT SWAPS ANTITRUST   :

LITIGATION                            :       13md2476 (DLC)

                                        :
---------------------------------------- X

APPEARANCES

For plaintiffs:

Daniel L. Brockett
Steig D. Olson
Justin T. Reinheimer
Nick T. Landsman-Roos
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Bruce L. Simon
George S. Trevor
Aaron M. Sheanin
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104

For defendants Bank of America
Corporation and Bank of America N.A.:

Robert F. Wise, Jr.
Arthur J. Burke
Jeremy T. Adler
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

For defendant Barclays Bank PLC:

Todd S. Fishman
Michael S. Feldberg
M. Elaine Johnston
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

For defendant BNP Paribas:

David Esseks
Brian de Haan
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

John Terzaken
Molly Kelley
ALLEN & OVERY LLP
1101 New York Avenue, N.W.
Washington, DC 20005

For defendants Citigroup Inc., Citibank,
N.A., and Citigroup Global Markets Inc.:

Benjamin R. Nagin
Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

David F. Graham
David C. Giardina
Jennifer E. Novoselsky
SIDLEY AUSTIN LLP
1 S Dearborn St
Chicago, IL 60603

For defendant Credit Suisse AG:

J. Robert Robertson
Benjamin Holt
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004

For defendant Deutsche Bank AG:

David P. Wales
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001

Tracy V. Schaffer

Eric P. Stephens
JONES DAY
222 East 41st Street
New York, NY 10017

Paula W. Render
Alex P. Middleton
JONES DAY
77 West Wacker
Chicago, IL 60601

For defendant Goldman, Sachs & Co.:

Richard C. Pepperman II
Bradley P. Smith
Mark S. Geiger
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Robert Y. Sperling
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

Seth Farber
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006

For defendants HSBC Bank plc and HSBC
Bank USA, N.A.:

Richard A. Spehr
Michael O. Ware
MAYER BROWN LLP
1675 Broadway
New York, NY 10019

Andrew S. Marovitz
Britt M. Miller
MAYER BROWN LLP

71 South Wacker Drive
Chicago, IL 60606

For defendants JPMorgan Chase & Co. and
JPMorgan Chase Bank, N.A.:

Peter E. Greene
Peter S. Julian
Boris Bershteyn
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
New York, NY 10036

Patrick J. Fitzgerald
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive
Suite 2700
Chicago, IL 60606

For defendant Morgan Stanley & Co. LLC:

Evan R. Chesler
Daniel Slifkin
Michael A. Paskin
Vanessa A. Lavely
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

For defendants UBS AG and UBS Securities
LLC:

David C. Bohan
KATTEN MUCHIN ROSENMAN, LLP
525 W. Monroe St.
Chicago, IL 60661

James J. Calder
KATTEN MUCHIN ROSENMAN, LLP
575 Madison Avenue
New York, NY 10022

For defendants Royal Bank of Scotland PL
and Royal Bank of Scotland N.V.:

Charles F. Rule
Joseph J. Bial

Amy W. Ray
CADWALADER, WICKERSHAM & TAFT LLP
700 6th Street, N.W.
Washington, DC 20001

For defendant International Swaps and
Derivatives Association:

Matthew J. Reilly
Abram J. Ellis
SIMPSON THACHER & BARTLETT LLP
1155 F Street, NW
Washington, DC 20004

Michael J. Garvey
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017

For defendant Markit Group Ltd.:

Colin R. Kass
Scott M. Abeles
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004

Alan R. Kusinitz
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036

For defendant Markit Group Holdings
Limited:

Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004

Alan R. Kusinitz
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036

DENISE COTE, District Judge:

Plaintiffs bring this antitrust action individually[1] and on behalf of all persons who, during the period from January 1, 2008 through December 31, 2013, which plaintiffs define as the "Relevant Period," purchased credit default swaps ("CDS")[2] from, or sold CDS to, certain banks in the United States.  The Second Consolidated Amended Class Action Complaint ("Complaint") names as defendants those banks (the "Dealer-Defendants"),[3] as well as the International Swaps and Derivatives Association ("ISDA"), and both Markit Group Holdings Limited and its subsidiary Markit Group Ltd. (collectively "Markit").  Plaintiffs bring claims

---

[1] Plaintiffs are Los Angeles County Employees Retirement Association; Salix Capital US Inc.; Value Recovery Fund LLC; Delta Institutional, LP; Delta Offshore, Ltd.; Delta Onshore, Ltd.; Delta Pleiades, LP; Essex Regional Retirement System; Unipension Fondsmaeglerselskab A/S; Arkitekternes Pensionskasse; Pensionskassen for Magistre & Psykologer; and Pensionskassen for Jordbrugsakademikere & Dyrlæger.

[2] This Opinion uses the abbreviation "CDS" to refer both to the singular, "credit default swap," and to the plural, "credit default swaps."

[3] Dealer-Defendants are Bank of America Corporation, and Bank of America N.A. (collectively "BofA"); Barclays Bank PLC ("Barclays"); BNP Paribas ("BNP"); Citigroup Inc., Citibank, N.A., and Citigroup Global Markets Inc. (collectively "Citibank"); Credit Suisse AG ("Credit Suisse"); Deutsche Bank AG ("Deutsche Bank"); Goldman, Sachs & Co. ("Goldman Sachs"); HSBC Bank plc, and HSBC Bank USA, N.A. (collectively "HSBC"); JPMorgan Chase & Co., and JPMorgan Chase Bank, N.A. (collectively "JPMorgan"); Morgan Stanley & Co. LLC ("Morgan Stanley"); Royal Bank of Scotland PLC, and Royal Bank of Scotland N.V. (collectively "RBS"); and UBS AG, and UBS Securities LLC (collectively "UBS").

under Sections 1 and 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. §§ 1-2, and under state unjust enrichment law. Defendants have moved under Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint for failure to state a claim on which relief can be granted.  For the reasons stated below, defendants' motions are granted in part.

## BACKGROUND

The following facts are drawn from the Complaint and are accepted as true for purposes of this motion.  LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009).

### I.    The CDS Market Generally

A CDS is a type of derivative, which is a financial instrument whose value depends on the value of some underlying asset.  In the case of CDS, the underlying asset is a debt instrument.  CDS are tools for hedging credit risk.  The buyer of the CDS purchases the seller's promise to pay on the occasion of a "credit event," such as a default on the debt instrument by a third party, who is known as the "reference entity."

When they originated in the 1990s, trading of CDS was largely ad hoc.  Because CDS instruments were not standardized, their terms were individually negotiated, resulting in high transaction costs.  One such cost came from searching for a counterparty: a party willing to buy or sell the credit protection that the investor was offering or seeking.

In response to this situation, market makers arose.  Market makers -- also referred to as "dealers" -- sell to buyers, buy from sellers, and hold inventory until a match emerges.  In other words, dealers (the "sell-side" of the market) sell CDS investors (the "buy-side" of the market) liquidity: the ability to trade without having to wait for a counterparty.  A dealer offers a "bid" price at which the dealer will purchase and an "ask" price at which the dealer will sell.  By keeping their bid lower than their ask, dealers can capture the difference, known as the "bid/ask spread."  The primary CDS dealers are the large investment banks: the Dealer-Defendants.

## II.  Dealer-Defendants Take Control of the CDS Market.

By the early-2000s, Dealer-Defendants had established their position as prominent over-the-counter CDS dealers.  In those days a dealer's role as market maker was valuable because a dearth of buyers and sellers created a need for liquidity.  Moreover, there were substantial barriers to entry in the over-the-counter dealer market.  Due to low trading volume and unstandardized products, dealers faced the possibility of holding undesirable CDS exposure, a risk that only large financial institutions, like Dealer-Defendants, could manage.  Under these circumstances Dealer-Defendants were able to charge high prices in the form of bid/ask spreads.

By the mid-2000s, however, several changes in the CDS market increased liquidity, threatening Dealer-Defendants' positions of prominence.  For one thing, the volume of CDS transactions increased significantly.  Standing alone, increased trading volume could have benefited Dealer-Defendants by creating economies of scale and scope.

In addition to increased volume, however, the structure of CDS transactions was standardized under a "Master Agreement" created by ISDA, a financial trade association representing institutions involved in the derivatives market.  Most of the terms of the Master Agreement applied automatically, obviating the need for negotiation in each transaction.

CDS products themselves became standardized as well.  As CDS markets grew, two types of products emerged as highly liquid options: single-name CDS and CDS indices.  Single-name CDS are based on a debt instrument issued by a single reference entity.  The vast majority of single-name CDS contracts follow the Master Agreement.  CDS indices are keyed to a basket of reference entities.  In November 2007, the two major CDS indices were purchased by Markit, a private financial information company.  Markit standardized not only the CDS indices themselves by selecting their baskets of reference entities, but also the indices' contract terms.  Dealer-Defendants came to occupy seats on the boards of both ISDA and Markit.

With increased standardization, the market was ripe for alternative means of CDS trading, such as an electronic exchange.  Such alternative means would have diminished the buy-side's dependence on the over-the-counter trading services offered by Dealer-Defendants.

To protect their positions of prominence, Dealer-Defendants restricted pre- and post-transaction price transparency.  Before a transaction, Dealer-Defendants strove to keep investors in the dark about both the volume of supply and demand and the real price at which CDS were trading.  For instance, investors could not see Dealer-Defendants' solicitations of bids and asks.

And after a transaction, virtually no CDS data could be shared without Dealer-Defendants' consent.  Formal processing of Dealer-Defendants' CDS trades was handled by subsidiaries of the Depository Trust & Clearing Corporation ("DTCC"), whose board of directors included representatives of Dealer-Defendants.  DTCC was privy to the terms of Dealer-Defendants' CDS trades and could have disseminated that information to data vendors, but Dealer-Defendants used their positions as board members to promulgate rules that prevented such dissemination.

DTCC provided real-time post-trade data only to its members, which included Dealer-Defendants and Markit.  In exchange for receiving this data, Markit agreed to Dealer-Defendants' condition that Markit not provide pricing

information to its subscribers in real-time.  Instead, Markit would delay before circulating information, allowing Dealer-Defendants to quote different prices in the interim and to disavow as stale the information that Markit eventually released.  This agreement with Dealer-Defendants was contrary to Markit's economic interests:  Because the CDS market lacked real-time pricing data, Markit could have sold that data to investors.

Dealer-Defendants secured additional informational advantages by restricting participation in the inter-dealer market.  When dealers trade CDS among themselves they use intermediaries called inter-dealer brokers ("IDBs").  IDBs receive information about the price at which one dealer is willing to buy or sell a CDS and then attempt to match that bid or ask with another dealer.  The inter-dealer market was structured to provide Dealer-Defendants some of the very benefits denied non-dealers.  When transacting through IDBs, for instance, dealers had access to a large array of real-time bid and ask prices.  Dealers also were able to enter trades automatically at the quoted price, with no need to negotiate or to submit a counter quote.  Moreover, dealers were able to post quotes anonymously.  In sum, the inter-dealer market possessed some of the key attributes of an electronic exchange,

demonstrating that, even before 2008, the CDS market was ripe for exchange trading.

Dealer-Defendants actively prevented non-dealers from accessing the benefits of the inter-dealer market, striving to ensure that each CDS transaction included at least one dealer. In fact, Dealer-Defendants threatened to boycott IDBs that transacted with non-dealers, a threat that, if acted upon, would effectively force an IDB to shut down.

In short, by the beginning of 2008 Dealer-Defendants had total command of CDS trading.  By controlling real-time pricing data, Dealer-Defendants were able to maintain supracompetitive bid/ask spreads, even as increased liquidity and standardization should have driven those spreads down.

**III. Changes Threaten the Status Quo.**

Unsurprisingly, by early 2008 there was demand for greater transparency and competition in the CDS market.  While considerable barriers to entry prevented direct buy-side competition with the major dealers in the over-the-counter market, clearinghouses and exchanges would have created competition on bid/ask spreads.  As a result, potential CDS clearinghouses and exchanges began to emerge.

One such enterprise was the Credit Market Derivatives Exchange ("CMDX"), a joint venture between Citadel LLC ("Citadel") -- a leading investor in the CDS market -- and CME

Group Inc. ("CME").  CME, as the operator of the world's foremost derivatives marketplace, offered exchanges for trading in derivatives and a clearinghouse.  Together, Citadel and CME had the capital, experience, reputation, and knowhow to launch a successful CDS clearinghouse and exchange.

Citadel and CME heavily invested, working with buy- and sell-side parties to ensure that CMDX would be a viable electronic exchange platform.  They intended CMDX membership to be generally open to dealers, banks, and institutional investors.  CMDX was designed with an open architecture that would enable market participants to trade through Central Limit Order Booking ("CLOB").  In a CLOB model, customers and dealers can trade directly between or among each other.  Research suggested that CMDX would support extensive trading and clearing of CDS products, including the major CDS indices and their single-name constituents.  CMDX would thus have excluded Dealer-Defendants as intermediaries in many CDS transactions and made real-time pricing information available to investors.

Trades using CMDX were to be processed directly through the CME clearinghouse.  A clearinghouse is an entity designed to reduce counterparty risk by turning a bilateral trade into two separate transactions: a sale from the seller to the clearinghouse, and then a sale from the clearinghouse to the buyer.  Because every trade participant faces the same

13

counterparty -- the clearinghouse -- traders need not evaluate counterparty risk for each deal.  By serving as the clearinghouse for all CMDX trades, CME would have virtually eliminated the risk of counterparty default.

Citadel and CME offered equity in CMDX to certain sell-side parties, including six Dealer-Defendants.  Parties who invested in CMDX early had the potential to realize a sizeable first-mover advantage.  Accordingly, some Dealer-Defendants expressed interest in becoming involved.

Citadel and CME also targeted Markit and ISDA.  To succeed, CMDX would need licenses to two types of Markit's intellectual property: the makeup of its CDS indices and its reference-entity database ("RED") codes, which identify the financial instrument and reference entity underlying a CDS.  Markit stood to gain significant revenue from licensing its CDS indices and RED codes, and Markit directors expressed interest.

CMDX would also need a license to use ISDA's Master Agreement to ensure that the conventions of a CDS exchange market would mirror those of the over-the-counter analog.  It was in ISDA's interest to license to CMDX:  As an industry trade association, ISDA's stated goals include reducing counterparty credit risk, increasing transparency, and improving industry infrastructure.  Furthermore, ISDA sought to achieve broader

adoption of its Master Agreement.  Accordingly, representatives
indicated that ISDA was interested in licensing to CMDX.

CMDX was not the only proposal for change in the CDS
market.  Others were presented by Eurex Clearing and Liffe.
Nevertheless, CMDX was the most advanced, and Dealer-Defendants
had an economic incentive to participate in the venture,
especially those that could be first movers.  CMDX was fully
operational and ready for market by the Fall of 2008.  Modeling
suggested that CDS investors, such as plaintiffs, would quickly
begin executing CDS trades on CMDX.

**IV.  Defendants Conspire To Prevent Changes to the CDS Market.**

As CMDX was poised to enter the market, Dealer-Defendants
conspired to shut it down.  They reached their agreement at
secret meetings and through telephone and email communication.
Some of their gatherings took place in midtown Manhattan on the
third Wednesday of the month during the Fall of 2008 and were
masked as board or committee meetings -- some of them for Markit
and ISDA.

As a result of these meetings, Dealer-Defendants agreed not
to deal with CMDX or any other clearing platform that might
allow CDS trading.  Clearinghouses can lay the groundwork for
full-blown exchanges by bringing buyers and sellers to a central
platform, creating infrastructure for trade processing, and
obviating the need for repeated risk assessments.  To prevent

the emergence of any clearinghouse "with exchange trading in its DNA," Dealer-Defendants coordinated their clearinghouse choices, refusing to deal with any nascent venture, such as Eurex Clearing, Liffe, or CMDX.  Instead, Dealer-Defendants agreed to clear almost all transactions through the one clearinghouse they could control: ICE Clear Credit LLC ("ICE").

Dealer-Defendants have an ownership stake in ICE, and, during the Relevant Period, controlled ICE's risk committee. Under the guise of risk committee meetings, Dealer-Defendants conspired to limit changes to the over-the-counter CDS market. Dealer-Defendants imposed rules restricting participation in ICE that were designed to prevent a transition to exchange trading. For example, certain rules effectively required that clearing members have a trading desk, which all Dealer-Defendants have, but which most investors do not.

As for CMDX, Dealer-Defendants convinced Markit and ISDA not to grant any licenses that referred to a CLOB or exchange platform.  Dealer-Defendants secured these agreements by leveraging their status as Markit's and ISDA's largest customers and by exercising influence as members of the boards of both Markit and ISDA.  As a result, in November 2008, Markit and ISDA, in synchronized fashion, expressed to CME and Citadel that more formal approval from Dealer-Defendants would be required before licensing to CMDX.  Markit and ISDA also sent CMDX draft

agreements that excluded licenses for use in exchange trading. This sudden, simultaneous about-face ran counter to Markit's and ISDA's own incentives.  In March 2009, again in conspicuously similar fashion, ISDA and Markit granted CMDX licenses that permitted clearing but that expressly precluded the use of licensed property for a CLOB or exchange-trading platform.  The licenses also required that some Dealer-Defendant be on at least one side of every CDS transaction.

Even after the exchange component had been eliminated from CMDX, when CME targeted some smaller Dealer-Defendants to join its clearinghouse, they expressed interest but indicated that they would need to confer with the "dealer community."  In June 2009, Dealer-Defendants agreed to discuss the possibility of clearing through CMDX, but only if Citadel not be involved, on the theory that a large investor's involvement increased chances that the clearinghouse would grow into a trading exchange. After Citadel was effectively dropped from CMDX, Dealer-Defendants began to sign on to the clearinghouse.  As a condition of their joining, however, Dealer-Defendants demanded to control CME's risk committee, much as they had with ICE. Operating through that committee, Dealer-Defendants froze CME's ability to clear trades.  They did this by, among other things, promulgating rules that limited how many members could join the clearinghouse.  Additionally, as a condition of joining the

17

clearinghouse, Dealer-Defendants required CME to agree not to offer CDS trading in any form until December 2012.

Defendants' conduct harmed plaintiffs by keeping the market opaque, preventing competition, and maintaining inflated bid/ask spreads.  Defendants agreed to keep their meetings and communications secret.  Beginning in early 2009, defendants issued public statements designed to make excuses for their conduct and to give the false impression that they supported greater competition and transparency in the CDS market.  For their part, Markit and ISDA affirmatively denied wrongdoing when questioned by the press.

Plaintiffs could not have discovered through the exercise of reasonable diligence that they were injured until December 2010, when the existence of secret meetings was first uncovered by the New York Times.  Even then, the report did not disclose that defendants had conspired to block CDS exchange trading. Similarly, the ensuing revelation that the Department of Justice was investigating Markit did not disclose that defendants conspired to prevent a CDS exchange.  The first significant disclosure of the fact that Dealer-Defendants may have conspired with Markit came in April 2011, when the European Commission divulged that it was probing the CDS market.  In July 2013, the European Commission reported that it had issued a Statement of Objections -- a formal complaint -- based on the preliminary

conclusion that Dealer-Defendants, Markit, and ISDA had colluded
to inhibit the emergence of exchanges.

The initial complaint in this action was filed on May 3,
2013.  At a conference on December 5, 2013, lead counsel was
selected.  The Complaint was filed on April 11, 2014.  On May
23, 2014, various defendants filed motions to dismiss.  The
motions were fully submitted on July 15, 2014.

## DISCUSSION

Dealer-Defendants have filed the chief motion to dismiss,
in which all defendants join.  Markit, ISDA, and BNP (itself a
Dealer-Defendant), in addition to joining Dealer-Defendants'
motion, individually submitted motions of their own.  The
following discussion addresses all of defendants' arguments,
noting, where relevant, their authors.

Some of defendants' arguments call for complete dismissal
of one or both of the antitrust claims.  Defendants argue that
plaintiffs (1) lack antitrust standing; (2) fail to plead facts
plausibly supporting a violation of Sherman Act Section 1; and
(3) fail to plead facts plausibly supporting a violation of
Sherman Act Section 2.

Others of defendants' arguments attempt to limit the
temporal scope of the antitrust claims.  Defendants contend that
(1) the Complaint alleges no injury-in-fact prior to December
23, 2008; (2) plaintiffs' claims based on conduct before May 3,

2009 are barred by a four-year statute of limitations imposed by the Clayton Antitrust Act of 1914 ("Clayton Act"), Pub. L. No. 63-212, 38 Stat. 730; and (3) the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), implicitly precludes application of the antitrust laws to post-July 21, 2011 conduct.

Defendants also assert that the unjust enrichment claim must be dismissed. These arguments are addressed in turn.

## I.    Pleading Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d Cir. 2014). To survive a motion under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Wilson v. Dantas, 746 F.3d 530, 535 (2d Cir. 2014) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

## II.   Antitrust Standing

There are "two imperatives" of antitrust standing.  <u>Gatt Commc'ns, Inc. v. PMC Assoc., LLC</u>, 711 F.3d 68, 76 (2d Cir. 2013).  A plaintiff must plausibly plead both that it suffered an antitrust injury and that it is an efficient enforcer of the antitrust laws.  <u>Id.</u>  Here, defendants all argue that plaintiffs are not efficient enforcers; Markit also argues that plaintiffs fail to plead antitrust injury.

### A.   Antitrust Injury

There is a three-step process for determining that antitrust injury has been sufficiently pled:

> First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive.  Next, we identify the actual injury the plaintiff alleges. . . .  Finally, we compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

<u>Id.</u> (citation omitted).

It is at the third step that Markit mounts its challenge. That step requires a plaintiff to demonstrate that its injury "stems from a competition-<u>reducing</u> aspect or effect of the plaintiff's behavior."  <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006) (quoting <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990)).

Plaintiffs allege that they were forced to invest in a CDS market lacking transparency and competition because Markit refused to license data to nascent ventures such as CMDX. Markit questions how plaintiffs' injury could stem from anticompetitive behavior:  After all, says Markit, it sounds like plaintiffs would have liked Markit to increase, not reduce, its collaboration by working with entities like CMDX.

This attempt to recast the Complaint's allegations is unavailing.  The charge is that Markit's withholding of licensure -- far from reflecting insufficient collaboration -- directly resulted from Markit's anticompetitive collusion with Dealer-Defendants.  Plaintiffs allege that, because of a secret agreement with Dealer-Defendants secured to prevent competition, Markit acted against its own interests and withheld licenses from CMDX.  Plaintiffs also allege that their injury -- paying inflated bid/ask spreads -- resulted from this conduct on Markit's part.  Taken together, these allegations satisfy the third step of the antitrust-injury inquiry.

### B. Efficient Enforcer

To determine whether a plaintiff is an efficient enforcer of the antitrust laws, the Second Circuit Court of Appeals directs courts to the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate

them to vindicate the public interest in antitrust
enforcement; (3) the speculativeness of the alleged
injury; and (4) the difficulty of identifying damages
and apportioning them among direct and indirect
victims so as to avoid duplicative recoveries.

Gatt, 711 F.3d at 78 (citation omitted).  The Supreme Court has
recently discussed these factors in the context of the Lanham
Act, noting that the latter two are "problematic," and that
"potential difficulty in ascertaining and apportioning damages
is not . . . an independent basis for denying standing where it
is adequately alleged that a defendant's conduct has proximately
injured an interest of the plaintiff's that the statute
protects" and other relief may be available to the plaintiff.
Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S.
Ct. 1377, 1392 (2014).  Defendants argue that all of the factors
weigh against plaintiffs.

### 1.  Directness of Injury

"Directness in the antitrust context means close in the
chain of causation."  Gatt, 711 F.3d at 78 (citation omitted).
This is essentially a proximate cause analysis, Lotes Co. v. Hon
Hai Precision Indus. Co., 753 F.3d 395, 412 (2d Cir. 2014), and
is a threshold requirement that every plaintiff must meet,
Lexmark, 134 S. Ct. at 1392.

Here, the prevention of exchange trading directly injured
CDS investors by sustaining the inflated bid/ask spreads they
had to pay.  No intermediaries stood between plaintiffs, who

paid the supracompetitive prices, and Dealer-Defendants, who
pocketed them as a result of their efforts to keep CMDX and
other nascent ventures out of the market.

Defendants rely on Paycom Billing Services, Inc. v.
MasterCard International, Inc., where a merchant, Paycom,
alleged that it was injured by MasterCard's competitive programs
policy ("CPP"), which prohibited MasterCard member banks from
acting as issuers or acquirers for any other payment-card
network, with the exception of Visa.  467 F.3d at 288, 293.
Paycom claimed that, absent the CPP, American Express and
Discover would have expanded their networks, and that increased
competition from American Express and Discover would have caused
MasterCard to adopt policies more favorable to merchants like
Paycom.  Id. at 293.

The Second Circuit reasoned:

> The CPP did not prevent Paycom from accepting Discover
> or American Express cards as payment options, and
> elimination of the CPP would have benefitted Paycom
> only through the increased use of Discover and
> American Express cards.  Consequently, any injury
> suffered by Paycom was indirect and flowed from the
> injuries suffered by Discover and American Express.

Id.

The causal chain in Paycom was more attenuated than the one
at issue here.  There, absent the CPP, MasterCard member banks
might have decided to act as issuers or acquirers for American
Express and Discover; American Express and Discover might have

24

increased their networks; MasterCard might have felt pressure to compete for merchants; and MasterCard might have changed some of its polices to be more merchant-friendly.  Here, by contrast, plaintiffs allege that, absent defendants' agreement to prevent a CDS exchange, CMDX would have entered the market, immediately allowing plaintiffs to avoid trading directly with Dealer-Defendants and paying their inflated bid/ask spreads.

### 2.  Other Potential Plaintiffs

"The second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws. 'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 689 (2d Cir. 2009).  Defendants argue that Citadel and CME were less remote parties whose own economic interests would have motivated them to bring antitrust actions. Both the plaintiffs and the entities seeking to create CMDX are naturally motivated to enforce the antitrust laws due to their distinct injuries.  CME and Citadel lost profits on their venture, whereas plaintiffs paid supracompetitive prices on their CDS transactions.  Denying plaintiffs a remedy in favor of a suit by CME and Citadel "would thus be likely to leave a significant antitrust violation . . . unremedied." Id. (citation omitted).

### 3.   Speculativeness

To assert that the alleged injuries are speculative, defendants essentially repackage their indirectness-of-injury argument, rejected above.  Defendants contend that it is overly speculative to posit the marketplace developments that "would have" occurred but for the alleged misconduct.

Plaintiffs' alleged injuries are not speculative.  To support the claim that the prevention of a CDS exchange directly caused plaintiffs to continue paying inflated bid/ask spreads, the Complaint references several sources: modeling by CME and Citadel, research performed by some Dealer-Defendants, statements of SEC employees, and an economic analysis commissioned by plaintiffs.  Moreover, the Complaint alleges that CMDX, as an exchange and clearinghouse, was operationally ready to enter the market until defendants conspired to block it.

### 4.   Avoiding Duplicative Recoveries

In their final attempt to show that plaintiffs are not efficient enforcers of the antitrust laws, defendants contend that "it would be virtually impossible to apportion damages between various clearinghouses and exchanges, which allegedly suffered direct injuries, and plaintiffs, which might have been indirectly harmed."  Plaintiffs' claims present no danger of duplicative recovery or problems of apportionment.  As noted

above, plaintiffs seek damages for overcharges on CDS transactions, whereas entities such as CME or Citadel, which hoped to launch exchange platforms, would seek lost profits if they sued.  See DDAVP, 585 F.3d at 689.

In sum, plaintiffs have antitrust standing.  The next question is whether the Complaint adequately pleads violations of the antitrust laws.

## III. Sherman Act Section 1

### A.   Arguments Common to All Defendants

All defendants argue that the Complaint fails to plead facts raising a plausible inference of a Sherman Act Section 1 violation.  Section 1 outlaws "conspirac[ies] . . . in restraint of trade or commerce among the several States."  15 U.S.C. § 1. "A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  Mayor & City Council of Balt., Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).  To support such an inference, a plaintiff may present circumstantial facts.  Id.  When the circumstantial facts consist of parallel acts, the allegations must be bolstered by plus factors.  Id.; Apex Oil Co. v. DiMauro, 822 F.2d 246, 253 (2d Cir. 1987).  Such plus factors may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest

of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor, 709 F.3d at 136 (citation omitted).

Here, the Complaint alleges facts to support the allegation that a conspiracy existed.  Plaintiffs allege that representatives of all Dealer-Defendants secretly met and communicated during certain time periods at certain places and agreed to block CMDX and other nascent ventures from entering the CDS market, thus insulating Dealer-Defendants' control. Plaintiffs further allege that Dealer-Defendants accomplished this task by, among other things, securing agreements from Markit and ISDA not to license necessary information.

The Complaint provides a chronology of "behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 322 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 557 n.4).  Indeed, the Complaint alleges "plus factors": "a common motive to conspire" (no single Dealer-Defendant could prevent exchanges from emerging, but all Dealer-Defendants would profit from such prevention); "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators" (Markit and ISDA had incentives to facilitate exchange trading,

and CMDX offered sizeable first-mover advantages to Dealer-Defendants that joined the venture); and "evidence of a high level of interfirm communications" (representatives of Dealer-Defendants were strategically placed in other relevant entities -- such as Markit, ISDA, DTCC, and ICE -- fostering much communication).  Mayor, 709 F.3d at 136.

Defendants argue that references to "Dealer-Defendants" as a group are insufficiently particular to render the allegations plausible.  But the Complaint alleges that "senior-level employees of each [Dealer-Defendant] participated" in face-to-face meetings and telephone and email communications in which the conspiratorial agreement was reached.  And the Complaint includes various lists of Dealer-Defendant representatives who plaintiffs believe were present at different meetings.  While no single list includes all Dealer-Defendants, each Dealer-Defendant is included on at least one of the lists.

Defendants also argue that the Complaint alleges facts that make out a mere opportunity to conspire, which is insufficient. The Complaint alleges that Markit and ISDA, which both initially expressed interest in CMDX, and all Dealer-Defendants, even the six or more that had been in advanced discussions about investing in CMDX, abruptly and simultaneously took the position that they would not deal with CMDX so long as it had an exchange component or involved Citadel.  The Complaint also alleges that

this about-face occurred after defendants met in secret to strategize how to maintain control of the CDS market.  Indeed, the Complaint pleads facts about the who, when, and where of these gatherings, and alleges that some of them were held under the auspices of board or committee meetings, while others of them were held under the guise of phony entities lacking any legitimacy whatsoever.  See Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 187 (2d Cir. 2012), cert. denied, 133 S. Ct. 846 (2013) (concluding that complaint "alleges actual agreement" where it "alleges not just that all of the defendants ceased, in virtual lock-step, to deal with [Plaintiff]," but also includes dates of meetings and specifies the names or positions of defendants' representatives who attended).  These allegations, when taken together, make out more than a mere opportunity to conspire.

Finally, defendants assert that the allegations are equally consistent with a non-collusive explanation, namely, independent, self-interested conduct in reaction to the global financial crisis.  The financial crisis hardly explains the alleged secret meetings and coordinated actions.  Nor does it explain why ISDA and Markit simultaneously reversed course.  The Complaint plausibly alleges an antitrust conspiracy in violation of Section 1 of the Sherman Act.

### B.   BNP's Argument

BNP contends that none of the alleged facts links it to the conspiracy.  But the Complaint alleges that, under the auspices of Markit and ISDA board meetings, BNP representatives agreed with agents of other Dealer-Defendants to block CMDX from the market and to neutralize other nascent clearinghouses.

### C.   Markit's Arguments

Markit contends that it was incapable of conspiring with Dealer-Defendants because it either (1) was controlled by Dealer-Defendants or (2) acted with Dealer-Defendants as a single entity engaged in a joint venture.  These arguments fail.

#### 1.   "Controlling Shareholder Rule"

Markit invokes Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), where the Supreme Court held that a parent and its wholly owned subsidiary are legally incapable of conspiring under Section 1 of the Sherman Act.  Id. at 771. Relying on Section 1's requirement of concerted action, the Court held that a corporation and its wholly owned subsidiary must be viewed as a single enterprise because they have "a complete unity of interest."  Id.  "[A]n internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police."  Id. at 769. Copperweld's holding was limited; the Court expressly declined to "consider under what circumstances, if any, a parent may be

liable for conspiring with an affiliated corporation it does not completely own." Id. at 767.  It had no occasion to address whether an entity created by a consortium of conspirators could not be deemed a conspirator as well.

The Complaint is not clear about the precise size of Dealer-Defendants' ownership stake in Markit.  According to the Complaint:

> Markit . . . is owned by the company's employees, the investment firm Temasek, the private equity group General Atlantic, and sixteen investment banks, including Dealer-Defendants Bank of America, Barclays, BNP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS. During the Relevant Period, these sixteen investment banks owned between 50% and 70% of Markit.

One thing is clear:  Markit is not a wholly owned subsidiary of any one Dealer-Defendant, much less such a subsidiary of all Dealer-Defendants.  Nevertheless, Markit contends that Copperweld's narrow rule against Section 1 liability should extend here.

It is unnecessary to trace the precise contours of the controlling shareholder rule to reject its application here. Plaintiffs simply do not allege that Dealer-Defendants so dominated Markit as to create a unity of interest.  Indeed, part of plaintiffs' theory is that Markit had interests independent of Dealer-Defendants', but acted against those interests as a result of its agreement with Dealer-Defendants.  Plaintiffs

allege that Dealer-Defendants got Markit to join the conspiracy by exerting influence not just in their capacity as part-owners and board members, but also in their role as Markit's largest customers.  The reasoning of Copperweld does not extend naturally to these facts.  Cf. Fishman v. Estate of Wirtz, 807 F.2d 520, 541 n.19 (7th Cir. 1986) ("[Copperweld] should not be extended to shelter independent actors having diverse economic interests acting jointly.").

Markit cites no controlling authority to support its claim that "courts have expanded the rule first articulated in Copperweld to all forms of corporate control, giving rise to the 'controlling shareholder rule.'"  And neither of the cases Markit cites from this district is on point.  See Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002); Gucci v. Gucci Shops, Inc., 651 F. Supp. 194, 198 (S.D.N.Y. 1986).

### 2.   Joint Venture

Markit next invokes Texaco Inc. v. Dagher, 547 U.S. 1 (2006), where the Supreme Court held that it is not per se illegal under Section 1 of the Sherman Act for a lawful, economically integrated joint venture to set the prices at which it sells its products.  Id. at 6.  Such a joint venture arises when those "who would otherwise be competitors pool their capital and share the risks of loss and opportunities for

profit." Id. (citation omitted).  To discern whether various
entities are acting as a joint venture, "the inquiry is one of
competitive reality[;] it is not determinative that two parties
to an alleged § 1 violation are legally distinct entities.  Nor,
however, is it determinative that two legally distinct entities
have organized themselves under a single umbrella or into a
structured joint venture." Am. Needle, Inc. v. Nat'l Football
League, 560 U.S. 183, 196 (2010).  Instead, "[t]he question is
whether the agreement joins together independent centers of
decisionmaking.  If it does, the entities are capable of
conspiring under § 1." Id. (citation omitted).

Markit argues that "the conduct here erected a new single
center of economic power out of whole cloth."  Markit seems to
be referring to the actions it took to centralize and
standardize CDS indices and their contract terms.  But the
Complaint does not challenge that conduct as illegal; rather, it
challenges the subsequent agreement between Markit -- as a
financial information company -- and Dealer-Defendants -- as CDS
dealers and customers of Markit -- to withhold necessary
licenses from nascent clearinghouses and exchanges.  In other
words, despite the fact that Dealer-Defendants held ownership
interests and board positions in Markit, the agreement
challenged in the Complaint is one between independent centers
of decisionmaking.  Dealer-Defendants and Markit, as

characterized in the Complaint, were thus capable of conspiring under Section 1.

### D.   ISDA's Arguments

ISDA asserts that the Complaint fails to plead facts plausibly linking ISDA to the "bid/ask conspiracy."  Nothing in the Complaint, says ISDA, suggests that ISDA's refusal to grant CMDX licenses was pursuant to an "agreement" between ISDA and Dealer-Defendants.

The Complaint alleges that ISDA initially expressed interest in licensing its Master Agreement to CMDX.  Indeed, the Complaint pleads facts that explain why licensing to CMDX was in ISDA's self-interest; contrary to ISDA's protestations these are factual assertions, not "legal conclusions."  Plaintiffs go on to allege that after Dealer-Defendants had an opportunity to conspire and exert influence, ISDA abruptly changed course and withheld licenses from CMDX until certain pro-dealer conditions were met.  Moreover, ISDA and Markit conspicuously reversed course at the same time, often making parallel demands on the same day.  These allegations link ISDA to the very conspiracy that plaintiffs accuse Dealer-Defendants of propagating in violation of Section 1.

According to ISDA, its and Markit's strikingly identical actions can be explained as responses to contemporaneous licensing requests by CMDX.  But the Complaint does not allege

that ISDA's and Markit's initial responses to CMDX's licensing
requests were identical; rather, the Complaint alleges that ISDA
and Markit began behaving identically after conspiring with
Dealer-Defendants.  For instance, the Complaint alleges that, in
tandem, ISDA and Markit deviated from previous statements and
notified CMDX that they would not issue licenses for exchange
trading.  ISDA tries to argue that allegations about its
parallel conduct with Markit are insufficient because ISDA and
Markit are not competitors.  But whether or not they are
competitors, their simultaneous, abrupt reversal of course and
synchronized insistence on nearly identical licensing terms is
sufficient to allege a plausible claim of collusion with Dealer-
Defendants.

     ISDA also argues that, because Dealer-Defendants occupied
seats on its board and from there could control ISDA's actions,
the fact of ISDA's and Dealer-Defendants' parallel conduct does
not, standing alone, plausibly suggest an anticompetitive
conspiracy.  It is unnecessary to decide whether an allegation
that Dealer-Defendants secured ISDA's agreement to withhold
licenses by directing ISDA from its board would be sufficient to
state a claim against ISDA since the Complaint alleges more.  It
also asserts that Dealer-Defendants leveraged their status as
ISDA's largest customers to obtain ISDA's cooperation in their
conspiracy.  The conspiracy was thus hatched by Dealer-

Defendants in their capacity as CDS dealers and ISDA in its capacity as a trade association.  When viewed in the context of the other allegations in the Complaint, assertions of ISDA's, Markit's, and Dealer-Defendants' parallel conduct plausibly support an inference of conspiracy.

Finally, ISDA seeks a more definite statement under Fed. R. Civ. P. 12(e), arguing that the Complaint does not articulate which ISDA product was necessary for exchange trading.  But the Complaint expressly alleges that Citadel and CME sought a license to use ISDA's Master Agreement.

## IV.  **Sherman Act Section 2**

Section 2 of the Sherman Act makes it a crime to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2; see also In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014), as corrected, (June 19, 2014).  Section 2 thus contemplates three different types of claims: monopolization claims, attempt-to-monopolize claims, and conspiracy-to-monopolize claims.  Here, plaintiffs raise a conspiracy-to-monopolize claim.  Significantly, the claim is that Dealer-Defendants collectively sought to monopolize the CDS market; plaintiffs do not allege that Dealer-Defendants sought to confer monopoly power on any single entity.

It is settled that such a "shared monopoly" theory cannot support a Section 2 attempt-to-monopolize claim.  H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1018 (2d Cir. 1989).  There is no binding authority, however, on whether a conspiracy-to-monopolize claim can be based on a "shared monopoly."  Many non-binding cases conclude that it cannot.  See, e.g., Suture Exp., Inc. v. Cardinal Health 200, LLC, 963 F. Supp. 2d 1212, 1227 (D. Kan. 2013) ("[I]t appears that most courts have rejected shared or joint monopoly arguments when analyzing § 2 claims, finding that such claims contradict the basic concept that a monopoly is the domination of a market by a single firm."); RxUSA Wholesale, Inc. v. Alcon Labs., Inc., 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009), aff'd sub nom. RxUSA Wholesale Inc. v. Alcon Labs., 391 F. App'x 59 (2d Cir. 2010) ("[T]he Court harbors grave doubt" about the viability of such a conspiracy-to-monopolize claim "given that district[] courts in this and other districts have uniformly held or approved the view that allegations of a 'shared monopoly' do not state a claim under section 2 of the Sherman Act." (citation omitted)); H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 672 F. Supp. 724, 741-42 (S.D.N.Y. 1987), aff'd, 879 F.2d 1005 (2d Cir. 1989) ("The notion that two competitors could conspire to monopolize is, seemingly, antithetical.  Two competitors could conspire to oligopolize,

which would constitute an illegal section 1 conspiracy in
restraint of trade, but it would not constitute an offense under
a literal reading of section 2."); Consol. Terminal Sys., Inc.
v. ITT World Commc'ns, Inc., 535 F. Supp. 225, 228-29 (S.D.N.Y.
1982) ("[A]n oligopoly, or a shared monopoly, does not in itself
violate s 2 of the Sherman Act.").

Nevertheless, the Honorable Gerard Lynch, when sitting as a
district court judge, has pointed out:

> The Supreme Court's decision in American Tobacco Co.
> v. United States, 328 U.S. 781 (1946), affirming the
> conviction of three major tobacco companies for a § 2
> conspiracy, has given some courts pause about
> categorically rejecting the shared monopoly theory in
> the context of a conspiracy to monopolize claim.  Some
> district courts, moreover, although expressing
> skepticism generally about the shared monopoly theory,
> have suggested that the theory may be viable in the
> context of a claim for conspiracy to monopolize if the
> aim of the conspiracy is to form a single entity to
> possess the illegal market power, or where two or more
> competitors seek to allocate a market and exclude
> competitors, even if they do not form a single
> corporate entity.

Arista Records LLC v. Lime Grp. LLC, 532 F. Supp. 2d 556, 580
(S.D.N.Y. 2007) (citation omitted).

Here, the Complaint does not allege that the aim of
defendants' conspiracy was to form a single entity to possess
monopoly power.  And, while it is true that the Complaint
alleges that Dealer-Defendants sought to maintain their
prominence by blocking the development of exchange-trading
platforms, plaintiffs do not contend that Dealer-Defendants

sought to allocate the CDS market.  The charge is not, for example, that the twelve named Dealer-Defendants split the market among themselves and conspired to exclude other big banks.  Even assuming, therefore, that a "conspiracy-to-monopolize-jointly" claim is theoretically available under Section 2, the Complaint here does not allege the necessary facts.  Accordingly, plaintiffs' Section 2 claim is dismissed.

## V.   Injury-in-Fact Prior to December 23, 2008

Defendants note that a magazine article -- cited in a footnote of the Complaint for an unrelated proposition -- specifies that CMDX did not receive approval from necessary regulatory bodies until December 23, 2008.  Because the Complaint alleges that CMDX presented the "most imminent" change to the CDS market, defendants argue that the Complaint does not plausibly allege injury-in-fact prior to December 23, 2008.

Even accounting for the article, see, e.g., Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (reliance upon documents incorporated by reference in the complaint), it can reasonably be inferred from the Complaint's allegations that the December 23 regulatory approval date may itself have been impacted by defendants' tactics to delay the introduction of an electronic exchange.  That being said, the Complaint does not plausibly allege injury-in-fact as early as the date specified as the start of the Relevant Period: January 1, 2008.  Instead,

allegations of defendants' anticompetitive conduct refer, at the earliest, to "fall 2008." Accordingly, while evidence of activities before the Fall of 2008 may be highly probative of the conspiracy alleged in the Complaint, plaintiffs' claims for damages appear to be limited to the Fall of 2008 and the period that follows.

## VI.  Clayton Act Statute of Limitations

The Clayton Act provides that a private antitrust action "shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  "In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act."  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  A plaintiff suing "for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period."  Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 296 (2d Cir. 1979).

The initial complaint in this action was filed on May 3, 2013.  Defendants argue that the statute of limitations bars those claims arising from conduct that occurred before May 3, 2009, but, as noted above, it is the date of plaintiffs' injury,

not the date of defendants' conduct, that matters here.
Accordingly, plaintiffs who, from May 3, 2009 through December
31, 2013 (the end of the Relevant Period), invested in the CDS
market, and thus were injured by paying inflated bid/ask
spreads, bring timely claims.

As previously discussed, claims for damages based on
investments made before the Fall of 2008 are dismissed, because
no anticompetitive injury is alleged prior to that period.
Claims arising from investments entered between the Fall of 2008
and May 3, 2009 can be timely only if the statute of limitations
was tolled.

The running of the statute of limitations can be tolled by
a showing of fraudulent concealment, which requires a plaintiff
to demonstrate "(1) that the defendant concealed from him the
existence of his cause of action, (2) that he remained in
ignorance of that cause of action until some point within four
years of the commencement of his action, and (3) that his
continuing ignorance was not attributable to lack of diligence
on his part." New York v. Hendrickson Bros., Inc., 840 F.2d
1065, 1083 (2d Cir. 1988).  Although "the statute of limitations
is an affirmative defense under Rule 8(c) that [a] pleading need
not have anticipated," Harris v. City of New York, 186 F.3d 243,
251 (2d Cir. 1999) (citation omitted), the Complaint contains

sufficient allegations to support a showing of fraudulent concealment.

With respect to the first part of the fraudulent concealment test, "the plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing."  Hendrickson Bros., 840 F.2d at 1083.  A group boycott of exchange trading has the characteristics of other types of conspiracies that have been held to be self-concealing -- it is the kind of enterprise that requires a number of participants, is designed to endure over a period of time, and must remain concealed to be successful.  See id. at 1084.

As for the second element, the Complaint alleges that plaintiffs remained ignorant of the conspiracy, and thus of their potential cause of action, until, at the earliest, December 2010, when the New York Times reported on secret meetings.  December 2010 was within the four-year period before this action was commenced.  With regard to the third element, the Complaint alleges that plaintiffs monitored news on the financial industry and CDS market, enlisted investment managers to track CDS pricing and to obtain the most favorable executions possible, and made inquiries to Dealer-Defendants regarding CDS

price movement.  While the issue of fraudulent concealment must be determined on the merits, plaintiffs have anticipated defendants' affirmative defense invoking the four-year statute of limitations and pleaded sufficient facts to allow them to claim damages extending to the Fall of 2008.

## VII. Dodd-Frank

Defendants argue that Dodd-Frank precludes application of the antitrust laws to conduct occurring after July 21, 2011, when the statute became effective in relevant part.  As defendants concede, Dodd-Frank includes an "antitrust savings clause":

> Nothing in this Act . . . shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, <u>unless otherwise specified</u>.  For purposes of this section [with some exceptions not relevant here], the term "antitrust laws" . . . mean[s] [the Sherman Act, parts of the Wilson Tariff Act, the Act amending the Wilson Tariff Act, and the Clayton Act.]

12 U.S.C. § 5303 (emphasis added); <u>see also</u> 15 U.S.C. § 12(a); <u>Nashville Milk Co. v. Carnation Co.</u>, 355 U.S. 373, 375 (1958).

Statutory interpretation "begins, as it must, with the text of the statute."  <u>Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.</u>, No. 12-2106-cv, 2014 WL 3636283, at *17 (2d Cir. July 24, 2014) (Lynch, J.).  "In interpreting a statute, courts generally presume that Congress acts against the background of our traditional legal concepts."  <u>Id.</u> at *13 (citation omitted).

44

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Liu Meng-Lin v. Siemens AG, No. 13-4385-cv, 2014 WL 3953672, at *5 (2d Cir. Aug. 14, 2014) (Lynch, J.).

The question, then, is whether, and where, Dodd-Frank has "otherwise specified" that it is modifying sections of those antitrust statutes. Dodd-Frank never mentions the Sherman Act (or the Wilson Tariff Act), and it explicitly modifies the Clayton Act in four provisions, none of which is relevant here. See 12 U.S.C. §§ 1843(k)(6)(B)(iii), 5363(b)(5), 5390(a)(1)(G)(ii)(III), 5390(h)(11). These are the four provisions captured by the "unless otherwise specified" exception to the antitrust savings clause. In other words, despite Dodd-Frank, the antitrust laws apply with full force to the conduct at issue here.

Defendants erroneously argue that Dodd-Frank has "otherwise specified" in two additional provisions that are relevant to the CDS market. Identical subsections on the duties of swap dealers, on the one hand, and security-based swap dealers, on the other, provide:

> Antitrust considerations. Unless necessary or appropriate to achieve the purposes of this chapter, a swap dealer [or security-based swap dealer] . . .

45

> shall not -- (A) adopt any process or take any action
> that results in any unreasonable restraint of trade;
> or (B) impose any material anticompetitive burden on
> trading or clearing.

7 U.S.C. § 6s(j)(6); 15 U.S.C. § 78o-10(j)(6) (emphasis added).

According to defendants, these "antitrust-considerations"

provisions effectively mean that CDS dealers shall not violate

the "antitrust laws," unless necessary or appropriate to achieve

the purposes of Dodd-Frank.  And, say defendants, since Dodd-

Frank vests regulators with the authority to determine when it

would be "necessary or appropriate" for dealers to violate the

antitrust laws, see 7 U.S.C. § 6s(j)(7); 15 U.S.C. § 78o-

10(j)(7), dealers cannot be subject to private antitrust

actions.

Defendants misread the statutory scheme.  The antitrust-

considerations provisions are included in lists of swap dealers'

(and security-based swap dealers') duties.  See 7 U.S.C.

§ 6s(j)(6); 15 U.S.C. § 78o-10(j)(6).  Rather than explicitly

modifying "the antitrust laws" -- as do the four provisions that

directly refer to the Clayton Act -- the antitrust-

considerations provisions impose a duty to avoid taking actions

that could have antitrust implications, even if those actions

fall short of actually violating the antitrust laws.  In other

words, the antitrust-considerations provisions impose on dealers

obligations above and beyond what the antitrust laws themselves

require.  For example, whereas the antitrust laws criminalize "contract[s], combination[s] . . . , or conspiracy[ies], in restraint of trade . . . among the several States, or with foreign nations," 15 U.S.C. § 1, the antitrust-considerations provisions more broadly forbid "adopt[ing] any process or tak[ing] any action that results in any unreasonable restraint of trade."  7 U.S.C. § 6s(j)(6); 15 U.S.C. § 78o-10(j)(6).  It follows that the carve-outs from the antitrust-considerations provisions permit neglect of the heightened antitrust considerations when necessary or appropriate to achieve the purposes of Dodd-Frank, but do not permit neglect of the baseline antitrust laws.

In short, the antitrust savings clause, the exception to which is not applicable here, disarms defendants' argument that Dodd-Frank implicitly repealed the antitrust laws in this context.  Claims based on conduct occurring after July 21, 2011 may thus proceed.

## VIII.    Unjust Enrichment

In addition to their antitrust claims, plaintiffs assert a cause of action sounding in unjust enrichment.  "A person who is unjustly enriched at the expense of another is subject to liability in restitution."  Restatement (Third) of Restitution & Unjust Enrichment § 1 (2011).  Notably, defendants do not argue that plaintiffs fail to plead facts plausibly supporting a claim

for unjust enrichment.  Instead, defendants argue that this
claim should be dismissed for two independent reasons, neither
of which is persuasive.

First, defendants contend that the unjust enrichment claim
is duplicative of the antitrust claims.  But "while a plaintiff
cannot obtain a double recovery under the [the antitrust laws]
and state unjust enrichment law, there is no bar to pleading
both claims simultaneously."  Chaluisan v. Simsmetal E. LLC, 698
F. Supp. 2d 397, 406-07 (S.D.N.Y. 2010); see also Davis v. Lenox
Hill Hosp., No. 03cv3746, 2004 WL 1926087, at *7 (S.D.N.Y. Aug.
31, 2004) ("[The defendants] correctly note that [a plaintiff]
cannot recover under both federal and state law for the
enforcement of the same right.  At the pleading stage, however,
parties are entitled to plead causes of action under both state
and federal law to vindicate the same right unless the federal
law preempts the state claim."  (citing Overnite Transp. Co. v.
Tianti, 926 F.2d 220, 222 (2d Cir. 1991)); see also In re DDAVP
Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 236
(S.D.N.Y. 2012).

Second, defendants note that plaintiffs do not identify the
jurisdiction on whose law the unjust enrichment claim is
predicated.  In response, plaintiffs contend that such
identification is not necessary at the pleading stage.  The
elements of unjust enrichment are similar in every state.

Daniel R. Karon, Undoing the Otherwise Perfect Crime: Applying Unjust Enrichment to Consumer Price-Fixing Claims, 108 W. Va. L. Rev. 395, 410 & n.79 (2005) (listing elements of states' unjust enrichment laws).  More importantly, defendants have made no showing that any differences in the various states' laws are material at this early stage of the litigation.

### CONCLUSION

Defendants' May 23, 2014 motions to dismiss are granted in part.  Claims brought under Section 2 of the Sherman Act and claims for damages based on investments entered prior to the Fall of 2008 are dismissed.  All other claims shall proceed.

SO ORDERED:

Dated:    New York, New York
          September 4, 2014

_____
DENISE COTE
United States District Judge